UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-14002-CR-ROSENBERG/LYNCH

_____

UNITED STATES OF AMERICA,

-v-

JULIUS ANDREW REASON, III, and
VENTERIA LEANET REASON,

Defendants.

_____

DEFENDANTS JULIUS ANDREW REASON III AND VENTERIA LEANET REASON'S
MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Motion

Defendants Julius Andrew Reason III and Venteria Leanet Reason, by their undersigned

counsel, respectfully move under Federal Rule of Criminal Procedure 12 to dismiss the

Superseding Indictment (D.E. 54)("the Superseding Indictment") because (1) it fails to allege a

federal offense under Title 21, United States Code, because dibutylone HCl ("dibutylone") is not

a controlled substance, and (2) the Drug Enforcement Administration, by purporting to

criminalize unspecified "positional isomers" of pentylone, violated due process by failing to put

the public on notice of what substances are criminalized.  In further support of this motion,

defendants file the sworn declaration of chemist Gregory B. Dudley, Ph.D. ("Dr. Dudley's

Declaration" or cited as "Dudley Decl.") and the accompanying expert report of Dr. Dudley

("Dr. Dudley's Expert Report")(the Declaration and Dr. Dudley's Expert Report are attached as

Exhibit A). Dr. Dudley is a Professor and Associate Chairman of the Chemistry and

Biochemistry Department of Florida State University. Dr. Dudley explains in his expert report

that dibutylone does not fit the regulatory definition of a "positional isomer" of pentylone.  For this reason, dibutylone is not a controlled substance.

**Statement Regarding Pre-Motion Conference**

Undersigned counsel conferred with the attorney for the United States, Carmen Lineberger, prior to making this motion.  Ms. Lineberger has informed me that the government opposes the motion.

**Memorandum of Law**

**Background**

**A.     The Charges in the Superseding Indictment**

Julius Andrew Reason III and Venteria Reason are charged in Count One of the Superseding Indictment with conspiracy to import into the United States dibutylone, which the Superseding Indictment alleges is a controlled substance, in violation of 21 U.S.C. § 952(a) and 963.  They are charged in Count Two with conspiracy to possess dibutylone with intent to distribute, under 21 U.S.C. §§841(a)(1) and 846, and in Count Three with a substantive count of possessing dibutylone with intent to distribute, under 21 U.S.C. § 841(a)(1).  All three counts allege that the controlled substance involved is a "mixture and substance containing a detectable amount of dibutylone HCl, a positional isomer of pentylone, a Schedule I controlled substance." Count Four, seeking forfeiture, is based on the allegations in the first three counts.

**B.     The Statutes and Regulations Which Purport to Provide the Basis for the Superseding Indictment's Charges**

Title 21 section 952(a), the basis for the charge in Count One, states in pertinent part as follows:

> It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter

I of this chapter, any narcotic drug in schedule III, IV, or V of  subchapter I of this
chapter, or ephedrine, pseudoephedrine, or phenylpropanolamine[,]

Title 21 section 841(a)(1), the basis for the charges in Count Two and Three, provides:

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or
intentionally --

(1) To manufacture, distribute, or dispense, or possess with intent to manufacture,
distribute or dispense, a controlled substance[.]

It is a threshold legal requirement under both of these statutes that the substance involved be a
"controlled substance."  *See Eleventh Circuit Pattern Jury Instructions* (Criminal Cases) 2010,
Instructions 98 and 104. [1]

To satisfy the threshold requirement that the offenses involve a "controlled substance,"
the Superseding Indictment alleges that the defendants unlawfully conspired to import and
possess, and possessed, a mixture and substance containing a detectable amount of dibutylone
HCl, which the Superseding Indictment alleges is a "positional isomer" of pentylone.  The
Deputy Administrator of the Drug Enforcement Administration, pursuant to the temporary
scheduling provisions of the Controlled Substance Act, beginning on or about March 7, 2014,
temporarily added pentylone to Schedule I.  *See* Federal Register, Vol. 79, No. 45, page 12938,
March 7, 2014 **and** Vol. 81, No. 43, page 11429, March 4, 2016 (both attached in Exhibit B).  As
a result of this temporary scheduling, pentylone was added to the C.F.R. provision identifying
Schedule I substances, as follows:

21 C.F.R. §1308.11   Schedule I.
……

---

[1] See Pattern Jury Instructions at
http://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCriminalPatternJuryInstructi
on.pdf

(h) *Temporary listing of substances subject to emergency scheduling.* Any material, compound, mixture or preparation which contains any quantity of the following substances:

……..

(13) Pentylone, its optical, positional, and geometric isomers, salts and salts of isomers—7542 (Other names: bk-MBDP; 1-(1,3-benzodioxol-5-yl)-2-(methylamino)pentan-1-one).

The Final Orders designating pentylone as a controlled substance (Exhibit B) do not identify the "positional isomers" of pentylone and nowhere mention dibutylone.

21 C.F.R. § 1300.01(b), within the regulations governing classification of substances as controlled substances, defines "positional isomer" as follows:

As used in §1308.11(d) of this chapter, the term "positional isomer" means any substance possessing the same molecular formula and core structure and having the same functional group(s) and/or substituent(s) as those found in the respective Schedule I hallucinogen, attached at any position(s) on the core structure, but in such manner that no new chemical functionalities are created and no existing chemical functionalities are destroyed relative to the respective Schedule I hallucinogen. Rearrangements of alkyl moieties within or between functional group(s) or substituent(s), or divisions or combinations of alkyl moieties, that do not create new chemical functionalities or destroy existing chemical functionalities, are allowed i.e., result in compounds which are positional isomers. For purposes of this definition, the "core structure" is the parent molecule that is the common basis for the class; for example, tryptamine, phenethylamine, or ergoline. Examples of rearrangements resulting in creation and/or destruction of chemical functionalities (and therefore resulting in compounds which are not positional isomers) include, but are not limited to: Ethoxy to *alpha*-hydroxyethyl, hydroxy and methyl to methoxy, or the repositioning of a phenolic or alcoholic hydroxy group to create a hydroxyamine. Examples of rearrangements resulting in compounds which would be positional isomers include: *Tert*-butyl to *sec*-butyl, methoxy and ethyl to isopropoxy, N,N-diethyl to N-methyl-N-propyl, or *alpha*-methylamino to N-methylamino.

This is the definition that governs whether dibutylone is or isn't a "positional isomer" of pentylone.

So, the question on this motion is whether dibutylone is a controlled substance as a result of it being a "positional isomer" of pentylone under the governing definition of the term "positional isomer."   As defense expert Dr. Gregory B. Dudley explains in his report (Exhibit

A), the answer to that question is "No."  Since dibutylone is not a "positional isomer" of

pentylone, and the Superseding Indictment alleges no alternative legal basis for finding that

dibutylone is a controlled substance, the Superseding Indictment must be dismissed.

###    C.    Dr. Dudley's Declaration and Expert Report Opining that Dibutylone Is Not a Positional Isomer of Pentylone

In support of this motion, the defense submits Dr. Dudley's Declaration and Expert

Report (Exhibit A).  Dr. Dudley's Curriculum Vitae ("CV") is submitted for the Court's

consideration as an attachment to Dr. Dudley's Expert Report.

Dr. Dudley is a Professor and Associate Chairman of the Department of Chemistry and

Biochemistry at Florida State University in Tallahassee, Florida.  (Dudley Decl. ¶ 3 and attached

CV).   Based on his expertise, extensive training, and experience, Dr. Dudley opines in his

expert report that dibutylone is not a "positional isomer" of pentylone under the regulatory

definition; thus it is not a controlled substance under federal law.  Dr. Dudley, at the beginning of

his expert report, states his opinion in a nutshell as follows:

> Opinion:  Dibutylone is not a "positional isomer" of pentylone because a chemical functionality has been "destroyed."  The hydrogen (H) atom attached at nitrogen (N) in pentylone can participate in hydrogen bonding with neighboring (bio)molecules, whereas dibutylone lacks this functionality.  Changes that impact hydrogen bonding "[result] in compounds which are not positional isomers."   (Dr. Dudley's Expert Report, p. 1)

### Argument

###    I.    The Court Must Dismiss the Superseding Indictment Because It Fails to Allege a Federal Offense Since Dibutylone Is Not a Controlled Substance

As Dr. Dudley's Expert Report explains, dibutylone is not a "positional isomer" of

pentylone.  The Superseding Indictment is wrong in alleging that it is, and wrong in alleging that

dibutylone is a controlled substance.  It is a threshold requirement under the provisions of the

Controlled Substance Act relevant to this case that the defendant's conduct involve a "controlled

substance."   Because dibutylone is not a "controlled substance," the Superseding Indictment's

allegations that the defendants imported and possessed dibutylone in violation of 21 U.S.C. §

952(a) and 841(a)(1) fail to state federal offenses.  Accordingly, the Superseding Indictment

must be dismissed.

A.    Whether Dibutylone is a Controlled Substance under Federal Law is<br>a Question of Law for the Court to Decide.

In cases under the Controlled Substances Act, the court decides, as a question of law,

whether the substance named in the indictment is or is not a controlled substance under Title 21.

*United States v. Lattin*, 1997 U.S. App. LEXIS 534, 84 (4th Cir. 1997); *Johnson v. United States*,

2012 U.S. Dist. LEXIS 101632, *23 (M.D. Fla. July 23, 2012). For this reason, the United States

Supreme Court was able to decide as a matter of law in *DePierre v. United States*, 564 U.S. 70

(2011), that the addition of cocaine base to Schedule I included cocaine in its chemically base

form, and not just crack cocaine.  Similarly, the Eleventh Circuit's Standard Jury Instructions do

not instruct the jury to decide whether the substance identified in the indictment is a controlled

substance.  Rather, in this Circuit's Standard Jury Instruction for offenses under 21 U.S.C. §

952(a) (the offense charged in Count One) and 21 U.S.C. § 841(a)(1) (the offense charged in

Counts Two and Three), the Court is instructed to **tell** the jury:  "[substance] is a 'controlled

substance.'"  *See Eleventh Circuit Pattern Jury Instructions* (Criminal Cases) 2010, Instructions

98 and 104 at

http://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCriminalPatternJuryInstructi
on.pdf.

The Superseding Indictment does not allege that dibutylone is itself listed as a controlled

substance.  Indeed, dibutylone is not listed as a controlled substance in Title 21.  All of the

counts of the Superseding Indictment allege that "dibutylone HCl, [is a] positional isomer of

6

pentylone, a Schedule I controlled substance." *See* Superseding Indictment, Count One ¶ 2, Count Two ¶ 2, Count 3 ¶ 2. As the Superseding Indictment recognizes, dibutylone is only a controlled substance **if** it is a positional isomer of pentylone.

Dr. Dudley's Expert Report establishes persuasively that dibutylone is not a "positional isomer" of pentylone. Because (1) dibutylone is not a listed controlled substance, (2) it is not a "positional isomer" of pentylone, and (3) the Superseding Indictment alleges no alternative legal basis under which dibutylone is a controlled substance, the Court should find as a question of law that dibutylone is not a controlled substance.

### B.  The Indictment Must be Dismissed on Jurisdictional Grounds Because It Fails to Allege a Federal Offense Under 21 U.S.C. §§ 841(a)(1) and 952(a).

"The district courts of the United States have original jurisdiction, exclusive of the courts of the states, of all offenses against the laws of the United States." 18 U.S.C. § 3231. If an indictment fails to charge such an offense, then a court has no basis for exercising jurisdiction. *United States v. McIntosh*, 704 F.3d 894, 902 (11th Cir. 2013). In *United States v. Meacham*, 626 F.2d 503 (5th Cir. 1980), the Fifth Circuit held that **conspiracy** to **attempt** to import and distribute marijuana was not a crime under the Controlled Substances Act, and that the trial court had erred in not dismissing an indictment that levelled a charge on that theory. As the Eleventh Circuit said in *McIntosh*, "[a]n indictment's relationship to jurisdiction is thus based on whether it alleges conduct constituting a federal offense[.]" 704 F.3d at 903.

Based on Dr. Dudley's Expert Report, the Court should conclude as a question of law that dibutylone is not a controlled substance under federal law. Since dibutylone is not a controlled substance, the Superseding Indictment, which alleges importation and possession of

dibutylone, does not state offenses under 21 U.S.C. §§ 841(a)(1) and 952(a).  Accordingly, the

Superseding Indictment must be dismissed.

> **II.   The Superseding Indictment Should be Dismissed Because the Drug
> Enforcement  Administration's Temporary Classification to Schedule I of
> Pentylone's "Positional Isomers" Violates Due Process Because It Fails to
> Provide Adequate Notice to the Public.**

The Drug Enforcement Administration's addition to Schedule I of the "positional

isomers" of pentylone violates due process because it provides inadequate notice to persons of

ordinary intelligence of what is proscribed.  The government alleges in the Superseding

Indictment that "...[t]he controlled substance involved in the conspiracy attributable to JULIUS

ANDREW REASON III and VENTERIA LEANET REASON, as a result of their own conduct,

and the conduct of other conspirators reasonably foreseeable to them, is a mixture and substance

containing a detectable amount of dibutylone HCI, a **positional isomer** of pentylone, a Schedule

I controlled substance..." The government alleges this violates United States Code, Sections §

960(b)(3) and § 802(14), and 21 C.F.R. Section 1308.11(h)(16).  Prosecuting the Reasons under

these statutes, cross-referenced with the C.F.R., violates the fair notice requirements of the Due

Process clause.

 As used in 21 C.F.R. Section 1308.11(h)(13) (the regulation that added pentylone and its

positional isomers to Schedule I), the term "positional isomer" means:

> "[A]ny substance possessing the same molecular formula and core structure and having
> the same functional group(s) and/or substituent(s) as those found in the respective
> Schedule I hallucinogen, attached at any position(s) on the core structure, but in such
> manner that no new chemical functionalities are created and no existing chemical
> functionalities are destroyed relative to the respective Schedule I hallucinogen.
> Rearrangements of alkyl moieties within or between functional group(s) or substituent(s),
> or divisions or combinations of alkyl moieties, that do not create new chemical
> functionalities or destroy existing chemical functionalities, are allowed i.e., result in
> compounds which are positional isomers. For purposes of this definition, the "core
> structure" is the parent molecule that is the common basis for the class; for example,
> tryptamine, phenethylamine, or ergoline. Examples of rearrangements resulting in

> creation and/or destruction of chemical functionalities (and therefore resulting in compounds which are not positional isomers) include, but are not limited to: Ethoxy to alpha -hydroxyethyl, hydroxy and methyl to methoxy, or the repositioning of a phenolic or alcoholic hydroxy group to create a hydroxyamine. Examples of rearrangements resulting in compounds which would be positional isomers include: Tert -butyl to sec - butyl, methoxy and ethyl to isopropoxy, N,N-diethyl to N-methyl-N-propyl, or alpha - methylamino to N-methylamino.

*See* 21 C.F.R. § 1300.01(b)(definition of "positional isomer").  The Drug Enforcement Administration, in discussing this definition when it was added to the C.F.R., acknowledged that the definition is "highly technical and laden with scientific terms."  *See* Federal Register, Vol. 72, No. 231, page 67850, December 3, 2007, attached as Exhibit C (at page 67852 under heading "Scientific/Technical Nature of Definition").  The definition would be understandable only to specialized forensic or research chemists.  Dr. Dudley's Expert Report, with its discussion of molecular structure and hydrogen bonding, demonstrates how inaccessible this definition would be to a person untrained in chemistry.   With respect to criminalization of "positional isomers" of pentylone, the highly technical definition of a "positional isomer" does not enable individuals or persons of ordinary intelligence to determine what substances qualify as "positional isomers" of pentylone.

   None of this highly, technical and chemistry-based terminology would put a person of ordinary intelligence on notice as to whether they are breaking the law.  The Due Process Clause of the Fifth Amendment requires that any law that imposes criminal liability must give potential defendants fair warning of what conduct is proscribed. Criminal liability cannot be imposed without "'fair warning . . . in language that the common world will understand of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.'" *United States v. Lanier*, 520 U.S. 259, 265 (1997) (*quoting McBoyle v. United States*, 283 U.S. 25, 27 (1931)). Due process "bars enforcement" of a statute that uses "'terms so

vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id*. at 266 (*quoting Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).

### Conclusion

For the foregoing reasons, Defendants Julius Reason and Venteria Reason respectfully move for entry of an order dismissing the Superseding Indictment.

Dated: June 13, 2016                                          Respectfully submitted,

                                                             s/ Julie Prag Vianale
                                                             Julie Prag Vianale (FBN 0184977)
                                                             Attorney for Venteria Reason
                                                             Vianale & Vianale LLP
                                                             5550 Glades Road, Suite 500
                                                             Boca Raton, FL  33431
                                                             Tel: (561) 392-4750
                                                             jvianale@vianalelaw.com

                                                             Jonathan S. Friedman, P.A.
                                                             Attorney for Julius Reason
                                                             One East Broward Blvd., Ste 925
                                                             Fort Lauderdale, Florida 33301
                                                             Telephone: (954) 713-2820
                                                             Facsimile: (954) 713-2894
                                                             JFriedmanlawfirm@gmail.com
                                                             /s/ Jonathan S. Friedman, Esq.
                                                             Fla. Bar Number: 973297

## <u>CERTIFICATE OF SERVICE</u>

        Undersigned counsel hereby certifies that she filed the foregoing document on June 13, 2016 using the Court's CM-ECF system, which will cause a true and correct copy to be sent electronically to:

Carmen Lineberger
Assistant United States Attorney
101 South U.S. Highway 1
Suite 3100
Ft. Pierce FL  34950
carmen.lineberger@usdoj.gov

<u>s/ Julie Prag Vianale</u>
Julie Prag Vianale (FBN 1084977)
Vianale & Vianale LLP
5550 Glades Road, Suite 500
Boca Raton, FL  33431
Tel: (561) 392-4750

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-14002-CR-ROSENBERG/LYNCH

UNITED STATES OF AMERICA,

-v-

JULIUS ANDREW REASON, III, and
VENTERIA LEANET REASON,

Defendants.

DECLARATION OF GREGORY B. DUDLEY, Ph.D.,
IN SUPPORT OF DEFENDANTS' PRETRIAL MOTION TO DISMISS

Gregory B. Dudley, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as

follows:

1.      I have been retained by counsel for defendants Julius Reason and Venteria Reason

to serve as an expert in this case in the field of chemistry.

2.      Attached as Exhibit A to this Declaration is a statement I have written providing

my expert opinion on the following question:  Is Dibutylone a "Positional Isomer" of Pentylone?

As my attached written statement reflects, it is my expert opinion that Dibutylone is **not** a

"Positional Isomer" of Pentylone.

3.      Regarding my qualifications to serve as an expert on this issue, I submit to the

court my Curriculum Vitae ("CV"), which is appended to my expert report; the information in

my CV is true and correct.  I currently serve as a Professor and Associate Chair in the

Department of Chemistry and Biochemistry at Florida State University in Tallahassee, Florida,

and I am a member of the Graduate Faculty in the School of Pharmacy and Pharmaceutical

Sciences at Florida A&M University.  I hold a B.A. degree in Chemistry (with Honors) from

1

Florida State University and a Ph.D. in Organic Chemistry from Massachusetts Institute of

Technology in Cambridge, Massachusetts.  After receiving my Ph.D., I served for two years as

an NIH Postdoctoral Fellow at Sloan-Kettering Institute for Cancer Research in New York City.

I respectfully refer the Court to my CV for a list of my Publications, Patents, Research

Presentations, and Honors.

4.     I have been qualified by courts to provide expert testimony in chemistry in

multiple federal districts and state courts in 16 cases (14 cases in federal court, 2 cases in state

court); I have provided expert consultation, but not been required to provide testimony, in many

additional cases. *See* attached CV, pages 15-18.   Based on my education, study and training in

the field of chemistry, I believe I am amply qualified to provide expert testimony on the issue of

whether dibutylone is a "positional isomer" of pentylone.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:     June 13, 2016                        _____
           Tallahassee, Florida                 Gregory B. Dudley, Ph.D.


2

# IS DIBUTYLONE A "*POSITIONAL ISOMER*" OF PENTYLONE?

*Professor Gregory B. Dudley, Ph.D.*
*Department of Chemistry and Biochemistry, Florida State University*
*Tallahassee, FL 32306-4390, gdudley@chem.fsu.edu*

**Opinion**: *Dibutylone* is not a "*positional isomer*" of *pentylone* because a chemical functionality has been "*destroyed*". The hydrogen (H) atom attached at nitrogen (N) on *pentylone* can participate in hydrogen bonding with neighboring (bio)molecules, whereas *dibutylone* lacks this functionality. Changes that impact hydrogen bonding "*[result] in compounds which are not positional isomers*".



*dibutylone*
($C_{13}H_{17}NO_3$)

*pentylone*
($C_{13}H_{17}NO_3$)

can**not** participate in hydrogen bonding

can participate in hydrogen bonding

*same molecular formula, but different chemical functionality*

## *What is a "positional isomer"?*

Isomers in chemistry are compounds having the same molecular formula (elemental composition) but with the atoms in the molecule connected in a different way. Isomers are different structures with different properties. Isomers are sometimes categorically regulated in law, but the regulatory scope of "isomer" is restricted by the statutory definition of "positional isomers", which emphasizes the importance of core structure and functional groups (*cf. 21 CFR Part 1300.01, pages 8-9*):

"*As used in §1308.11(d) of this chapter, the term "positional isomer" means any substance possessing the same molecular formula and core structure and having the same functional group(s) and/or substituent(s) as those found in the respective Schedule I hallucinogen, attached at any position(s) on the core structure, but in such manner that no new chemical functionalities are created and no existing chemical functionalities are destroyed relative to the respective Schedule I hallucinogen. Rearrangements of alkyl moieties within or between functional group(s) or substituent(s), or divisions or combinations of alkyl moieties, that do not create new chemical functionalities or destroy existing chemical functionalities, are allowed i.e., result in compounds which are positional isomers. For purposes of this definition, the "core structure" is the parent molecule that is the common basis for the class; for example, tryptamine, phenethylamine, or ergoline. Examples of rearrangements resulting in creation and/or destruction of chemical functionalities (and therefore resulting in compounds which are not positional isomers) include, but are not limited to: Ethoxy to alpha-hydroxyethyl, hydroxy and methyl to methoxy, or the repositioning of a phenolic or alcoholic hydroxy group to create a hydroxyamine. Examples of rearrangements resulting in compounds which would be positional isomers include: tert-butyl to sec-butyl, methoxy and ethyl to isopropoxy, N,N-diethyl to N-methyl-N-propyl, or alpha-methylamino to N-methylamino.*"



participate in hydrogen bonding?
YES

4-FMC
($C_{10}H_{12}FNO$)

YES

3-FMC
($C_{10}H_{12}FNO$)

*"positional isomers": same core structure and functional groups, different position of fluorine substituents*

participate in hydrogen bonding?
YES

(hydroxy)
(methyl) `CH_3`
$C_{11}H_{16}O$
(an alcohol)

NO

(methoxy)
$C_{11}H_{16}O$
(an ether)

*isomer (same molecular formula), but NOT "positional isomers" by legal definition ("hydroxy and methyl to methoxy" exclusion)*

*Important general disclaimer*

Molecular substances have actual chemical structures with dynamic three-dimensional shapes. The actual chemical structures are represented herein using coded two-dimensional line drawing approximations, with alternative approximations of actual structures provided where appropriate. The line drawings and other structural representations conform to standard conventions in organic chemistry. They are interpretable with proper training; a brief tutorial on chemical structure is provided. Structural considerations require an understanding of actual structures.

*General structural considerations*

Molecular structures typically consist of a core ***framework*** of carbon and hydrogen atoms — which provide size, shape, and dynamics — and attached ***functional groups*** that impart characteristic activities. Molecular structures are often represented graphically using line drawings, with lines to represent bonds (shared electrons) between atoms, and vertices to identify the location of atoms. Carbon and hydrogen atoms that are part of the framework are often not labeled explicitly if they can be inferred from the line drawing.

The chemical properties of a molecular substance are related to the arrangement of functional groups in three-dimensional space, as well as the size, shape, and dynamics of the molecule. Common functional groups include alcohols, olefins, amines, aldehydes, ketones, carboxylic acids, and halogens, with some examples provided in the structures illustrated below. Some molecules, like those of sugars and amino acids, have a framework that is rich in functional groups. In molecules with fewer functional groups (e.g., steroids), the size, shape, and dynamics of the framework play larger roles in determining properties.



D-glucose
(common sugar)

glycine
(smallest amino acid)

cholesterol
(common steroid)

Functional groups are of central importance in the consideration of chemical structures. Changes in functional groups fundamentally change the function and properties of the structure. The central importance of functional groups is reflected in the definition of "positional isomer", especially in the examples of what rearrangements do not produce structures that qualify as positional isomers. The listed examples are illustrated below in the context of phenylalanine, a common amino acid.

*"compounds which are not positional isomers" (per the statutory definition of "positional isomer")*

Chemical Formula: $C_{11}H_{15}NO_3$
*"ethoxy to alpha-hydroxyethyl"*

Chemical Formula: $C_{10}H_{13}NO_3$
*"hydroxy and methyl to methoxy"*

Chemical Formula: $C_9H_{11}NO_3$
*"[phenolic hydroxy to hydroxylamine]"*

Gregory B. Dudley, Ph.D.                                                                                    6/8/16, p. 2

The pairs of structures provided in the preceding graphic **_are not_** "positional isomers" under the regulatory definition. The structures in each pair are isomers, because they have the same chemical formula. They are not positional isomers, however, because chemical functionality has been changed. In the first two pairs of examples, the ability to participate in _hydrogen bonding_ has been changed (added or deleted). Going from "ethoxy to alpha-hydroxyethyl" creates the ability to donate hydrogen bonds (see preceding graphic). Likewise, the change of "hydroxy and methyl to methoxy" deletes the ability to donate hydrogen bonds (hydroxy and methoxy groups can accept hydrogen bonds). The third pair of structural examples highlights that the hydroxylamine functional group is distinct from hydroxyl and/or amine; the hydroxylamine and many other unique functional groups in chemistry are beyond the scope of the present discussion.

_Hydrogen bonding_ Hydrogen bonding is one of the major mechanisms by which molecules interact. Hydrogen bonding is integral to the structure of double-stranded DNA and to why water and ethanol are miscible (mixable) liquids at standard (normal) temperature and pressure (STP). Hydrogen bonding would also be the primary explanation of the fact that ethylmethylamine ($C_3H_{10}N$) is a liquid at STP, whereas trimethylamine ($C_3H_{10}N$) is a gas.



Hydrogen atoms that are attached directly to certain atoms — oxygen, nitrogen, sulfur, etc. — are generally free to engage in hydrogen bonding with similar types of atoms on neighboring molecules. The molecular source of the hydrogen atom is called the _hydrogen bond donor_, and the neighboring molecule (or portion of a molecule) to which it binds is the _hydrogen bond acceptor_. Water molecules can both donate and accept hydrogen bonds, as can complementary strands of DNA. Ethylmethylamine can act as a hydrogen bond donor by virtue of its nitrogen–hydrogen bond, whereas trimethylamine cannot, because it does not have the requisite nitrogen–hydrogen bond. Chemical functionalities relevant to hydrogen bonding figure prominently in the regulation's examples of what compounds are not positional isomers. Isomeric structures do not qualify as "positional isomers" if the rearrangement of atoms between them adds or deletes the ability to donate hydrogen bonds.

_"compounds which would be positional isomers" (per the statutory definition of "positional isomer")_

$C_{13}H_{19}NO_2$          $C_{12}H_{17}NO_3$          $C_{13}H_{19}NO_2$          $C_{11}H_{13}NO_4$
_"tert-butyl to sec-butyl"_   _"methoxy and ethyl to isopropoxy"_   _"N,N-diethyl to N-methyl-N-propyl"_   _"alpha-methylamino to N-methylamino"_

The pairs of structures provided in the preceding graphic *are* "positional isomers" under the regulatory definition. Each pair has the same molecular formula (i.e., they are isomers), and each has the same core structure. (The first three pairs feature the phenylalanine core, whereas the expanded core of the fourth pair could be identified as "methylenedioxy-phenylalanine".) The structures in each pair are positional isomers, because chemical functionality has not been changed. The rearrangements primarily involve movement of *hydrocarbon* residues, which do not offer much in terms of reactivity and functionality profiles. The first pair of examples involves two different types of butyl ($C_4H_9$-) groups, the second features two different types of ethers, and the third involves two tertiary (trisubstituted) amines. The fourth pair reflects a migration of a methyl group from carbon to nitrogen, but the "*N-methylamino*" group retains a similar profile of hydrogen bonding capabilities of the "*alpha-methylamino*" group.



Note that the structures in the first and third pairs of examples above share the same molecular formula ($C_{13}H_{19}NO_2$). The four structures are isomers. Each pair of compounds exemplifies the concept of positional isomer. However, the structures in the first pair are ***not*** positional isomers of the structures in the third pair. The first pair of examples illustrates a rearrangement of an alkyl moiety on a *secondary amine*; secondary amines can donate hydrogen bonds. The third pair illustrates two combinations of alkyl moieties on a *tertiary amine*, which cannot donate hydrogen bonds. The rearrangement of atoms going from the first pair to the third pair results in the destruction of the ability to act as a hydrogen bond donor. Secondary and tertiary amines are not positional isomers.

### *Dibutylone is NOT a positional isomer of pentylone*

Pentylone is a Schedule I controlled substance; its "positional isomers" are categorically controlled. There are thousands of unique substances that have the same molecular formula ($C_{13}H_{17}NO_3$) as pentylone. Only those of which that have the same core structure and chemical functionality as pentylone qualify as its positional isomers, and dibutylone does not meet these criteria. The rearrangement of atoms between pentylone and dibutylone results in the "*destruction of chemical functionalit[y]*": namely, the ability to act as a hydrogen bond donor.



Going from *N-methylamino and methyl* to *N,N-dimethylamino* (i.e. the difference between pentylone and dibutylone) is analogous to going from "*hydroxy and methyl to methoxy*" (*vide supra*), in that both of these rearrangements alter the ability to participate in hydrogen bonding. This type of "*creation and/or destruction of chemical functionalities*" is specifically excluded from the categorical classification of positional isomers. Therefore, pentylone and dibutylone are not positional isomers.

Gregory B. Dudley, Ph.D.                                                   6/8/16, p. 4

**My background and expertise**

I am a Professor and Associate Chair in the Department of Chemistry and Biochemistry at Florida State University (FSU) in Tallahassee, FL, and I hold an appointment on the Graduate Faculty in the College of Pharmacy and Pharmaceutical Science at Florida A&M University (FAMU) in Tallahassee, FL. I graduated *magna cum laude* with a B.A. in Chemistry from FSU in 1995, and I earned a Ph.D. in Organic Chemistry from the Massachusetts Institute of Technology (MIT) in 2000. I then received a National Institutes of Health (NIH) Fellowship to conduct postdoctoral research in Molecular Pharmacology and Chemistry at the Sloan–Kettering Institute for Cancer Research, which is the research wing of the Memorial Sloan–Kettering Cancer Hospital in New York, NY. I worked in this capacity from 2000–2002, at which point I joined the faculty of FSU as an Assistant Professor. I was promoted to Associate Professor with tenure in 2008 and Full Professor in 2015. I assumed Associate Chair responsibilities beginning in 2012.

My expertise is in synthetic, organic, and medicinal chemistry. My research interests focus on the development of new organic reactions and reaction technology, chemical synthesis of natural and drug-like compounds, and applications of synthetic organic chemistry in biomedical research. My research efforts have produced over 70 peer-reviewed publications, 7 invited contributions to leading reference works in organic chemistry, and multiple patents for innovations leading to two commercial products. I am called upon frequently to provide expert peer-review services for leading journals in chemistry (e.g., *Journal of the American Chemical Society*), organic chemistry (e.g., *The Journal of Organic Chemistry*), and medicinal chemistry (e.g., *ACS Medicinal Chemistry*) and major research funding agencies (e.g., National Institutes of Health, National Science Foundation, American Chemical Society). I have delivered approximately 150 invited lectures at universities, scientific conferences, and pharmaceutical companies. I have received numerous awards and recognition related to research, teaching, and innovation, as outlined in the attached CV.

My consulting experience includes matters of chemistry and pharmacology for major pharmaceutical companies, small to mid-size biotechnology companies, entrepreneurial and economic development endeavors, and litigation support.

# Gregory B. Dudley, Ph.D.

| | |
|---|---|
| Professor and Associate Chair | Office: 5007 CSL |
| Department of Chemistry and Biochemistry | Phone: (850) 644-2333 |
| Florida State University | Fax: (850) 644-8281 |
| Tallahassee, FL 32306–4390 | Email: gdudley@chem.fsu.edu |

## Professional Appointments

**Florida State University, Tallahassee, FL**

| | |
|---|---|
| • Associate Department Chair | 2012–present |
| • Professor of Chemistry and Biochemistry | 2015–present |
| • Associate Professor of Organic Chemistry | 2008–2015 |
|     Raymond Cottrell Family Professor | 2008–2012 |
| • Assistant Professor of Organic Chemistry | 2002–2008 |
| • http://www.chem.fsu.edu/dudley/index.html | |

**Florida A&M University, Tallahassee, FL**

| | |
|---|---|
| • Graduate Faculty of Pharmacy and Pharmaceutical Sciences | 2016-present |

**University of Ottawa, Canada**

| | |
|---|---|
| • Visiting Professor of Organic Chemistry | 2011 |

## Education and Professional Development

**Sloan-Kettering Institute for Cancer Research, New York, NY**

- NIH Postdoctoral Fellow, 2000–2002
- Molecular Pharmacology and Chemistry Program
- *Advisor:* Professor Samuel J. Danishefsky
- Research Topic: *Total Synthesis of Guanacastepene A*

**Massachusetts Institute of Technology, Cambridge, MA**

- September 1995 to August 2000
- Ph.D. in Organic Chemistry
- *Research Advisor:* Professor Rick L. Danheiser
- Thesis: *A Total Synthesis of (−)-Ascochlorin*

**Florida State University, Tallahassee, FL**

- August 1991 to May 1995
- B.A. degree in Chemistry, with Honors - *magna cum laude*
- *Research Advisor:* Professor Martin A. Schwartz

**University of Kansas, Lawrence, KS**

- June 1994 to August 1994
- NSF Research Experience for Undergraduates Program
- *Research Advisor:* Professor Richard S. Givens

## Honors and Awards

- *CEM Corporation* Lecturer, Georgia State University, 2015
- *Organic Syntheses* Lecturer, University of New Hampshire, 2012
- Raymond Cottrell Family Professor, 2008–2012
- Highlighted in Florida Trend Magazine, "Person to Watch", 2010
- FSU Developing Scholar Award, 2010
- FSU Undergraduate Teaching Award, 2010
- FSU Research Foundation GAP Award, 2008
- FSU Innovator Award, 2006, 2007, 2008, 2010, 2012
- Featured in Tallahassee Magazine, "The New Establishment", 2006
- Thieme Publishers Journal Award, 2006
- ORAU Ralph E. Powe Junior Faculty Enhancement Award, 2004
- Research Corporation Research Innovation Award, 2004
- FSU First-Year Assistant Professor Award, 2003
- NIH Postdoctoral Fellowship, 2000–2002
- Bristol-Myers Squibb Predoctoral Fellowship, 1999–2000
- Roche Award for Excellence in Organic Chemistry, 1999
- Boehringer Ingelheim Predoctoral Fellowship, 1997–1998
- MIT Chemistry Outreach Fellowship, 1997

## Professional Activities

- Associate Chair: Department Curriculum, 2012–present
  Responsible for curriculum design, teaching assignments, instructor supervision, course creation and approval, and other duties.
- Conference Organizer: Enabling Technology for Reactions and Processes, 2015–present
  Initiated and help coordinate an annual workshop for synthetic and physical organic chemists on modern tools and methods for chemical synthesis. This workshop is part of the Telluride Science Research Center (TSRC) summer conference series in Telluride, CO.
- Professional Member of the AAAS, 2014–present
  American Association for the Advancement of Science
- Member of the American Chemical Society (ACS), 1996–present
- Faculty Advisor: FSU Chemistry Outreach, 2004–2013
  Initiated and currently serve as faculty mentor for a program in which graduate students visit area high schools, interact with students in the chemistry classes, and perform demonstrations
- Faculty Advisor: Alpha Phi Omega, 2007–2013
  Serve as faculty advisor and mentor for the FSU chapter of Alpha Phi Omega (AΦΩ), the national undergraduate service fraternity
- Faculty Advisor: FSU BioDiesel Initiative, 2008–2010
  Served as faculty advisor and mentor for a group of undergraduate students as they built a reactor for converting used fry grease into usable biodiesel fuel for campus vehicles
- Faculty Advisor: ChemPreneurs pilot program, 2009
  Led a ChemPreneur team, comprising a chemistry graduate student and a business school entrepreneur student, in the development of a business plan based on chemical technology

## Classroom Teaching

- Instructor: General Chemistry I, CHM 1045C
  Course Description: introductory chemistry course for science majors (2004–2005, 2007)
- Instructor: Survey of Organic Chemistry, CHM 2200
  Course Description: one-semester organic chemistry for allied health majors (2011–2013)
- Instructor: Organic Chemistry I, CHM 2210
  Course Description: introductory undergraduate organic chemistry course (2010, 2015x2)
- Instructor: Organic Chemistry II, CHM 2211
  Course Description: second-semester undergraduate organic chemistry course (2009)
- Instructor: Honors Organic Chemistry I, CHM 2210
  Course Description: undergraduate organic chemistry course for honors students (2007–2008)
- Instructor: Honors Organic Chemistry II, CHM 2211
  Course Description: undergraduate organic chemistry course for honors students (2008–2009)
- Instructor: Advanced Organic Chemistry — Reactions, CHM 5226
  Course Description: graduate course on important organic methodology (2002–2006, 2011)
- Instructor: Synthetic Organic Chemistry, CHM 5250
  Course Description: graduate course on organic reactions and synthesis (2014x2)
- Instructor: Chemical Reactivity — Bioorthogonal Chemistry, CHM 5555
  Course Description: graduate course on a cutting-edge topic in the chemical sciences (2012)
- Instructor: Advanced Topics in Organic Chemistry: Alkynes, CHM 8304J (2011)
  Course Description: graduate course on modern alkyne chemistry (Univ of Ottawa, 2011)

## Research Associates

*Graduate Students*

| | | |
|---|---|---|
| Paratchata Batsomboon | 6th year student | Chulabhorn Research Institute, Thailand |
| Ron R. Ramsubhag | 5th year student | University of Connecticut |
| Alec E. Morrison | 4th year student | Worcester Polytechnic Institute, MA |
| Nicholas J. Kramer | 3rd year student | Ramapo College of New Jersey |
| Joshua Gagnier | 3rd year student | East Carolina University |
| Mélodie Birepinte | visiting student | University of Bordeaux, France |

*Undergraduate Students*

| | |
|---|---|
| Andrew Janeczek | 08/2015 – present |
| Danielle Fox | 01/2015 – present |

*Previous Group Members*

*Former postdoctoral associates:*

Prof. Gaspar Diaz Muñoz, 01/2012–01/2013
Dr. Jumreang Tummatorn, 12/2009–06/2011
Dr. Philip A. Albiniak, 08/2006 – 02/2009
Dr. Jeannie H. Jeong, 08/2007 – 12/2008
Dr. Sreenivas Katukojvala, 08/2005–07/2006

Dr. Kevin Wing C. Poon, 01/2004 – 06/2006
Dr. Shin Kamijo, 01/2004 – 03/2006
Dr. Timothy F. Briggs, 10/2003 – 10/2005
Dr. Hubert T.-C. Lam, 01/2003 – 09/2005

*Former graduate students:*

Tung Hoang, Ph.D. 2015
Rimantas Slegeris, Ph.D. 2015
Michael R. Rosana, Ph.D. 2014
Marilda P. Lisboa, Ph.D. 2013
Jingyue Yang, Ph.D. 2011
Sami F. Tlais, Ph.D. 2011

David M. Jones, Ph.D. 2009
Douglas A. Engel, Ph.D. 2009
Mariya V. Kozytska, Ph.D. 2008
Susana S. Lopez, M.S. 2009
Daniella M. Barker, M.S. 2009
Dena R. Hodges, M.S. 2008
Ernest O. Nwoye, M.S. 2008

3

Samuel G. Salamone, M.S. 2005

*Selected former undergraduate students:*
Chelsea Massaro, B.S. Honors 2016
Apiwat Wangweerawong, B.S. Honors 2011
Cecelia C. O'Leary, B.S. Honors 2010
Sarah E. House, B.S. Honors 2005
James D. Sunderhaus, B.S. Honors 2003
Christina Dadich, B.S. 2015
Taylor Southworth, B.S. 2013
Colleen Keohane, B.S. 2013
Rojay Gordon, B.S. 2013
Janet Simon, B.S. 2012
Claudia R. Avalos, B.S. 2010
Shawn M. Amisial, B.S. 2007
Jeananne A. Singletary, B.S. 2004

*CHM 1051L (honors freshmen) students*:
Margaret E. Matthews (2007), Joseph P. Hernandez (2007), Alyson W. West (2008), Edward F. Kuester (2008), James Hoang (2013), Jillian Jones (2013)

*Visiting and exchange students*:
Suzan Al-Anwar (2015), Vincent Vedovato (2014), Andrew Royappa (2013), Vitchaphol "Ton" Motaneeyachart (2012), Sanpitcha "Jae" Siangsuebchart (2012), Cristiano Leandro (2012), Teng-wei Wang (2011), Tanit Intaranukulkit (2011), Thitiya "Whan" Patarakosol (2009), Viriya "Joy" Boonmuang (2009), Jumreang Tummatorn (2007 – 2008), Maureen K. Reilly (2006)

*Student Dissertations and Theses (with type and title)*

Tung Hoang (PhD, 2015) *"Tandem processes involving an alkynogenic fragmentation and applications in sesquiterpene syntheses"*

Rimantas Slegeris (PhD, 2015) *"Process improvements in the total chemical synthesis of progesterone, and other synthetic studies"*

Michael R. Rosana (PhD, 2014) *"Selective heating of polar solutes in a homogeneous solution: evidence of microwave-specific effects and a method to quantify these effects"*

Marilda P. Lisboa (PhD, 2013) *"Formal synthesis of palmerolide A using fragmentation methodology"*

Jingyue Yang (PhD, 2011) *"Anionic rearrangement of 2-benzyloxypyridine derivatives and a synthetic approach to aldingenin B"*

Sami F. Tlais (PhD, 2011) *"I. para-Siletanylbenzyl (PSB) protecting group II. Stereocontrol of 5,5-spiroketals in the synthesis of cephalosporolides H, E, and F"*

David M. Jones (PhD, 2009) *"Addition / C–C bond cleavage reactions of vinylogous acyl triflates and their application to natural products synthesis"*

Douglas A. Engel (PhD, 2009) *"Organic synthesis and methodology related to the malaria drug artemisinin"*

Mariya V. Kozytska (PhD, 2008) *"I. Siletanylmethyllithium, an ambiphilic siletane. II. Synthetic approach to basiliolide B"*

Susana S. Lopez (MS, 2009) *"Methodology for the olefination of aldehydes and ketones via the Meyer-Schuster reaction"*

Samuel G. Salamone (MS, 2005) *"A ring expansion approach to roseophilin"*

Chelsea Massaro (BS, Honors 2016) *"gem-Dimethylcyclopentane-fused pharmacophores"*

Apiwat Wangweerawong (BS, Honors 2011) *"Scope of a novel [1,2]-anionic rearrangement of 2-benzyloxypyridine derivatives"*

Cecelia C. O'Leary (BS, Honors 2010) *"A novel protocol for the synthesis of aryl Grignard reagents at low heat"*

Sarah E. House (BS, Honors 2005) *"para-Siletanylbenzyl: a novel hydroxyl protecting group"*

4

# Publications

### *Dudley Lab Original Research Publications:*

(66)  Slegeris, R; Dudley, G. B. Alternative synthetic approaches to *rac*-progesterone by way of the classic Johnson cationic polycyclization strategy. *Tetrahedron* **2016**, *72*, 3666–3672.

(Symposium in Print special issue)

http://www.sciencedirect.com/science/article/pii/S0040402016301739

(65)  Ramsubhag, R. R.; Dudley, G. B. Orthogonal dual-click diyne for CuAAC and/or SPAAC couplings. *Org. Biomol. Chem.* **2016**, *14*, 5028–5031.

http://pubs.rsc.org/en/content/articlelanding/2014/ob/c6ob00795c

(64)  Wright, A. K.; Batsomboon, P.; Dai, J.; Hung, I.; Zhou, H.-X.; Dudley, G. B.; Cross, T. A. Differential binding of rimantadine enantiomers to influenza A M2 proton channel. *J. Am. Chem. Soc.* **2016**, *138*, 1506–1509.

http://pubs.acs.org/doi/abs/10.1021/jacs.5b13129

(63)  Ferrari, A.; Hunt. J.; Stiegman, A. E.; Dudley, G. B. Microwave-assisted superheating and/or microwave-specific superboiling (nucleation-limited boiling) of liquids occurs under certain conditions but is mitigated by stirring. *Molecules* **2015**, 20, 21671–21680.

(Invited Contribution to a Special Issue on Microwave-Assisted Organic Synthesis)

http://www.mdpi.com/1420-3049/20/12/19793

(62)  Diaz Muñoz, G.; Dudley, G. B. Synthesis of 1,2,3,4-tetrahydroquinolines including angustureine and congeneric alkaloids. *Org. Prep. Proc. Intl.* **2015**, *47*, 179–206.

http://dx.doi.org/10.1080/00304948.2015.1025012

(61)  Dudley, G. B.; Richert, R.; Stiegman, A. E. On the Existence of and Mechanism for Microwave-Specific Reaction Rate Enhancement. *Chem. Sci.* **2015**, *6*, 2144–2152.

http://pubs.rsc.org/en/content/articlelanding/2015/sc/C4SC03372H

(60)  Rizkallah, R.; Batsomboon, P.; Dudley, G. B.; Hurt, M. The Oncogenic Kinase TOPK/PBK is a Master Mitotic Regulator of C2H2 Zinc Finger Proteins. *Oncotarget* **2015**, *6*, 1446–1461.

http://www.impactjournals.com/oncotarget/index.php?journal=oncotarget&page=article&op=view&path[]=2735

*FSU Press Releases:*

"*Researchers collaborate to identify 'master regulator' in cell division*"

http://medicalxpress.com/news/2015-03-collaborate-master-cell-division.html

"*Working together to unmask 'Enzyme X'*"

http://issuu.com/fsumed/docs/fsu_med_spring_2015_final/7?e=0

(59)  Chen, P.-K.; Rosana, M. R.; Dudley, G. B.; Stiegman, A. E. Parameters affecting the microwave-specific acceleration of a chemical reaction. *J. Org. Chem.* **2014**, *79*, 7425–7436.

http://pubs.acs.org/doi/abs/10.1021/jo5011526

Featured in *Chemical and Engineering News* **2014**, *92*, issue 32, 23.

http://cen.acs.org/articles/92/i32/Microwaves.html

Featured in *Chemistry World*:

http://www.rsc.org/chemistryworld/2014/09/debate-over-microwave-specific-heating-rumbles

(58)  Rosana, M. R.; Hunt, J.; Ferrari, A.; Southworth, T.; Tao, Y.; Stiegman, A. E.; Dudley, G. B. Microwave-Specific Acceleration of a Friedel–Crafts Reaction: Evidence for Selective Heating in Homogeneous Solution. *J. Org. Chem.* **2014**, *79*, 7437–7450.

http://pubs.acs.org/doi/abs/10.1021/jo501153r

5

Featured in *Chemical and Engineering News* **2014**, *92*, issue 32, 23.
http://cen.acs.org/articles/92/i32/Microwaves.html
Featured in *Chemistry World*:
http://www.rsc.org/chemistryworld/2014/09/debate-over-microwave-specific-heating-rumbles
GEOSET <http://www.geoset.info/> video presentations on selective microwave heating:
http://goo.gl/jVhVSC, http://goo.gl/nbECVu, http://goo.gl/o3qN3U, http://goo.gl/OdXeY0

(57)  Gold, B. A.; Batsomboon, P.; Dudley, G. B.; Alabugin, I. V. Alkynyl crown ethers as a scaffold for hyperconjugative assistance in non-catalyzed azide-alkyne click reactions: ion sensing through enhanced transition state stabilization. *J. Org. Chem.* **2014**, *79*, 6221–6232.
http://pubs.acs.org/doi/abs/10.1021/jo500958n

(56)  Lisboa, M. P.; Dudley, G. B. Synthesis of cytotoxic palmerolides. *Chem.–Eur. J.* **2013**, *19*, 16146–16168.
http://onlinelibrary.wiley.com/doi/10.1002/chem.201302167/abstract

(55)  Hoang, T. T.; Dudley, G. B. Synthesis of high-value 1,6-enynes by tandem fragmentation / olefination. *Org. Lett.* **2013**, *15*, 4026–4029.
http://pubs.acs.org/doi/abs/10.1021/ol401839e

(54)  Dudley, G. B.; Stiegman, A. E.; Rosana, M. R. Correspondence on microwave effects in organic synthesis. *Angew. Chem. Int. Ed.* **2013**, *52*, 7918–7923.
http://onlinelibrary.wiley.com/doi/10.1002/anie.201301539/abstract
A response to the Essay: Kappe, C. O.; Pieber, B.; Dallinger, D. Microwave Effects in Organic Synthesis—Myth or Reality? *Angew. Chem. Int. Ed.* **2013**, *52*, 1088–1094.
http://onlinelibrary.wiley.com/doi/10.1002/anie.201204103/full
Featured in *Chemical and Engineering News* **2014**, *92*, issue 4, 26–28.
http://cen.acs.org/articles/92/i4/Microwave-Chemistry-Remains-Hot-Fast.html

(53)  Lisboa, M. P.; Jones, D. M.; Dudley, G. B. Formal synthesis of palmerolide A, featuring alkynogenic fragmentation and *syn*-selective vinylogous aldol chemistry. *Org. Lett.* **2013**, *15*, 886–889.
http://pubs.acs.org/doi/abs/10.1021/ol400014e

(52)  Gold, B.; Dudley, G. B.; Alabugin, I. V. Moderating strain without sacrificing reactivity: Design of fast and tunable noncatalyzed alkyne-azide cycloadditions via stereoelectronically controlled transition state stabilization. *J. Am. Chem. Soc.* **2013**, *135*, 1558–1569.
http://pubs.acs.org/doi/abs/10.1021/ja3114196

(51)  Tummatorn, J.; Diaz Muñoz, G.; Dudley, G. B. Synthesis of (–)-(*R*)-angustureine by formal alkynylation of a chiral ß-amino ester. *Tetrahedron Lett.* **2013**, *54*, 1312–1314.
http://www.sciencedirect.com/science/article/pii/S0040403913000099#

(50)  Tlais, S. F.; Dudley, G. B. On the proposed structures and stereocontrolled synthesis of the cephalosporolides. *Beilstein J. Org. Chem.* **2012**, *8*, 1287–1292.
http://www.beilstein-journals.org/bjoc/single/articleFullText.htm?publicId=1860-5397-8-146

(49)  Yang, J.; Wangweerawong, A.; Dudley, G. B. [1,2]-Wittig rearrangement of aromatic heterocycles. *Heterocycles*, **2012**, *85*, 1603–1606.
http://www.heterocycles.jp/newlibrary/libraries/fulltext/22358/85/7

(48)  Batsomboon, P.; Gold, B. A.; Alabugin, I. V. Dudley, G. B. Tandem nucleophilic addition/fragmentation of vinylogous acyl nonaflates for the synthesis of functionalized alkynes, with new mechanistic insight. *Synthesis* **2012,** *44*, 1818–1824.
        (Invited contribution to Special Topic: Tandem Transformations in Organic Synthesis.)
https://www.thieme-connect.com/ejournals/abstract/10.1055/s-0031-1290945

6

(47) Lisboa, M. P.; Jeong-Im, J. H.; Jones, D. M.; Dudley, G. B. Toward a new palmerolide assembly strategy: synthesis of C16–C24. *Synlett*, **2012**, *23*, 1493–1496.
https://www.thieme-connect.com/ejournals/abstract/10.1055/s-0031-1290675

(46) Tummatorn, J.; Batsomboon, P.; Clark, R. J.; Alabugin, I. V.; Dudley, G. B. Strain-promoted azide–alkyne cycloadditions of benzocyclononynone. *J. Org. Chem.* **2012**, *77*, 2093–2097.
http://pubs.acs.org/doi/abs/10.1021/jo300188y

(45) Rosana, M. R.; Tao, Y.; Stiegman, A. E.; Dudley, G. B. On the rational design of microwave-actuated organic reactions. *Chem. Sci.* **2012**, *3*, 1240–1244.
http://pubs.rsc.org/en/content/articlelanding/2012/sc/c2sc01003h
Featured in *Chemistry World*:
http://www.rsc.org/chemistryworld/News/2012/February/microwave-effects-in-organic-reactions.asp
Featured in *Chemical and Engineering News* **2014**, *92*, issue 4, 26–28.
http://cen.acs.org/articles/92/i4/Microwave-Chemistry-Remains-Hot-Fast.html

(44) Gold, B.; Shevchenko, N. E.; Bonus, N.; Dudley, G. B.; Alabugin, I. V. Selective transition state stabilization via hyperconjugative assistance: stereoelectronic concept for copper-free click chemistry. *J. Org. Chem.* **2012**, *77*, 75–89.
http://pubs.acs.org/doi/abs/10.1021/jo201434w

(43) Wang, T.; Intaranukulkit; T.; Rosana, M. R.; Slegeris, R.; Simon, J.; Dudley, G. B. Microwave-assisted benzyl-transfer reactions of commercially available 2-benzyloxy-1-methylpyridinium triflate. *Org. Biomol. Chem.* **2012**, *10*, 248–250.
http://pubs.rsc.org/en/Content/ArticleLanding/2012/OB/C1OB06504A

(42) Lisboa, M. P.; Hoang, T. T.; Dudley, G. B. Tandem nucleophilic addition / fragmentation of vinylogous acyl triflates: 2-methyl-2-(1-oxo-5-heptynyl)-1,3-dithiane. *Org. Synth.* **2011**, *88*, 353–363.
http://www.orgsyn.org/orgsyn/pdfs/v88p0353.pdf

(41) Yang, J.; Tummatorn, J.; Slegeris, R.; Tlais, S. F.; Dudley, G. B. Synthesis of the tricyclic core of aldingenin B by oxidative cyclo-ketalization of an alkyne-diol. *Org. Lett.* **2011**, *13*, 2065–2067.
http://pubs.acs.org/doi/abs/10.1021/ol200421s

(40) Tlais, S. F.; Dudley, G. B. A gold-catalyzed alkyne-diol cycloisomerization for the synthesis of oxygenated 5,5-spiroketals. *Beilstein J. Org. Chem.* **2011**, *7*, 570–577.
http://www.beilstein-journals.org/bjoc/content/7/1/66

(39) Tummatorn, J.; Dudley, G. B. Generation of medium-ring cycloalkynes by ring expansion of vinylogous acyl triflates. *Org. Lett.* **2011**, *13*, 1572–1575.
http://pubs.acs.org/doi/abs/10.1021/ol2003308

(38) Tummatorn, J.; Dudley, G. B. Stereodefined homopropargyl amines by tandem nucleophilic addition/fragmentation of dihydropyridone triflates. *Org. Lett.* **2011**, *13*, 158–160.
http://pubs.acs.org/doi/abs/10.1021/ol102760q

(37) Yang, J.; Dudley, G. B. Pyridine-directed organolithium addition to an enol ether. *Adv. Synth. Catal.* **2010**, *352*, 3438–3442.
http://onlinelibrary.wiley.com/doi/10.1002/adsc.201000495/abstract

(36) Tlais, S. F.; Dudley, G. B. Stereocontrol of 5,5-spiroketals in the synthesis of cephalosporolide H epimers. *Org. Lett.* **2010**, *12*, 4698–4701.
http://pubs.acs.org/doi/abs/10.1021/ol102201z

7

(35) Jones, D. M.; Dudley, G. B. An open-and-shut strategy: preparation of benzo-fused indanes by ring-opening of a vinylogous acyl triflate and metal-catalyzed Asao–Yamamoto benzannulation. *Tetrahedron* **2010**, *66*, 4860–4866.          (Symposium in Print special issue)
http://dx.doi.org/10.1016/j.tet.2010.03.014

(34) Jones, D. M.; Lisboa, M. P.; Kamijo, S.; Dudley, G. B. Ring opening of cyclic vinylogous acyl triflates using stabilized carbanion nucleophiles: Claisen condensations linked to carbon–carbon bond cleavage. *J. Org. Chem.* **2010**, *75*, 3260–3267.
http://pubs.acs.org/doi/abs/10.1021/jo100249g

(33) Albiniak, P. A.; Dudley, G. B. New reagents for the synthesis of arylmethyl ethers and esters. *Synlett* **2010**, 841–851.          (Account)
https://www.thieme-connect.com/ejournals/abstract/10.1055/s-0029-1219531

(32) Jones, D. M.; Dudley, G. B. Synthesis of the C1–C15 region of palmerolide A using refined Claisen-type addition / bond cleavage methodology. *Synlett* **2010**, 223–226.
https://www.thieme-connect.com/ejournals/abstract/10.1055/s-0029-1218565

(31) Tlais, S. F.; Clark, R. J.; Dudley, G. B. A striking exception to the chelate model for acyclic diastereocontrol: efficient access to a versatile propargyl alcohol for chemical synthesis. *Molecules* **2009**, *14*, 5216–5222.          (Special Issue on Asymmetric Synthesis)
http://mdpi.com/1420-3049/14/12/5216

(30) Yang, J.; Dudley, G. B. [1,2]-Anionic rearrangement of 2-benzyloxypyridine and related pyridyl ethers. *J. Org. Chem.* **2009**, *74*, 7998–8000.
http://pubs.acs.org/doi/abs/10.1021/jo901707x

(29) Engel, D. A.; Dudley, G. B. The Meyer–Schuster rearrangement for the synthesis of α,β-unsaturated carbonyls. *Org. Biomol. Chem.* **2009**, *7*, 4149–4158. (Perspective Article)
http://pubs.rsc.org/en/Content/ArticleLanding/2009/OB/b912099h

(28) Tlais, S. F.; Lam, H.; House, S. E.; Dudley, G. B. New strategies for protecting group chemistry: synthesis, reactivity, and indirect oxidative cleavage of *para*-siletanylbenzyl (PSB) ethers. *J. Org. Chem.* **2009**, *74*, 1876–1885.
http://pubs.acs.org/doi/abs/10.1021/jo802229p

(27) Lopez, S. S.; Dudley, G. B. Convenient method for preparing benzyl ethers and esters using 2-benzyloxypyridine. *Beilstein J. Org. Chem.* **2008**, *4*, No. 44; doi:10.3762/bjoc.4.44.
http://www.beilstein-journals.org/bjoc/single/articleFullText.htm?publicId=1860-5397-4-44

(26) Tummatorn, J.; Dudley, G. B. Ring opening / fragmentation of dihydropyrones for the synthesis of homopropargyl alcohols. *J. Am. Chem. Soc.* **2008**, *130*, 5050–5051.
http://pubs.acs.org/doi/abs/10.1021/ja801018r

(25) Kozytska, M. V.; Dudley, G. B. On the intramolecular pyrone Diels–Alder approach to basiliolide B. *Tetrahedron Lett.* **2008**, *49*, 2899–2901.
http://dx.doi.org/10.1016/j.tetlet.2008.03.031

(24) Engel, D. A.; Lopez, S. S.; Dudley, G. B. Lewis acid-catalyzed Meyer–Schuster reactions: methodology for the olefination of aldehydes and ketones. *Tetrahedron* **2008**, *64*, 6988–6996.          (Symposium in Print special issue)
http://dx.doi.org/10.1016/j.tet.2008.02.030

(23) Albiniak, P. A.; Amisial, S. M.; Dudley, G. B.; Hernandez, J. P.; House, S. E.; Matthews, M. E.; Nwoye, E. O.; Reilly, M. K.; Tlais, S. F. Stable oxypyridinium triflate (OPT) salts for the synthesis of halobenzyl ethers. *Synth. Commun.* **2008**, *38*, 656–665.
          Dedicated to Prof Ken Goldsby for his support of undergraduate research at FSU.
http://www.tandfonline.com/doi/abs/10.1080/00397910701818362

8

(22) Tummatorn, J.; Albiniak, P. A.; Dudley, G. B. Synthesis of benzyl esters using 2-benzyloxy-1-methylpyridinium triflate. *J. Org. Chem.* **2007**, *72*, 8962–8964.
http://pubs.acs.org/doi/abs/10.1021/jo7018625

(21) Albiniak, P. A.; Dudley, G. B. Thermally generated phenylcarbenium ions: acid-free and self-quenching Friedel–Crafts reactions. *Tetrahedron Lett.* **2007**, *48*, 8097–8100.
http://dx.doi.org/10.1016/j.tetlet.2007.09.116

(20) Yang, J.; Dudley, G. B. Conjugate addition of organocopper reagents in dichloromethane to α,β-unsaturated esters. *Tetrahedron Lett.* **2007**, *48*, 7887–7889.
http://dx.doi.org/10.1016/j.tetlet.2007.08.105

(19) Dudley, G. B.; Engel, D. A.; Ghiviriga, I.; Lam, H.; Poon, K. W. C.; Singletary, J. A. Synthesis of dihydro-*epi*-deoxyarteannuin B. *Org. Lett.* **2007**, *9*, 2839–2842.
http://pubs.acs.org/doi/abs/10.1021/ol070992e

(18) Poon, K. W. C.; Albiniak, P. A.; Dudley, G. B. Protection of alcohols using 2-benzyloxy-1-methylpyridinium trifluoromethanesulfonate: methyl (*R*)-(–)-3-benzyloxy-2-methyl propanoate. *Org. Synth.* **2007**, *84*, 295–305.    (Featured in *ChemFiles* **2007**, *7*, 3.)
http://www.orgsyn.org/orgsyn/pdfs/V84P0295.pdf
Title reagent manufactured and marketed by Sigma–Aldrich Chemical Co, catalog #679674

(17) Lopez, S. S.; Engel, D. A.; Dudley, G. B. The Meyer–Schuster rearrangement of ethoxyalkynyl carbinols. *Synlett* **2007**, 949–953.
https://www.thieme-connect.com/ejournals/abstract/10.1055/s-2007-973885

(16) Nwoye, E. O.; Dudley, G. B. A method for the synthesis of *para*-methoxybenzyl (PMB) ethers under effectively neutral conditions. *Chem. Commun.* **2007**, 1436–1437.
http://www.rsc.org/publishing/journals/CC/article.asp?doi=B617926F
Title reagent manufactured and marketed by Sigma–Aldrich Chemical Co, catalog #701440
http://www.sigmaaldrich.com/chemistry/chemical-synthesis/technology-spotlights/dudley-reagents.html

(15) Engel, D. A.; Dudley, G. B. Olefination of ketones using a gold(III)-catalyzed Meyer–Schuster rearrangement. *Org. Lett.* **2006**, *8*, 4027–4029.
http://pubs.acs.org/doi/abs/10.1021/ol0616743

(14) Kamijo, S.; Dudley, G. B. Cyclic vinylogous triflate hemiacetals as new surrogates for alkynyl aldehydes. *Tetrahedron Lett.* **2006**, *47*, 5629–5632.
http://dx.doi.org/10.1016/j.tetlet.2006.06.040

(13) Kamijo, S.; Dudley, G. B. Tandem nucleophilic addition/fragmentation reactions and synthetic versatility of vinylogous acyl triflates. *J. Am. Chem. Soc.* **2006**, *128*, 6499–6507.
http://pubs.acs.org/doi/abs/10.1021/ja0608085
                              (Addition/Correction: *J. Am. Chem. Soc.* **2010**, *132*, 8223.)

(12) Poon, K. W. C.; Dudley, G. B. Mix-and-heat benzylation of alcohols using a bench-stable pyridinium salt. *J. Org. Chem.* **2006**, *71*, 3923–3927.
http://pubs.acs.org/doi/10.1021/jo0602773
http://www.sigmaaldrich.com/chemistry/chemical-synthesis/technology-spotlights/dudley-reagents.html

(11) Jones, D. M.; Kamijo, S.; Dudley, G. B. Grignard-triggered fragmentation of vinylogous acyl triflates: synthesis of (*Z*)-6-heneicosan-11-one, the Douglas fir tussock moth sex pheromone. *Synlett* **2006**, 936–938.
https://www.thieme-connect.com/ejournals/abstract/10.1055/s-2006-939051

(10) House, S. E.; Poon, K. W. C.; Lam, H.; Dudley, G. B. *p*-Siletanylbenzylidene acetal: oxidizable protecting group for diols. *J. Org. Chem.* **2006**, *71*, 420–422.
http://pubs.acs.org/doi/abs/10.1021/jo052015r

9

(9)   Kamijo, S.; Dudley, G. B. Claisen-type condensation of vinylogous acyl triflates. *Org. Lett*. **2006**, *8*, 175–177.
      http://pubs.acs.org/doi/abs/10.1021/ol0527781

(8)   Poon, K. W. C.; House, S. E.; Dudley, G. B. A bench-stable organic salt for the benzylation of alcohols. *Synlett* **2005**, 3142–3144.
      https://www.thieme-connect.com/ejournals/abstract/10.1055/s-2005-921898

(7)   Briggs, T. F.; Dudley, G. B. Synthesis of the floresolide B hydroquinone lactone core using ring-closing metathesis. *Tetrahedron Lett*. **2005**, *46*, 7793–7796.
      http://dx.doi.org/10.1016/j.tetlet.2005.09.023

(6)   Salamone, S. G.; Dudley, G. B. A ring expansion approach to roseophilin. *Org. Lett*. **2005**, *7*, 4443–4445.
      http://pubs.acs.org/doi/abs/10.1021/ol051730k

(5)   Kozytska, M. V.; Dudley, G. B. Siletanylmethyllithium: an ambiphilic organosilane. *Chem. Commun*. **2005**, 3047–3049.
      http://www.rsc.org/publishing/journals/CC/article.asp?doi=b503110a

(4)   Lam, H.; House, S. E.; Dudley, G. B. The *para*-siletanylbenzyl (PSB) ether: a peroxide-cleavable protecting group for alcohols and phenols. *Tetrahedron Lett*. **2005**, *46*, 3283–3285.
      http://dx.doi.org/10.1016/j.tetlet.2005.03.110

(3)   Kamijo, S.; Dudley, G. B. A tandem carbanion addition/carbon–carbon bond cleavage reaction yields alkynyl ketones. *J. Am. Chem. Soc*. **2005**, *127*, 5028–5029.
      http://pubs.acs.org/doi/abs/10.1021/ja050663m

(2)   Singletary, J. A.; Lam, H.; Dudley, G. B. A succinct method for preparing the Stork–Jung vinylsilane Robinson annulation reagent. *J. Org. Chem*. **2005**, *70*, 739–741.
      http://pubs.acs.org/doi/abs/10.1021/jo0480803

(1)   Sunderhaus, J. D.; Lam, H.; Dudley, G. B. Oxidation of carbon–silicon bonds: the dramatic advantage of strained siletanes. *Org. Lett*. **2003**, *5*, 4571–4573.
      http://pubs.acs.org/doi/abs/10.1021/ol035695y

*Research publications from pre- and post-doctoral studies:*

•   Mandal, M.; Yun, H.; Dudley, G. B.; Lin, S.; Tan, D. S.; Danishefsky, S. J. Total synthesis of guanacastepene A: a route to enantiomeric control. *J. Org. Chem*. **2005**, *70*, 10619–10637.
    http://pubs.acs.org/doi/full/10.1021/jo051470k

•   Dudley, G. B.; Danishefsky, S. J.; Sukenick, G. On the use of deuterium isotope effects in chemical synthesis. *Tetrahedron Lett*. **2002**, *43*, 5605–5606.
    http://www.sciencedirect.com/science/article/pii/S0040403902011140

•   Lin, S.; Dudley, G. B.; Tan, D. S.; Danishefsky, S. J. A stereoselective route to guanacastepene A via a surprising epoxidation. *Angew. Chem., Int. Ed*. **2002**, *41*, 2185–2188.
    http://onlinelibrary.wiley.com/doi/10.1002/1521-3773%2820020617%2941:12%3C2185::AID-ANIE2185%3E3.0.CO;2-0/full

•   Tan, D. S.; Dudley, G. B.; Danishefsky, S. J. Synthesis of the functionalized tricyclic skeleton of guanacastepene A: a tandem epoxide opening β-elimination–Knoevenagel cyclization. *Angew. Chem., Int. Ed*. **2002**, *41*, 2188–2191.
    http://onlinelibrary.wiley.com/doi/10.1002/1521-3773%2820020617%2941:12%3C2188::AID-ANIE2188%3E3.0.CO;2-J/full

•   Dudley, G. B.; Tan, D. S.; Kim, G.; Tanski, J. M.; Danishefsky, S. J. Remarkable stereoselectivity in the alkylation of a hydroazulenone: progress towards the total synthesis of guanacastepene. *Tetrahedron Lett*. **2001**, *42*, 6789–6791.

http://www.sciencedirect.com/science/article/pii/S0040403901013429
- Dudley, G. B.; Danishefsky, S. J. A four-step synthesis of the hydroazulene core of guanacastepene. *Org. Lett.* **2001**, *3*, 2399–2402.
  http://pubs.acs.org/doi/full/10.1021/ol016222z
- Dudley, G. B.; Takaki, K. S.; Cha, D. C.; Danheiser, R. L. Total synthesis of (–)-ascochlorin via a cyclobutenone-based benzannulation strategy. *Org. Lett.* **2000**, *2*, 3407–3410.
  http://pubs.acs.org/doi/full/10.1021/ol006561c
- Gee, K. R.; Kueper, L. W., III; Barnes, J.; Dudley, G. B.; Givens, R. S. Desyl esters of amino acid neurotransmitters. Phototriggers for biologically active neurotransmitters. *J. Org. Chem.* **1996**, *61*, 1228–1233.
  http://pubs.acs.org/doi/full/10.1021/jo951635x

### Book Chapters and Other Manuscripts:

(VII) Hoang, T. T.; Dudley, G. B.; Williams, L. J. Fragmentation Reactions. In *Comprehensive Organic Synthesis*, 2nd Edition; Molander, G., Knochel, P., Eds.; Elsevier: Oxford, 2014; Vol. 6, Chap. 30, 842–860.

(VI) Dudley, G. B. Silacyclobutane, 1-[4-(bromomethyl)phenyl]-1-methyl- (and alcohol). In *Encyclopedia of Reagents for Organic Synthesis* [Online]; Crich, D., Fuchs, P. L., Charette, A. B., Rovis, T., Eds., John Wiley & Sons: Chichester. DOI: 10.1002/047084289X.rn01526, Article Online Posting Date: May 3, 2013.
  http://onlinelibrary.wiley.com/o/eros/articles/rn01526/frame.html

(V) Dudley, G. B. 2-(4-Methoxybenzyloxy)-4-methylquinoline. In *Encyclopedia of Reagents for Organic Synthesis* [Online]; Crich, D., Charette, A. B., Fuchs, P. L., Molander, G. A., Eds., John Wiley & Sons: Chichester. DOI: 10.1002/047084289X.rn01183, Article Online Posting Date: October 15, 2010.
  http://onlinelibrary.wiley.com/o/eros/articles/rn01183/frame.html

(IV) Dudley, G. B. 2-Benzyloxy-1-methylpyridinium trifluoromethanesulfonate. In *Encyclopedia of Reagents for Organic Synthesis* [Online]; Paquette, L., Fuchs, P., Crich, D., Molander, G., Eds., John Wiley & Sons: Chichester. DOI: 10.1002/047084289X.rn00906, Article Online Posting Date: September 15, 2008.
  http://onlinelibrary.wiley.com/o/eros/articles/rn00906/frame.html

(III) Kozytska, M. V.; Dudley, G. B. Four-membered rings with one silicon, germanium, tin, or lead atom. *Reference Module in Chemistry, Molecular Sciences and Chemical Engineering*, In *Comprehensive Heterocyclic Chemistry III*; Katritsky, A. R., Ramsden, C. A., Scriven, E. F. V., Taylor, R. J. K., Eds., Elsevier: Oxford, 2008; vol 2, pp 513–554.
  http://www.sciencedirect.com/science/article/pii/B97800804499200211X

(II) Danheiser, R. L.; Dudley, G. B.; Austin, W. F. Product class 13: alkenylketenes. In *Science of Synthesis: Houben–Weyl Methods of Molecular Transformation*. Bellus, D., Danheiser, R. L., Eds., Thieme: Stuttgart, 2006; Vol. 23, Chapter 13, pp 492–568.

(I) Austin, W. F.; Kowalczyk, J. J.; Dudley, G. B.; Danheiser, R. L. Product class 7: alkylideneketenes. In *Science of Synthesis: Houben–Weyl Methods of Molecular Transformation*. Bellus, D., Danheiser, R. L., Eds., Thieme: Stuttgart, 2006; Vol. 23, Chapter 7, pp 245–258.

### Patents:

(iii) Hanson, K.; Dudley, G. B. Absolute Stereocontrol of Prochiral Substrates with Chiral Excited State Proton Transfer Dyes. Disclosure (2014).

(ii)   Dudley, G. B. Reagent for synthesis of para-methoxybenzyl (PMB) ethers and associated methods. U.S. Patent No. 7,960,553 (2011).

> 1 patent, licensed from FSU by Sigma–Aldrich Chemical Company.

(i)   Dudley, G. B. Compounds and methods of arylmethylation (benzylation) as protection for alcohol groups during chemical synthesis. U.S. Patents 7,754,909 (2010), 7,915,437 (2011), 8,008,531 (2011), 8,334,414 (2012), 8,580,992 (2013).

> 5 patents, licensed from FSU by Sigma–Aldrich Chemical Company.

# Research Presentations

**upcoming**
- 57th Groupement d'Etude de Chimie Organique (GECO), Basque Region, France
- TSRC Enabling Technology for Reactions and Processes Conference, Telluride, CO

**2016**
150. West Virginia University, Morgantown
149. Rensselaer Polytechnic Institute, Troy, NY
148. Mona Symposium on Natural Products and Medicinal Chemistry, Kingston, Jamaica

**2015**
147. Pacifichem 2015, Honolulu, HI (*organic*)
146. Pacifichem 2015, Honolulu, HI (*clean energy*)
145. TSRC Enabling Technology for Reactions and Processes Conference, Telluride, CO
144. ACS Florida Meeting, Tampa (*chem ed*)
143. ACS Florida Meeting, Tampa (*organic*)
142. Georgia State University, Atlanta
141. University of California, San Francisco
140. Rigel Pharmaceuticals, San Francisco
139. Auburn University, AL
138. Rutgers University, Piscataway, NJ

**2014**
137. University of Kansas, Lawrence
136. North Carolina Federal Defenders, Raleigh, NC
135. CEM Corporation, Matthews, NC
134. University of North Carolina, Greensboro
133. Wake Forest University, Winston-Salem, NC
132. University of California, Merced
131. Utah State University, Logan
130. Brigham Young University, Provo, UT
129. Cubist Pharmaceuticals, Lexington, MA
128. Ensemble Pharmaceuticals, Cambridge, MA
127. TSRC Accelerating Reaction Discovery Conference, Telluride, CO
126. Natural Products Gordon Conference
125. Organic Reactions Gordon Conference

124. National Federal Defenders Convention, Cleveland, OH
123. Florida Heterocyclic Conference, Gainesville
122. Florida State University, Tallahassee

**2013**
121. Lebanese University, Beirut
120. University of New Mexico, Albuquerque
119. New Mexico State University, Las Cruces
118. University of South Alabama, Mobile
117. University of West Florida, Pensacola

**2012**
116. Max Plank Institute, Potsdam, Germany
115. University of Hannover, Germany
114. Technical University, Dortmund, Germany
113. Louisiana State University, Baton Rouge
112. Notre Dame University, South Bend, IN
111. University of Chicago, IL
110. University of Illinois, Chicago
109. University of New Hampshire, Durham
108. Dartmouth College, Hanover, NH
107. University of the South, Sewanee, TN
106. University of Tennessee, Knoxville
105. Middle Tenn State Univ, Murfreesboro, TN
104. ACS National Meeting, Philadelphia, PA
103. ACS National Meeting, Philadelphia, PA
102. ACS Florida Meeting, Tampa
101. Organic Faculty of Florida Conference
100. FAMU-FSU Engineering, Tallahassee
99. FSU Biomedical Sciences Symposium

**2011**
98. University of Virginia, Charlottesville
97. Univ of Mary Washington, Fredericksburg, VA
96. ACS Southeast Meeting, Richmond, VA
95. NanoFlorida Conference, Miami, FL
94. University of Houston, TX
93. University of Texas, San Antonio
92. University of Minnesota, Twin Cities
91. University of Minnesota, Duluth

12

90. North Dakota State University, Fargo
89. NSERC-CREATE Program, Ottawa, Canada
88. University of Ottawa, Canada
87. Florida Heterocyclic Conference, Gainesville

**2010**

86. Federal University of Ouro Preto, Brazil
85. Federal University of Minas Gerais, Brazil
84. Federal University of Fluminense, Brazil
83. Federal University of Rio de Janeiro, Brazil
82. UNICAMP, Campinas, Brazil
81. University of Sao Paulo, Brazil
80. Sunrise Rotary Club, Tallahassee, FL
79. Tallahassee Economic Develop. Council, FL

**2009**

78. University of Toledo, Ohio
77. Wayne State University, Detroit, MI
76. University of California, Berkeley
75. Rigel Pharmaceuticals, San Francisco, CA
74. FSU College of Medicine, Tallahassee
73. Univ of Southern Mississippi, Hattiesburg
72. University of South Florida, Tampa
71. Natural Products Gordon Conference
70. Innovation Park, Tallahassee, FL
69. University of Oregon, Eugene
68. Oregon State University, Corvallis
67. Berry College, Mt Berry, GA

**2008**

66. BioFine Chemical Process Design Conference, Sanibel Island, FL
65. ACS Southeast Meeting, Nashville, TN
64. University of Vermont, Burlington
63. Schering–Plough Research, Cambridge, MA
62. Nanyang Technical University, Singapore
61. A*Star Institute of Chemical and Engineering Sciences, Singapore
60. National University of Singapore
59. Chulabhorn Research Institute, Thailand
58. Chulalongkorn Univ, Bangkok, Thailand
57. Schering–Plough Research, Kenilworth, NJ
56. ACS Florida Meeting, Orlando
55. U of British Columbia, Vancouver, Canada
54. Simon Fraser University, Burnaby, Canada
53. University of Washington, Seattle
52. Organic Faculty of Florida Conference
51. Texas Christian University, Fort Worth
50. University of Texas, Arlington
49. U of Texas Southwestern Med Center, Dallas

**2007**

48. Florida State University, Tallahassee

47. International Conference on the Chemistry of Antibiotics (ICCA-X), Nashville, TN
46. ACS Florida Meeting, Orlando
45. University of Wisconsin, Milwaukee
44. Marquette University, Milwaukee, WI
43. ACS National Meeting, Chicago, IL
42. University of Pennsylvania, Philadelphia
41. University of California, Santa Barbara
40. University of California, San Diego
39. Emory University, Atlanta, GA
38. Tennessee State University, Nashville

**2006**

37. University of Arkansas, Fayetteville
36. University of Delaware, Wilmington
35. Temple University, Philadelphia, PA
34. ACS Southeast Meeting, Augusta, GA
33. East Carolina Univ, Greenville, NC
32. ACS National Meeting, San Francisco, CA
31. Organic Reactions Gordon Conference
30. Eli Lilly Pharmaceuticals, Indianapolis, IN
29. ACS Florida Meeting, Orlando
28. Organic Faculty of Florida Conference
27. Univ of North Florida, Jacksonville
26. Vanderbilt University, Nashville, TN
25. Austin Peay State Univ, Clarksville, TN
24. Merck Research, Rahway, NJ
23. Univ of North Carolina, Chapel Hill
22. GlaxoSmithKline, RTP, NC
21. Duke University, Durham, NC

**2005**

20. Univ of Massachusetts, Amherst
19. Smith College, Northampton, MA
18. University of Connecticut, Storrs
17. University of Houston, TX
16. University of Florida, Gainesville
15. University of Georgia, Athens
14. Gulf Coast Chemistry Conference
13. Natural Products Gordon Conference
12. University of Alabama, Tuscaloosa
11. University of West Florida, Pensacola

**2004**

10. Rutgers University, New Brunswick, NJ
9. Barry University, Miami, FL
8. Southern University, Baton Rouge, LA
7. Kenesaw State University, Kenesaw, GA
6. ACS Florida Meeting, Orlando
5. Organic Faculty of Florida Conference

**2003**

4. Florida Institute of Technology

13

3. College of Charleston, SC  
2. Florida International University, Miami  
1. University of Miami, FL

## Financial Support

### Current Funding

- 09/2013–08/2016 *Synthesis of high-value alkynes*
  Source: National Science Foundation
  Award (Amount): NSF-CHE 1300722 ($450,000 total; $336,615 direct)
  Role: PI (80%); co-PI: Igor Alabugin (20%)

### Prior Funding

- 07/2011–08/2013 *New fragmentation reactions and strategies for chemical synthesis*
  Source: FSU Research Foundation
  Award (Amount): FSU-BRIDGE ($84,814)
  Role: PI

- 07/2008–06/2011 *New fragmentation reactions and strategies for chemical synthesis*
  Source: National Science Foundation
  Award (Amount): NSF-CHE 0749918 ($378,000 total; $272,677 direct)
  Role: PI

- 05/2011–08/2011 *Microwave-actuated organic reagents*
  Source: FSU Committee on Faculty Research Support (COFRS)
  Award (Amount): Faculty Summer Awards ($14,000)
  Role: PI

- 04/2010–03/2011 *Developing scholar award*
  Source: FSU Council on Research Creativity (CRC)
  Award (Amount): Developing Scholars 2010 Award ($10,000)
  Role: PI

- 01/2008–12/2008 *Organic Reagents for Current and Future Markets*
  Source: FSU Research Foundation
  Award (Amount): GAP award ($46,400)
  Role: PI

- 07/2005–06/2008 *Organic Synthesis and Methodology for Roseophilin, A Pharmacologically Active Natural Product*
  Source: James and Ester King Biomedical Research Program, Florida Department of Health
  Award (Amount): FBRP-DOH, 016272 ($450,000 total; $429,618 direct)
  Role: PI

- 01/2004–12/2007 *Ring Expansion Strategies for Preparing Cyclophanes: Concise Syntheses of Roseophilin and Floresolide A*
  Source: Research Corporation
  Award (Amount): Research Innovation Award, RI1161 ($35,000)
  Role: PI

- 06/2005–08/2007 *An Allene-Centered Pericyclic Reaction Sequence for the Synthesis of the Cyathane Diterpenes*
  Source: American Chemical Society, Petroleum Research Fund
  Award (Amount): PRF Type G, 42180-G1 ($35,000)
  Role: PI

- 05/2004 *Synthesis of Cytotoxic Cyclophanes: Haouamine A*
  Source: Oak Ridge Associated Universities
  Award (Amount): Ralph E. Powe Junior Faculty Enhancement Award ($10,000)

Role: PI
- 05/2003–08/2003 *New Reagents for Organic Synthesis: Strained Silacycles*
    Source: FSU Council for Research and Creativity (CRC)
    Award (Amount): First Year Assistant Professor Award ($12,000)
    Role: PI

# Expert Witness and Legal Consulting

## *Representative Reports:*

- *Brief Of Expert Forensic Scientists As Amici Curiae In Support Of Petitioner Stephen McFadden* (Stephen Dominick McFadden v. United States of America)
    - Amicus Brief to the Supreme Court of the United States
    - Counsel of Record: Prof. Gerald M. Finkel, Charleston School of Law
- *Sentencing guideline considerations for methylone*
- *Sentencing guideline considerations for ethylone*
- *Structural analysis of PB-22 as a possible analogue of JWH-018*
- *The chemical structure of AB-Pinaca and its status as a possible controlled substance analogue of ADB-Pinaca*
- *Expert opinion [on] the comparative pharmacology of JWH-018 and AM-2201*
- *Comparative analysis of JWH-018, UR-144, and XLR-11 (5F-UR-144)*
- *Summary of scientific opinion on chemical structures*
- *Past and present applications of the Analogue statute*
- *Scientific considerations relevant to the Analogue statute*


## *Expert Witness Experience:*

19. United States Federal Court, Southern District of Florida, West Palm Beach, 2016-05-20
    Case 2:15-80068-CR-Rosenberg: *Sentencing hearing for a criminal proceeding*
    Defendant: Kevin Raphael Bully
    Proffered and qualified as an expert in chemistry
    Provided expert testimony and opinion on the chemical structures of controlled substances methylenedioxyethcathinone (MDEC, ethylone) and α-pyrrolidinovalerophenone (α-PVP) and their respective similarities and differences with respect to substances referenced in the Guidelines Manual for the purposes of sentencing considerations.

18. United States Federal Court, Middle District of Florida, Tampa, 2016-05-18
    Case 8:15-cr-00064-CEH-TBM: *Sentencing hearing for a criminal proceeding*
    Defendant: Saher Abdullah
    Qualified as an expert in chemistry; testified on molecular structure and pharmacology
    Provided expert testimony and opinion on the preparation, molecular pharmacology, and pharmacological effects of so-called "synthetic marijuana" containing the controlled substance XLR-11 as compared to marijuana and THC.

17. United States Federal Court, District of New Mexico, Santa Fe, 2016-05-10
    Case 1:12-cr-001766 MCA: *Daubert hearing for expert witnesses in a criminal proceeding*
    Defendant: Hussein Al-Omari
    Prepared expert testimony and opinion on the chemical structure and pharmacological effects of synthetic substances including AM-2201, UR-144, 4-MEC, and α-PVP, which were alleged to be Controlled Substance Analogues (*charges dropped prior to hearing*).

16. United States Federal Court, Middle District of Florida, Ft. Myers, 2016-03-28
    Case 2:15-cr-00004-SPC-CM: *Sentencing hearing for a criminal proceeding*
    Defendant: Travis Riddle
    Proffered and qualified as an expert in chemistry and pharmacology
    Provided expert testimony and opinion on the controlled substance dimethyltryptamine (DMT): extraction from natural sources, methods of abuse, and pharmacological effects

15. United States Federal Court, District of Utah, Salt Lake City, 2016-02-29
    Case 2:13-cr-00780-CW-DBP: *Daubert hearing for experts in a criminal proceeding*
    Defendant: Muhammad Mansoor
    Prepared expert testimony and opinion on the chemical structure and pharmacological effects of synthetic substances including AM-2201, JWH-122, MAM-2201, UR-144, XLR-11, and 5-MeO-DALT, which were alleged to be Controlled Substance Analogues (*charges dropped at the start of the hearing*).

14. United States Federal Court, Southern District of Florida, West Palm Beach, 2015-12-11
    Case 2:15-cr-14034-DMM: *Sentencing hearing for a criminal proceeding*
    Defendant: Saiful Hossain
    Proffered and qualified as an expert in molecular pharmacology
    Provided expert testimony and opinion on molecular pharmacology and pharmacological effects of so-called "synthetic marijuana" containing the controlled substance XLR-11 as compared to marijuana and THC

13. State of Florida 15th Judicial Circuit, Palm Beach County, 2015-11-05
    Case No. 2013CF009053BMB: *Criminal trial by jury*
    Defendant: William Sands
    Expert testimony in the areas of forensic chemistry and drug science
    Provided expert testimony and opinion on substances alleged to be synthetic marijuana, and on the forensic detection and analysis of the controlled substance PB-22

12. United States Federal Court, Southern District of Florida, Miami, 2015-10-23
    Case 2:15-20350-CR: *Sentencing hearing for a criminal proceeding*
    Defendant: Mario Malespin
    Proffered and qualified as an expert in chemistry and pharmacology
    Provided expert testimony and opinion on the chemical structure, pharmacological effects, and potency of the controlled substance, methylenedioxyethcathinone (MDEC, ethylone)

11. United States Federal Court, District of New Mexico, Albuquerque, 2015-07-07
    Case 1:13-cr-00571-MCA: *Daubert hearing for expert witnesses in a criminal proceeding*
    Defendant: Nathan Coccimiglio
    Proffered and qualified as an expert in chemistry
    Provided expert testimony and opinion on the chemical structure and pharmacological effects of synthetic cannabinoid substances including AM-2201, AM-694, JWH-250, UR-144, and XLR-11, which were alleged to be Controlled Substance Analogues of JWH-018

10. United States Federal Court, Middle District of Florida, Tampa, 2015-05-05
    Case 8:14-cr-00409-CEH-TBM: *Sentencing hearing for a criminal proceeding*
    Defendant: Wagner Cruz
    Qualified as an expert in chemistry; testified on chemistry and pharmacology
    Provided expert testimony and opinion on the chemical structure, pharmacological effects, and potency of the controlled substance, methylenedioxyethcathinone (MDEC, ethylone)

9. United States Federal Court, Middle District of Florida, Ft. Myers, 2015-04-28
   Case 2:14-CR-79-FIM-38DNF: *Sentencing hearing for a criminal proceeding*
   Defendant: Ferenc Palfalvi
   Proffered and qualified as an expert in chemistry and pharmacology
   Provided expert testimony and opinion on the chemical structure, pharmacological effects, and potency of the controlled substance, methylenedioxyethcathinone (MDEC, ethylone)

8. United States Federal Court, Middle District of Florida, Tampa, 2015-01-27
   Case 8:14-cr-00387-VMC-TBM: *Sentencing hearing for a criminal proceeding*
   Defendant: (Attorney: Dionja Dyer)
   Proffered and qualified as an expert in chemistry and pharmacology
   Provided expert testimony and opinion on the chemical structure, pharmacological effects, and potency of the controlled substance, methylenedioxyethcathinone (MDEC, ethylone)

7. United States Federal Court, District of Nevada, Las Vegas, 2014-12-03
   Case 2:13-cr-00255-JAD-GWF: *Sentencing hearing for a criminal proceeding*
   Defendant: Syvilay Thannavongsa
   Proffered and qualified as an expert in chemistry (telephonic testimony)
   Provided expert testimony and opinion on the chemical structure of the controlled substance, methylenedioxymethcathinone (MDMC, methylone)

6. United States Federal Court, Middle District of Florida, Tampa, 2014-11-18
   Case 8:13-cr-00421-MSS-TGW: *Sentencing hearing for a criminal proceeding*
   Defendant: John McGuire
   Proffered and qualified as an expert in chemistry
   Provided expert testimony and opinion on the chemical structure of the controlled substance, methylenedioxymethcathinone (MDMC, methylone)

5. United States Federal Court, Eastern District of New York, Brooklyn, 2014-08-20
   Case 13CR00570 (JBW): *Sentencing hearing for a criminal proceeding*
   Defendant: Chin Chong
   Proffered and qualified as an expert in chemistry (telephonic testimony)
   Provided expert testimony and opinion on the chemical structure of the controlled substance, methylenedioxymethcathinone (MDMC, methylone)

4. United States Federal Court, District of Minnesota, Minneapolis, 2013-09-30
   CASE 0:12-cr-00305-DSD-LIB: *Criminal trial by jury*
   Defendant: James Robert Carlson
   Testified as an expert in chemistry and pharmacology
   Provided expert testimony and opinion on the chemical structure and pharmacological effects of synthetic cannabinoid substances including AM-2201, UR-144, and XLR-11, which were alleged to be Controlled Substance Analogues of JWH-018

3. State of Louisiana 22nd Judicial District Court, Parish of St Tammany, 2013-02-06
   Case No. 524706/7 D: *Hearing on a motion to quash a criminal indictment*
   Defendant: David D'Aquin
   Proffered and qualified as an expert in chemistry and pharmacology
   Provided expert testimony and opinion on the chemical structure and pharmacological effects of synthetic cannabinoid substances of UR-144 and XLR-11, which were alleged to be Controlled Substance Analogues of JWH-018

2. United States Federal Court, Eastern District of Wisconsin, Milwaukee, 2013-02-28

Case 2:12-cv-01186-RTR: *Hearing on a petition for return of property*

Petitioner: The Smoke Shop, LLC

Proffered and qualified as an expert in chemistry and pharmacology

Provided expert testimony and opinion on the chemical structure and pharmacological effects of UR-144 and XLR-11, alleged to be Controlled Substance Analogues of JWH-018

1. United States Federal Court, Middle District of Florida, Orlando, 2012-12-06

6:12-cr-209-Orl-37DAB: *Joint hearing on a motion to dismiss a criminal indictment and a petition for return of property*

Defendants: Ilan Fedida and Timothy Hummel

Attended the hearing and wrote a brief on scientific considerations for the Court

# Exhibit B

| 14 CFR part or section identified and described | Current OMB control number |
|---|---|
| * * * * * | |
| Part 121 ................................................................ | 2120–0008, 2120–0028, 2120–0535, 2120–0571, 2120–0600, 2120–0606, 2120–0614, 2120–0616, 2120–0631, 2120–0651, 2120–0653, 2120–0691, 2120–0702, 2120–0739 |
| * * * * * | |

Issued in Washington, DC, under the authority provided by 49 U.S.C. 106(f) and 44701(a) on February 28, 2014.

**Lirio Liu,**

*Director, Office of Rulemaking.*

[FR Doc. 2014–04902 Filed 3–6–14; 8:45 am]

**BILLING CODE 4910–13–P**

## DEPARTMENT OF JUSTICE

### Drug Enforcement Administration

### 21 CFR Part 1308

[Docket No. DEA–386]

### Schedules of Controlled Substances: Temporary Placement of 10 Synthetic Cathinones Into Schedule I

**AGENCY:** Drug Enforcement Administration, Department of Justice.

**ACTION:** Final order.

**SUMMARY:** The Deputy Administrator of the Drug Enforcement Administration (DEA) is issuing this final order to temporarily schedule 10 synthetic cathinones into schedule I pursuant to the temporary scheduling provisions of the Controlled Substances Act (CSA). The 10 substances are: 4-methyl-*N*-ethylcathinone ("4-MEC"); 4-methyl-*alpha*-pyrrolidinopropiophenone ("4-MePPP"); alpha-pyrrolidinopentiophenone ("α-PVP"); 1-(1,3-benzodioxol-5-yl)-2-(methylamino)butan-1-one ("butylone"); 2-(methylamino)-1-phenylpentan-1-one ("pentedrone"); 1-(1,3-benzodioxol-5-yl)-2-(methylamino)pentan-1-one ("pentylone"); 4-fluoro-*N*-methylcathinone ("4–FMC"); 3-fluoro-*N*-methylcathinone ("3–FMC"); 1-(naphthalen-2-yl)-2-(pyrrolidin-1-yl)pentan-1-one ("naphyrone"); and alpha-pyrrolidinobutiophenone ("α-PBP"). This action is based on a finding by the Deputy Administrator that the placement of these synthetic cathinones and their optical, positional, and geometric isomers, salts and salts of isomers into schedule I of the CSA is necessary to avoid an imminent hazard to the public safety. As a result of this order, the regulatory controls and administrative, civil, and criminal sanctions applicable to schedule I controlled substances will be imposed on persons who handle (manufacture, distribute, import, export, engage in research, conduct instructional activities, and possess), or propose to handle these synthetic cathinones.

**DATES:** This final order is effective March 7, 2014.

**FOR FURTHER INFORMATION CONTACT:** Ruth A. Carter, Office of Diversion Control, Drug Enforcement Administration; Mailing Address: 8701 Morrissette Drive, Springfield, Virginia 22152, Telephone (202) 598–6812.

**SUPPLEMENTARY INFORMATION:**

### Legal Authority

The DEA implements and enforces titles II and III of the Comprehensive Drug Abuse Prevention and Control Act of 1970, as amended. Titles II and III are referred to as the "Controlled Substances Act" and the "Controlled Substances Import and Export Act," respectively, and are collectively referred to as the "Controlled Substances Act" or the "CSA" for the purpose of this action. 21 U.S.C. 801–971. The DEA publishes the implementing regulations for these statutes in title 21 of the Code of Federal Regulations (CFR), parts 1300 to 1321. The CSA and its implementing regulations are designed to prevent, detect, and eliminate the diversion of controlled substances and listed chemicals into the illicit market while providing for the legitimate medical, scientific, research, and industrial needs of the United States. Controlled substances have the potential for abuse and dependence and are controlled to protect the public health and safety.

Under the CSA, controlled substances are classified into one of five schedules based upon their potential for abuse, their currently accepted medical use, and the degree of dependence the substance may cause. 21 U.S.C. 812. The initial schedules of controlled substances established by Congress are found at 21 U.S.C. 812(c), and the current list of all scheduled substances is published at 21 CFR part 1308.

Section 201 of the CSA, 21 U.S.C. 811, provides the Attorney General with the authority to temporarily place a substance into schedule I of the CSA for two years without regard to the requirements of 21 U.S.C. 811(b) if he finds that such action is necessary to avoid an imminent hazard to the public safety. 21 U.S.C. 811(h). In addition, if proceedings to control a substance are initiated under 21 U.S.C. 811(a)(1), the Attorney General may extend the temporary scheduling for up to one year. 21 U.S.C. 811(h)(2).

Where the necessary findings are made, a substance may be temporarily scheduled if it is not listed in any other schedule under section 202 of the CSA, 21 U.S.C. 812, or if there is no exemption or approval in effect for the substance under section 505 of the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. 355. 21 U.S.C. 811(h)(1); 21 CFR part 1308. The Attorney General has delegated his authority under 21 U.S.C. 811 to the Administrator of the DEA, who in turn has delegated her authority to the Deputy Administrator of the DEA. 28 CFR 0.100, Appendix to Subpart R of Part 0, Sec. 12.

### Background

Section 201(h)(4) of the CSA (21 U.S.C. 811(h)(4)) requires the Deputy Administrator to notify the Secretary of the Department of Health and Human Services (HHS) of his intention to temporarily place a substance into schedule I of the CSA.[1] The Deputy Administrator transmitted notice of his intent to place 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP into schedule I on a temporary basis to

---

[1] Because the Secretary of the HHS has delegated to the Assistant Secretary for Health of the HHS the authority to make domestic drug scheduling recommendations, for purposes of this Final Order, all subsequent references to "Secretary" have been replaced with "Assistant Secretary." As set forth in a memorandum of understanding entered into by HHS, the Food and Drug Administration (FDA), and the National Institute on Drug Abuse (NIDA), FDA acts as the lead agency within HHS in carrying out the Assistant Secretary's scheduling responsibilities under the CSA, with the concurrence of NIDA. 50 FR 9518, Mar. 8, 1985.

the Assistant Secretary by letter dated November 7, 2013. The Assistant Secretary responded to this notice by letter dated December 4, 2013, and advised that based on review by the FDA, there are currently no investigational new drug applications or approved new drug applications for 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP. The Assistant Secretary also stated that the HHS has no objection to the temporary placement of 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP into schedule I of the CSA.

The DEA has taken into consideration the Assistant Secretary's comments as required by 21 U.S.C. 811(h)(4). As 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP are not currently listed in any schedule under the CSA, and as no exemptions or approvals are in effect for 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP under section 505 of the FDCA, 21 U.S.C. 355, the conditions of 21 U.S.C. 811(h)(1) have been satisfied. As required by 21 U.S.C. 811(h)(1)(A), a notice of intent to temporarily schedule these 10 synthetic cathinones was published in the **Federal Register** on January 28, 2014. 79 FR 4429.

To find that placing a substance temporarily into schedule I of the CSA is necessary to avoid an imminent hazard to the public safety, the Deputy Administrator is required to consider three of the eight factors set forth in section 201(c) of the CSA, 21 U.S.C. 811(c): The substance's history and current pattern of abuse; the scope, duration, and significance of abuse; and what, if any, risk there is to the public health. 21 U.S.C. 811(h)(3). Consideration of these factors includes actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution. 21 U.S.C. 811(h)(3).

A substance meeting the statutory requirements for temporary scheduling may only be placed in schedule I. 21 U.S.C. 811(h)(1). Substances in schedule I are those that have a high potential for abuse, no currently accepted medical use in treatment in the United States, and a lack of accepted safety for use under medical supervision. 21 U.S.C. 812(b)(1). Available data and information for 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP indicate that these 10 synthetic cathinones have a high potential for abuse, no currently accepted medical

use in treatment in the United States, and a lack of accepted safety for use under medical supervision.

**Synthetic Cathinones**

Synthetic cathinones are β-keto-phenethylamine derivatives of the larger phenethylamine structural class (amphetamines, cathinones, 2C compounds, aminoindanes, etc.). Synthetic cathinones share a core phenethylamine structure with substitutions at the β-position, α-position, phenyl ring, or nitrogen atom. The addition of a beta-keto (β-keto) substituent (i.e., carbonyl (C=O)) to the phenethylamine core structure along with substitutions on the alpha (α) carbon (C) atom or the nitrogen (N) atom produce a variety of substances called cathinones or synthetic cathinones. Many synthetic cathinones produce pharmacological effects substantially similar to the schedule I substances cathinone, methcathinone, and 3,4-methylenedioxymethamphetamine (MDMA) and schedule II stimulants amphetamine, methamphetamine, and cocaine. 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP are synthetic cathinones and are structurally and pharmacologically similar to amphetamine, MDMA, cathinone, and other related substances. Accordingly, these synthetic cathinone substances share substantial similarities with schedule I and schedule II substances with respect to desired and adverse effects. In general, desired effects reported by abusers of synthetic cathinone substances include euphoria, sense of well-being, increased sociability, energy, empathy, increased alertness, and improved concentration and focus. Abusers also report experiencing unwanted effects such as tremor, vomiting, agitation, sweating, fever, and chest pain. Other adverse or toxic effects that have been reported with the abuse of synthetic cathinones include tachycardia, hypertension, hyperthermia, mydriasis, rhabdomyolysis, hyponatremia, seizures, altered mental status (paranoia, hallucinations, delusions), and even death. These synthetic cathinone substances have no known medical use in the United States but evidence demonstrates that these substances are being abused by individuals. There have been documented reports of emergency room admissions and deaths associated with the abuse of synthetic cathinone substances.

Products that contain synthetic cathinones have been falsely marketed as "research chemicals," "jewelry

cleaner," "stain remover," "plant food or fertilizer," "insect repellants," or "bath salts." These products are sold at smoke shops, head shops, convenience stores, adult book stores, and gas stations and can also be purchased on the Internet. These substances are commonly encountered in the form of powders, crystals, resins, tablets, and capsules.

From January 2010 through December 2013, according to the System to Retrieve Information from Drug Evidence[2] (STRIDE) data, there are 377 exhibits for 4-MEC; 125 exhibits for 4-MePPP; 689 exhibits for α-PVP; 75 exhibits for butylone; 304 exhibits for pentedrone; 121 exhibits for pentylone; 37 exhibits for FMC[3]; 24 exhibits for naphyrone; and 37 exhibits for α-PBP. From January 2010 through December 2013, the National Forensic Laboratory Information System[4] (NFLIS) registered 9,113 reports containing these synthetic cathinones (4-MEC—1,952 reports; 4-MePPP—289 reports; α-PVP—4,536 reports; butylone—495 reports; pentedrone—1,167 reports; pentylone—238 reports; FMC[5]—292 reports; naphyrone—44 reports; α-PBP—100 reports) across 42 States.

**Factor 4. History and Current Pattern of Abuse**

4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP are synthetic cathinones that emerged on the United States' illicit drug market around the time of the temporary scheduling of mephedrone, MDPV, and methylone on October 21, 2011. 76 FR 65371. Mephedrone and MDPV were permanently placed in schedule I on July 9, 2012, by the Food and Drug Administration Safety and Innovation Act (Pub. L. 112–144), and methylone was permanently placed in schedule I by the DEA on April 12, 2013 (78 FR 21818). These synthetic cathinone substances, like the schedule I synthetic cathinones (mephedrone, methylone, and MDPV), are promoted as being a "legal" alternative to cocaine, methamphetamine, and MDMA. Products that contain 4-MEC, 4-MePPP,

---

[2] STRIDE is a database of drug exhibits sent to the DEA laboratories for analysis. Exhibits from the database are from the DEA, other Federal agencies, and some local law enforcement agencies. STRIDE data was queried on 2/5/2014 by date submitted to Federal forensic laboratories.

[3] FMC refers to both 3-FMC and 4-FMC.

[4] NFLIS is a national drug forensic laboratory reporting system that systematically collects results from drug chemistry analyses conducted by State and local forensic laboratories across the country. NFLIS State and local forensic drug reports were queried on 2/6/2014.

[5] FMC refers to both 3-FMC and 4-FMC.

α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP are falsely marketed as "research chemicals," "jewelry cleaner," "stain remover," "plant food or fertilizer," "insect repellants," or "bath salts." They are sold at smoke shops, head shops, convenience stores, adult book stores, and gas stations, and can also be purchased on the Internet under a variety of product names (e.g., "White Dove," "Explosion," and "Tranquility"). They are commonly encountered in the form of powders, crystals, resins, tablets, and capsules. The packages of these commercial products usually contain the warning "not for human consumption."

Information from published scientific studies indicates that the most common routes of administration for synthetic cathinone substances is ingestion by swallowing capsules or tablets or nasal insufflation by snorting the powder. Other methods of intake include intravenous or intramuscular injection, rectal administration, and swallowing via ingestion by "bombing" (wrapping a dose of powder in paper).

There is evidence that these synthetic cathinone substances are abused alone or ingested with other substances including other synthetic cathinones, pharmaceutical agents, or other recreational substances. Substances found in combination with 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, or naphyrone are: Other synthetic cathinones (e.g., methylone and MDPV), common cutting agents (e.g., lidocaine, caffeine, lignocaine, ephedrine, etc.), or other recreational substances (e.g., cocaine, methamphetamine, and amphetamine).

Evidence from poison centers and published reports suggest that the primary users of synthetic cathinones are youths and young adults. Synthetic cathinone exposures reported to the Texas Poison Center Network during 2010 and 2011 involved mostly adolescents (12 to 19-years-old) and young adults (mean age was 30-years-old). A survey of college students reported that the lifetime use (used at least once) of synthetic cathinones among college students (at a large Southeastern United States university) is 25 out of 2,349 students surveyed. A national survey on drug use by the Monitoring the Future (MTF)[6] research program showed that 0.2% of full-time college students (one to four years past

high school) used synthetic cathinone substances in 2012. Similarly, the use of synthetic cathinone substances among 8th, 10th, and 12th grade students, and young adults (non-college peers aged 19 to 28-years-old) was 0.8%, 0.6%, 1.3%, and 0.8%, respectively.

**Factor 5. Scope, Duration and Significance of Abuse**

4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP, like the schedule I cathinones mephedrone, methylone, and MDPV, are popular recreational drugs. Evidence that these synthetic cathinone substances are being abused is indicated by law enforcement encounters of these substances. Forensic laboratories have analyzed drug exhibits received from State, local, and Federal law enforcement agencies and confirmed the presence of 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP in these exhibits.

STRIDE registered 1,789 drug exhibits pertaining to the trafficking, distribution and abuse of 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP from January 2010 to December 2013.[7] Specifically, in 2010, STRIDE contains four reports related to 4-MEC and none for the other nine substances. However, in 2011, there were 216 reports related to these 10 substances, and in 2012, there were 1,314 reports. In 2013, there were 255 reports.

NFLIS registered over 9,000 reports from State and local forensic laboratories identifying these substances in drug-related exhibits for the period from January 2010 to December 2013, across 42 States. Specifically, in 2010, NFLIS registered 13 reports from 5 States containing many of these synthetic cathinone substances.[8] In 2011, there were 800 reports from 32 States related to these substances registered in NFLIS, in 2012 there were 5,519 reports from 41 States, and in 2013 there were 2,781 reports from 42 States.

Additionally, large seizures of these substances have occurred by the United States Customs and Border Protection (CBP). At selected United States ports of entry, CBP encountered several shipments of products from April 2010 to November 2013 containing these synthetic cathinone substances (4-MEC—78 encounters; 4-MePPP—8

encounters; α-PVP—40 encounters; butylone—21 encounters; pentedrone—18 encounters; pentylone—10 encounters; FMC[9]—13 encounters; naphyrone—3 encounters; α-PBP—11 encounters), thus indicating the appeal of these substances. Most of the shipments of these synthetic cathinones originated overseas and were destined for delivery throughout the United States to States including Arizona, Arkansas, California, Colorado, Florida, Hawaii, Idaho, Illinois, Michigan, Missouri, Nebraska, Nevada, New Jersey, New Mexico, Oklahoma, Oregon, Texas, Virginia, Washington, and Wyoming.

Concerns over the abuse of these synthetic cathinone substances have prompted many States to regulate them. As of June 24, 2013, more than half of the States in the United States have emergency scheduled or enacted legislation placing regulatory controls on some or many of the 10 synthetic cathinones that are the subject of this final order. In addition, due to the use of synthetic cathinones by service members, the United States Armed Forces has prohibited the use of synthetic cathinones for intoxication purposes.

**Factor 6. What, If Any, Risk There Is to the Public Health**

Available evidence on the overall public health risks associated with the use of synthetic cathinones indicates that 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP can cause acute health problems leading to emergency department admissions, violent behaviors causing harm to self or others, or death. For example, individuals have presented at emergency departments following exposure to some of these synthetic cathinone substances or products containing them. In addition, products containing these synthetic cathinone substances often do not bear labeling information regarding their ingredients and, if they do, they may not list the active synthetic ingredients or identify the health risks and potential hazards associated with these products. Acute effects of these substances are those typical of sympathomimetic agents (e.g., cocaine, methamphetamine, and amphetamine) and include, among other effects, tachycardia, headache, bruxism (teeth grinding), palpitations, agitation, anxiety, insomnia, mydriasis, tremor, fever or sweating, and hypertension. Other effects, with public health risk implications, that have been reported from the use of synthetic

---

[6] MTF is a research program conducted by the University of Michigan's Institute for Social Research under grants from NIDA. MTF tracks drug use trends among American adolescents in the 8th, 10th, and 12th grades and high school graduates into adulthood by conducting nationwide surveys.

[7] STRIDE data was queried on 2/5/2014 by date submitted to Federal forensic laboratories.

[8] NFLIS State and local forensic drug reports were queried on 2/6/2014.

[9] FMC refers to both 3-FMC and 4-FMC.

cathinone substances include vomiting, palpitations, chest pain, hyperthermia, rhabdomyolysis, hyponatremia, seizures, and altered mental status (paranoia, hallucinations, and delusions). Finally, the possibility of death for individuals abusing 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP indicates that these substances are serious public health threats. Some of these synthetic cathinone substances have been directly or indirectly implicated in the death of individuals. For example, a 24-year-old female died after ingesting two capsules of what she believed to be ''Ecstasy'' but was subsequently confirmed to be a mixture of methylone and butylone. The cause of death determined by the medical examiner was serotonin syndrome secondary to methylone and butylone ingestion. A 21-year-old male who ingested butylone for suicidal intentions died after he developed seizures and suffered a cardiac and respiratory arrest. The cause of death was reported as multi-organ failure resulting from malignant serotonin syndrome.

**Finding of Necessity of Schedule I Placement To Avoid Imminent Hazard to Public Safety**

Based on the above summarized data and information, the continued uncontrolled manufacture, distribution, importation, exportation, and abuse of 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP pose an imminent hazard to the public safety. The DEA is not aware of any currently accepted medical uses for these synthetic cathinones in the United States. A substance meeting the statutory requirements for temporary scheduling, 21 U.S.C. 811(h)(1), may only be placed in schedule I. Substances in schedule I are those that have a high potential for abuse, no currently accepted medical use in treatment in the United States, and a lack of accepted safety for use under medical supervision. 21 U.S.C. 812(b). Based on available data and information for 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP, the Deputy Administrator has made the determination that these 10 synthetic cathinones have a high potential for abuse, no currently accepted medical use in treatment in the United States, and a lack of accepted safety for use under medical supervision. As required by section 201(h)(4) of the CSA, 21 U.S.C. 811(h)(4), the Deputy Administrator through a letter dated November 7, 2013, notified the Assistant Secretary of the DEA's intention to temporarily place these 10 synthetic cathinones in schedule I.

**Conclusion**

In accordance with the provisions of section 201(h) of the CSA, 21 U.S.C. 811(h), the Deputy Administrator considered available data and information, herein set forth the grounds for his determination that it is necessary to temporarily place 10 synthetic cathinones, 4-MEC, 4-MePPP, α-PVP, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP into schedule I of the CSA, and finds that placement of these synthetic cathinones into schedule I of the CSA is warranted in order to avoid an imminent hazard to the public safety.

Because the Deputy Administrator hereby finds that it is necessary to temporarily place these synthetic cathinones into schedule I to avoid an imminent hazard to the public safety, the final order temporarily scheduling these substances will be effective on the date of publication in the **Federal Register,** and will be in effect for a period of two years, with a possible extension of one additional year, pending completion of the regular (permanent) scheduling process. 21 U.S.C. 811(h)(1) and (2).

The CSA sets forth specific criteria for scheduling a drug or other substance. Regular scheduling actions in accordance with 21 U.S.C. 811(a) are subject to formal rulemaking procedures done ''on the record after opportunity for a hearing'' conducted pursuant to the provisions of 5 U.S.C. 556 and 557. 21 U.S.C. 811. The regular scheduling process of formal rulemaking affords interested parties with appropriate process and the government with any additional relevant information needed to make a determination. Final decisions that conclude the regular scheduling process of formal rulemaking are subject to judicial review. 21 U.S.C. 877. Temporary scheduling orders are not subject to judicial review. 21 U.S.C. 811(h)(6).

**Requirements for Handling**

Upon the effective date of this final order, 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP become subject to the regulatory controls and administrative, civil, and criminal sanctions applicable to the manufacture, distribution, importing, exporting, research, conduct of instructional activities, and possession of schedule I controlled substances including the following:

1. *Registration.* Any person who handles (manufactures, distributes, imports, exports, engages in research, conducts instructional activities with, or possesses), or desires to handle, 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP, must be registered with the DEA to conduct such activities pursuant to 21 U.S.C. 822, 823, 957, and 958 and in accordance with 21 CFR parts 1301 and 1312 as of March 7, 2014. Any person who currently handles 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP, and is not registered with the DEA, must submit an application for registration and may not continue to handle 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP as of March 7, 2014, unless the DEA has approved that application for registration, pursuant to 21 U.S.C. 822, 823, 957, 958, and in accordance with 21 CFR parts 1301 and 1312. Retail sales of schedule I controlled substances to the general public are not allowed under the CSA.

2. *Security.* 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP are subject to schedule I security requirements and must be handled and stored pursuant to 21 U.S.C. 821, 823, 871(b), and in accordance with 21 CFR 1301.71–1301.93, as of March 7, 2014.

3. *Labeling and Packaging.* All labels and labeling for commercial containers of 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP must be in compliance with 21 U.S.C. 825, 958(e), and be in accordance with 21 CFR part 1302 as of March 7, 2014. Current DEA registrants shall have 30 calendar days from March 7, 2014, to comply with all labeling and packaging requirements.

4. *Inventory.* Every DEA registrant who possesses any quantity of 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP on the effective date of this order, must take an inventory of all stocks of these substances on hand as of March 7, 2014, pursuant to 21 U.S.C. 827, 958, and in accordance with 21 CFR 1304.03, 1304.04, and 1304.11(a) and (d). Current DEA registrants shall have 30 calendar days from the effective date of this order to be in compliance with all inventory requirements.

After the initial inventory, every DEA registrant must take an inventory of all controlled substances (including 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, and α-PBP) on hand on a biennial basis, pursuant to 21 U.S.C. 827, 958, and in

accordance with 21 CFR 1304.03, 1304.04, and 1304.11.

5. *Records.* All DEA registrants must maintain records with respect to 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP pursuant to 21 U.S.C. 827, 958, and in accordance with 21 CFR parts 1304, 1307, and 1312 as of March 7, 2014. Current DEA registrants authorized to handle 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP shall have 30 calendar days from the effective date of this order to be in compliance with all recordkeeping requirements.

6. *Reports.* All DEA registrants who manufacture or distribute 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP must submit reports pursuant to 21 U.S.C. 827 and in accordance with 21 CFR 1304.33 as of March 7, 2014.

7. *Order Forms.* All registrants who distribute 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP must comply with order form requirements pursuant to 21 U.S.C. 828 and in accordance with 21 CFR part 1305 as of March 7, 2014.

8. *Importation and Exportation.* All importation and exportation of 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP must be in compliance with 21 U.S.C. 952, 953, 957, 958, and in accordance with 21 CFR part 1312 as of March 7, 2014.

9. *Quota.* Only registered manufacturers may manufacture 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP in accordance with a quota assigned pursuant to 21 U.S.C. 826 and in accordance with 21 CFR part 1303.

10. *Criminal Liability.* Any activity involving 4-MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4-FMC, 3-FMC, naphyrone, or α-PBP not authorized by, or in violation of the CSA, occurring as of March 7, 2014, is unlawful, and may subject the person to administrative, civil, and/or criminal sanctions.

**Regulatory Matters**

Section 201(h) of the CSA, 21 U.S.C. 811(h), provides for an expedited temporary scheduling action where such action is necessary to avoid an imminent hazard to the public safety. As provided in this subsection, the Attorney General may, by order, schedule a substance in schedule I on a temporary basis. Such an order may not be issued before the expiration of 30 days from (1) the publication of a notice

in the **Federal Register** of the intention to issue such order and the grounds upon which such order is to be issued, and (2) the date that notice of the proposed temporary scheduling order is transmitted to the Assistant Secretary. 21 U.S.C. 811(h)(1).

Inasmuch as section 201(h) of the CSA directs that temporary scheduling actions be issued by order and sets forth the procedures by which such orders are to be issued, the DEA believes that the notice and comment requirements of section 553 of the Administrative Procedure Act (APA), 5 U.S.C. 553, do not apply to this temporary scheduling action. In the alternative, even assuming that this action might be subject to section 553 of the APA, the Deputy Administrator finds that there is good cause to forgo the notice and comment requirements of section 553, as any further delays in the process for issuance of temporary scheduling orders would be impracticable and contrary to the public interest in view of the manifest urgency to avoid an imminent hazard to the public safety. Further, the DEA believes that this temporary scheduling action final order is not a ''rule'' as defined by 5 U.S.C. 601(2), and, accordingly, is not subject to the requirements of the Regulatory Flexibility Act (RFA). The requirements for the preparation of an initial regulatory flexibility analysis in 5 U.S.C. 603(a) are not applicable where, as here, the DEA is not required by section 553 of the APA or any other law to publish a general notice of proposed rulemaking.

Additionally, this action is not a significant regulatory action as defined by Executive Order 12866 (Regulatory Planning and Review), section 3(f), and, accordingly, this action has not been reviewed by the Office of Management and Budget (OMB).

This action will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132 (Federalism), it is determined that this action does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

Pursuant to section 808(2) of the Congressional Review Act (CRA), ''any rule for which an agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest, shall take effect at such time as the Federal agency promulgating the rule determines.'' 5 U.S.C. 808(2). It is

in the public interest to schedule these substances immediately because they pose a public health risk. This temporary scheduling action is taken pursuant to 21 U.S.C. 811(h), which is specifically designed to enable the DEA to act in an expeditious manner to avoid an imminent hazard to the public safety from new or designer drugs or abuse of those drugs. 21 U.S.C. 811(h) exempts the temporary scheduling order from standard notice and comment rulemaking procedures to ensure that the process moves swiftly. For the same reasons that underlie 21 U.S.C. 811(h), that is, the DEA's need to move quickly to place these substances into schedule I because they pose a threat to the public safety, it would be contrary to the public interest to delay implementation of the temporary scheduling order. Therefore, in accordance with section 808(2) of the CRA, this order shall take effect immediately upon its publication.

**List of Subjects in 21 CFR Part 1308**

Administrative practice and procedure, Drug traffic control, Reporting and recordkeeping requirements.

For the reasons set out above, 21 CFR part 1308 is amended as follows:

**PART 1308—SCHEDULES OF CONTROLLED SUBSTANCES**

■ 1. The authority citation for 21 CFR Part 1308 continues to read as follows:

**Authority:** 21 U.S.C. 811, 812, 871(b), unless otherwise noted.

■ 2. Amend § 1308.11 by adding new paragraphs (h)(19) through (h)(28), to read as follows:

**§ 1308.11   Schedule I.**

\*     \*     \*     \*     \*

(h)   \*   \*   \*

(19) 4-methyl-*N*-ethylcathinone, its optical, positional, and geometric isomers, salts and salts of isomers—1249 (Other names: 4-MEC; 2-(ethylamino)-1-(4-methylphenyl)propan-1-one)

(20) 4-methyl-*alpha*-pyrrolidinopropiophenone, its optical, positional, and geometric isomers, salts and salts of isomers—7498 (Other names: 4-MePPP; MePPP; 4-methyl-α-pyrrolidinopropiophenone; 1-(4-methylphenyl)-2-(pyrrolidin-1-yl)-propan-1-one)

(21) *alpha*-pyrrolidinopentiophenone, its optical, positional, and geometric isomers, salts and salts of isomers—7545 (Other names: α-PVP; α-pyrrolidinovalerophenone; 1-phenyl-2-(pyrrolidin-1-yl)pentan-1-one)

(22) Butylone, its optical, positional, and geometric isomers, salts and salts of

isomers—7541 (Other names: bk-MBDB; 1-(1,3-benzodioxol-5-yl)-2-(methylamino)butan-1-one)

(23) Pentedrone, its optical, positional, and geometric isomers, salts and salts of isomers—1246 (Other names: α-methylaminovalerophenone; 2-(methylamino)-1-phenylpentan-1-one)

(24) Pentylone, its optical, positional, and geometric isomers, salts and salts of isomers—7542 (Other names: bk-MBDP; 1-(1,3-benzodioxol-5-yl)-2-(methylamino)pentan-1-one)

(25) 4-fluoro-*N*-methylcathinone, its optical, positional, and geometric isomers, salts and salts of isomers—1238 (Other names: 4-FMC; flephedrone; 1-(4-fluorophenyl)-2-(methylamino)propan-1-one)

(26) 3-fluoro-*N*-methylcathinone, its optical, positional, and geometric isomers, salts and salts of isomers—1233 (Other names: 3-FMC; 1-(3-fluorophenyl)-2-(methylamino)propan-1-one)

(27) Naphyrone, its optical, positional, and geometric isomers, salts and salts of isomers—1258 (Other names: naphthylpyrovalerone; 1-(naphthalen-2-yl)-2-(pyrrolidin-1-yl)pentan-1-one)

(28) *alpha*-pyrrolidinobutiophenone, its optical, positional, and geometric isomers, salts and salts of isomers—7546 (Other names: α-PBP; 1-phenyl-2-(pyrrolidin-1-yl)butan-1-one)

Dated: February 28, 2014.

**Thomas M. Harrigan,**

*Deputy Administrator.*

[FR Doc. 2014–04997 Filed 3–6–14; 8:45 am]

**BILLING CODE 4410–09–P**

# DEPARTMENT OF THE TREASURY

## Office of the Secretary

## 31 CFR Part 1

**RIN 1545–AC47**

## Privacy Act, Implementation

**AGENCY:** Internal Revenue Service, Treasury.

**ACTION:** Final rule.

**SUMMARY:** In accordance with the requirements of the Privacy Act of 1974, as amended, the Department of the Treasury gives notice of an amendment to this part to reflect revisions of existing Internal Revenue Service (IRS) systems of records and to exempt the resulting revised systems of records from certain provisions of the Privacy Act. Criminal Investigation has revised five systems of records and deleted one system of records. This final rule

applies the previously approved exemptions to the newly revised and renamed systems of records.

**DATES:** Effective April 7, 2014.

**ADDRESSES:** Please submit comments to Anne Jensen, Tax Law Specialist, Office of Privacy, Governmental Liaison, and Disclosure, 1111 Constitution Avenue NW., Room 1621, Washington, DC 20224. Comments will be made available for inspection at the IRS Freedom of Information Reading Room (Room 1621), at the above address. The telephone number for the Reading Room is (202) 317–4997 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:** Anne Jensen, Tax Law Specialist, Office of Privacy, Governmental Liaison, and Disclosure, 1111 Constitution Avenue NW., Room 1621, Washington, DC 20024. Ms. Jensen may be reached via telephone at (202) 317–4997 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:** 5 U.S.C. 552a(j)(2): Under 5 U.S.C. 552a(j)(2), the head of any agency may promulgate rules to exempt any system of records within the agency from certain provisions of the Privacy Act of 1974 if the agency or component thereof that maintains the system performs as its principal function any activities pertaining to the enforcement of criminal laws. Certain components of the Department of the Treasury have as their principal function activities pertaining to the enforcement of criminal laws. The IRS is hereby giving notice of a final rule to exempt ''Treasury/IRS 46.002, Management Information System and Case Files, Criminal Investigation''; ''Treasury/IRS 46.003, Confidential Informant Records, Criminal Investigation''; ''Treasury/IRS 46.005, Electronic Surveillance and Monitoring Records, Criminal Investigation''; ''Treasury/IRS 46.015, Relocated Witness Records, Criminal Investigation''; and ''Treasury/IRS 46.050, Automated Information Analysis and Recordkeeping, Criminal Investigation,'' from certain provisions of the Privacy Act of 1974, pursuant to 5 U.S.C. 552a(j)(2) to the extent these records capture criminal matters; otherwise 5 U.S.C. 552(k)(2) applies as described in subsequent sections.

The exemptions pursuant to 5 U.S.C. 552a(j)(2) are from the provisions 5 U.S.C. 552a(c)(3) and (4), 5 U.S.C. 552a(d)(1), (2), (3), (4), 5 U.S.C. 552a(e)(1), (2) and (3), 5 U.S.C. 552a(e)(4)(G), (H), and (I), 5 U.S.C. 552a(e)(5) and (8), 5 U.S.C. 552a(f), and 5 U.S.C. 552a(g). As published in Part 1, Subpart C, of title 31 of the Code of Federal Regulations, section 1.36, these exemptions already apply to the records

to which this final rule applies, therefore the reasons for the exemptions are not repeated here.

**SUPPLEMENTARY INFORMATION:** Under 5 U.S.C. 552a(k)(2), the head of an agency may promulgate rules to exempt a system of records from certain provisions of 5 U.S.C. 552a if the system is investigatory material compiled for law enforcement purposes. The IRS is hereby giving notice of a final rule to exempt ''Treasury/IRS 46.050, Automated Information Analysis and Recordkeeping'' from certain provisions of the Privacy Act of 1974, pursuant to 5 U.S.C. 552a(k)(2).

The exemptions pursuant to 5 U.S.C. 552a(k)(2) are from the provisions (c)(3), (d)(1)–(4), (e)(1), (e)(4)(G)–(I), and (f) because the system contains investigatory material compiled for law enforcement purposes. As published in Part 1, Subpart C, of title 31 of the Code of Federal Regulations, section 1.36, these exemptions already apply to the records to which this final rule applies; therefore the reasons for the exemptions are not repeated here.

As required by Executive Order 12866, it has been determined that this final rule is not a significant regulatory action, and therefore, does not require a regulatory impact analysis.

The regulation will not have a substantial direct effect on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, it is determined that this final rule does not have federalism implications under Executive Order 13132.

Pursuant to the requirements of the Regulatory Flexibility Act, 5 U.S.C. 601–612, it is hereby certified that these regulations will not significantly affect a substantial number of small entities. The final rule imposes no duties or obligations on small entities.

In accordance with the provisions of the Paperwork Reduction Act, the Department of the Treasury has determined that the revision of the systems or records notices would not impose new recordkeeping, application, reporting, or other types of information collection requirements.

## List of Subjects in 31 CFR Part 1

Privacy.

Part 1, Subpart C of title 31 of the Code of Federal Regulations is amended as follows:

# PART 1—[AMENDED]

■ 1. The authority citation for part 1 continues to read as follows:



## PART 830—UNIQUE DEVICE IDENTIFICATION

■ 4. The authority citation for 21 CFR part 830 continues to read as follows:

**Authority:** 21 U.S.C. 321, 331, 352, 353, 360, 360d, 360i, 360j, 371.

■ 5. In § 830.110, revise paragraph (a)(1) to read as follows:

### § 830.110  Application for accreditation as an issuing agency.

(a) * * * (1) An applicant seeking initial FDA accreditation as an issuing agency shall notify FDA of its desire to be accredited by sending a notification by email to: *GUDIDSupport@ fda.hhs.gov,* or by correspondence to: UDI Regulatory Policy Support, Center for Devices and Radiological Health, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 66, Rm. 3303, Silver Spring, MD 20993–0002.

\*     \*     \*     \*     \*

Dated: February 29, 2016.

**Leslie Kux,**

*Associate Commissioner for Policy.*

[FR Doc. 2016–04707 Filed 3–3–16; 8:45 am]

**BILLING CODE 4164–01–P**

## DEPARTMENT OF JUSTICE

### Drug Enforcement Administration

### 21 CFR Part 1308

[Docket No. DEA–386]

### Schedules of Controlled Substances: Extension of Temporary Placement of 10 Synthetic Cathinones in Schedule I of the Controlled Substances Act

**AGENCY:** Drug Enforcement Administration, Department of Justice.

**ACTION:** Final order.

**SUMMARY:** The Administrator of the Drug Enforcement Administration is issuing this final order to extend the temporary schedule I status of 10 synthetic cathinones pursuant to the temporary scheduling provisions of the Controlled Substances Act. The 10 substances are: 4-methyl-*N*-ethylcathinone (4–MEC); 4-methyl-*alpha*-pyrrolidinopropiophenone (4-MePPP); alpha-pyrrolidinopentiophenone (α-PVP); 1-(1,3-benzodioxol-5-yl)-2-(methylamino)butan-1-one (butylone); 2-(methylamino)-1-phenylpentan-1-one (pentedrone); 1-(1,3-benzodioxol-5-yl)-2-(methylamino)pentan-1-one (pentylone); 4-fluoro-*N*-methylcathinone (4–FMC); 3-fluoro-*N*-methylcathinone (3–FMC); 1-(naphthalen-2-yl)-2-(pyrrolidin-1-yl)pentan-1-one (naphyrone); and alpha-pyrrolidinobutiophenone (α-PBP) [hereinafter 4–MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4–FMC, 3–FMC, naphyrone, and α-PBP, respectively], including their optical, positional, and geometric isomers, salts, and salts of isomers. The current final order temporarily placing 4–MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4–FMC, 3–FMC, naphyrone, and α-PBP into schedule I is in effect through March 6, 2016. This final order will extend the temporary scheduling of 4–MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4–FMC, 3–FMC, naphyrone, and α-PBP for one year, or until the permanent scheduling action for these 10 substances is completed, whichever occurs first.

**DATES:** This final order is effective March 4, 2016.

**FOR FURTHER INFORMATION CONTACT:** Barbara J. Boockholdt, Office of Diversion Control, Drug Enforcement Administration; Mailing Address: 8701 Morrissette Drive, Springfield, Virginia 22152; Telephone: (202) 598–6812.

**SUPPLEMENTARY INFORMATION:**

### Legal Authority

The Drug Enforcement Administration (DEA) implements and enforces titles II and III of the Comprehensive Drug Abuse Prevention and Control Act of 1970, as amended. Titles II and III are referred to as the "Controlled Substances Act" and the "Controlled Substances Import and Export Act," respectively, and are collectively referred to as the "Controlled Substances Act" or the "CSA" for purpose of this action. 21 U.S.C. 801–971. The DEA published the implementing regulations for these statutes in title 21 of the Code of Federal Regulations (CFR), chapter II.

The CSA and its implementing regulations are designed to prevent, detect, and eliminate the diversion of controlled substances and listed chemicals into the illicit market while ensuring an adequate supply is available for the legitimate medical, scientific, research, and industrial needs of the United States. Controlled substances have the potential for abuse and dependence and are controlled to protect the public health and safety.

Under the CSA, every controlled substance is classified into one of five schedules based upon its potential for abuse, its currently accepted medical use in treatment in the United States, and the degree of dependence the drug or other substance may cause. 21 U.S.C. 812. The initial schedules of controlled substances established by Congress are found at 21 U.S.C. 812(c), and the current list of all scheduled substances is published at 21 CFR part 1308.

Section 201 of the CSA (21 U.S.C. 811) provides the Attorney General with the authority to temporarily place a substance into schedule I of the CSA for two years without regard to the requirements of 21 U.S.C. 811(b) if she finds that such action is necessary to avoid an imminent hazard to the public safety. 21 U.S.C. 811(h)(1). In addition, if proceedings to control a substance are initiated under 21 U.S.C. 811(a)(1), the Attorney General may extend the temporary scheduling for up to one year. 21 U.S.C. 811(h)(2).

Where the necessary findings are made, a substance may be temporarily scheduled if it is not listed in any other schedule under section 202 of the CSA (21 U.S.C. 812) or if there is no exemption or approval in effect for the substance under section 505 of the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. 355. 21 U.S.C. 811(h)(1). The Attorney General has delegated her scheduling authority under 21 U.S.C. 811 to the Administrator of the DEA. 28 CFR 0.100.

### Background

On March 7, 2014, the DEA published a final order in the **Federal Register** amending 21 CFR 1308.11(h) to temporarily place the 10 synthetic cathinones 4-methyl-*N*-ethylcathinone (4–MEC); 4-methyl-*alpha*-pyrrolidinopropiophenone (4-MePPP); alpha-pyrrolidinopentiophenone (α-PVP); 1-(1,3-benzodioxol-5-yl)-2-(methylamino)butan-1-one (butylone); 2-(methylamino)-1-phenylpentan-1-one (pentedrone); 1-(1,3-benzodioxol-5-yl)-2-(methylamino)pentan-1-one (pentylone); 4-fluoro-*N*-methylcathinone (4–FMC); 3-fluoro-*N*-methylcathinone (3–FMC); 1-(naphthalen-2-yl)-2-(pyrrolidin-1-yl)pentan-1-one (naphyrone); and alpha-pyrrolidinobutiophenone (α-PBP) into schedule I of the CSA pursuant to the temporary scheduling provisions of 21 U.S.C. 811(h). 79 FR 12938. That final order was effective on the date of publication, and was based on findings by the Deputy Administrator of the DEA that the temporary scheduling of these ten synthetic cathinones was necessary to avoid an imminent hazard to the public safety pursuant to 21 U.S.C. 811(h)(1). Section 201(h)(2) of the CSA (21 U.S.C. 811(h)(2)) requires that the temporary control of these substances expires two years from the effective date of the scheduling order, or on March 6, 2016. However, the CSA also provides that during the pendency of proceedings under 21 U.S.C. 811(a)(1) with respect

to the substance, the temporary scheduling of that substance could be extended for up to one year. Proceedings for the permanent scheduling of a substance under 21 U.S.C. 811(a) may be initiated by the Attorney General (delegated to the Administrator of the DEA pursuant to 28 CFR 0.100) on his or her own motion, at the request of the Secretary of Health and Human Services,[1] or on the petition of any interested party.

The Administrator of the DEA, on his own motion pursuant to 21 U.S.C. 811(a), has initiated proceedings under 21 U.S.C. 811(a)(1) to permanently schedule 4–MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4–FMC, 3–FMC, naphyrone, and α-PBP. The DEA has gathered and reviewed the available information regarding the pharmacology, chemistry, trafficking, actual abuse, pattern of abuse, and the relative potential for abuse for these 10 synthetic cathinones. On December 30, 2014, the DEA submitted a request to the HHS to provide the DEA with a scientific and medical evaluation of available information and a scheduling recommendation for 4–MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4–FMC, 3–FMC, naphyrone, and α-PBP, in accordance with 21 U.S.C. 811 (b) and (c). Upon evaluating the scientific and medical evidence, on March 2, 2016, the HHS submitted to the Administrator of the DEA its 10 scientific and medical evaluations for these substances. Upon receipt of the scientific and medical evaluation and scheduling recommendations from the HHS, the DEA reviewed the documents and all other relevant data, and conducted its own eight-factor analysis of the abuse potential of 4–MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4–FMC, 3–FMC, naphyrone, and α-PBP in accordance with 21 U.S.C. 811(c). The DEA has published a notice of proposed rulemaking for the placement of 4–MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4–FMC, 3–FMC, naphyrone, and α-PBP into schedule I elsewhere in this issue of the **Federal Register**.

Pursuant to 21 U.S.C. 811(h)(2), the Administrator of the DEA orders that the temporary scheduling of 4–MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4–FMC, 3–FMC, naphyrone, and α-PBP, including their optical,

positional, and geometric isomers, salts, and salts of isomers be extended for one year, or until the permanent scheduling proceeding is completed, whichever occurs first.

In accordance with this final order, the schedule I requirements for handling 4–MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4–FMC, 3–FMC, naphyrone, or α-PBP, including their optical, positional, and geometric isomers, salts, and salts of isomers, will remain in effect for one year, or until the permanent scheduling proceeding is completed, whichever occurs first.

**Regulatory Matters**

The CSA provides for an expedited temporary scheduling action where such action is necessary to avoid an imminent hazard to the public safety. 21 U.S.C. 811(h). The Attorney General may, by order, schedule a substance in schedule I on a temporary basis. *Id.* 21 U.S.C. 811(h) also provides that the temporary scheduling of a substance shall expire at the end of two years from the date of the issuance of the order scheduling such substance, except that the Attorney General may, during the pendency of proceedings to permanently schedule the substance, extend the temporary scheduling for up to one year.

To the extent that 21 U.S.C. 811(h) directs that temporary scheduling actions be issued by order and sets forth the procedures by which such orders are to be issued and extended, the DEA believes that the notice and comment requirements of section 553 of the Administrative Procedure Act (APA) (5 U.S.C. 553) do not apply to this extension of the temporary scheduling action. In the alternative, even assuming that this action might be subject to section 553 of the APA, the Administrator finds that there is good cause to forgo the notice and comment requirements of section 553, as any further delays in the process for extending the temporary scheduling order would be impracticable and contrary to the public interest in view of the manifest urgency to avoid an imminent hazard to the public safety. Further, the DEA believes that this final order extending the temporary scheduling action is not a "rule" as defined by 5 U.S.C. 601(2), and, accordingly, is not subject to the requirements of the Regulatory Flexibility Act (RFA). The requirements for the preparation of an initial regulatory flexibility analysis in 5 U.S.C. 603(a) are not applicable where, as here, the DEA is not required by section 553 of the APA or any other law to publish

a general notice of proposed rulemaking.

Additionally, this action is not a significant regulatory action as defined by Executive Order 12866 (Regulatory Planning and Review), section 3(f), and, accordingly, this action has not been reviewed by the Office of Management and Budget (OMB).

This action will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132 (Federalism), it is determined that this action does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

As noted above, this action is an order, not a rule. Accordingly, the Congressional Review Act (CRA) is inapplicable, as it applies only to rules. It is in the public interest to maintain the temporary placement of 4–MEC, 4-MePPP, α-PVP, butylone, pentedrone, pentylone, 4–FMC, 3–FMC, naphyrone, and α-PBP in schedule I because they pose a public health risk. The temporary scheduling action was taken pursuant to 21 U.S.C. 811(h), which is specifically designed to enable the DEA to act in an expeditious manner to avoid an imminent hazard to the public safety. Under 21 U.S.C. 811(h), temporary scheduling orders are not subject to notice and comment rulemaking procedures. The DEA understands that the CSA frames temporary scheduling actions as orders rather than rules to ensure that the process moves swiftly, and this extension of the temporary scheduling order continues to serve that purpose. For the same reasons that underlie 21 U.S.C. 811(h), that is, the need to place these substances in schedule I because they pose an imminent hazard to public safety, it would be contrary to the public interest to delay implementation of this extension of the temporary scheduling order. Therefore, in accordance with section 808(2) of the CRA, this final order extending the temporary scheduling order shall take effect immediately upon its publication. The DEA has submitted a copy of this final order to both Houses of Congress and to the Comptroller General, although such filing is not required under the Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act), 5 U.S.C. 801–808 because, as noted above, this action is an order, not a rule.

[1] Because the Secretary of the Department of Health and Human Services has delegated to the Assistant Secretary for Health of the Department of Health and Human Services the authority to make domestic drug scheduling recommendations, for purposes of this final order, all subsequent references to "Secretary" have been replaced with "Assistant Secretary."

Dated: March 2, 2016.

**Chuck Rosenberg,**

*Acting Administrator.*

[FR Doc. 2016–05004 Filed 3–3–16; 8:45 am]

**BILLING CODE 4410–09–P**

# DEPARTMENT OF THE TREASURY

## Internal Revenue Service

## 26 CFR Part 1

**[TD 9757]**

**RIN 1545–BM98**

## Consistent Basis Reporting Between Estate and Person Acquiring Property From Decedent

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Temporary regulations.

**SUMMARY:** This document contains temporary regulations that provide transition rules providing that executors and other persons required to file or furnish a statement under section 6035(a)(1) or (a)(2) before March 31, 2016, need not do so until March 31, 2016. These temporary regulations are applicable to executors and other persons who file after July 31, 2015, returns required by section 6018(a) or (b).

**DATES:** *Effective date.* These regulations are effective on March 4, 2016.

*Applicability dates:* For date of applicability, see § 1.6035–2T(b).

**FOR FURTHER INFORMATION CONTACT:** Theresa Melchiorre (202) 317–6859 (not a toll-free number).

## Background

On July 31, 2015, the President of the United States signed into law *H.R. 3236,* the *Surface Transportation and Veterans Health Care Choice Improvement Act of 2015,* Public Law 114–41, 129 Stat. 443 (Act). Section 2004 of the Act added new section 6035.

Section 6035 imposes reporting requirements with regard to the value of property included in a decedent's gross estate for federal estate tax purposes. Section 6035(a)(1) provides that the executor of any estate required to file a return under section 6018(a) must furnish, both to the Secretary and to the person acquiring any interest in property included in the decedent's gross estate for federal estate tax purposes, a statement identifying the value of each interest in such property as reported on such return and such other information with respect to such interest as the Secretary may prescribe.

Section 6035(a)(2) provides that each other person required to file a return under section 6018(b) must furnish, both to the Secretary and to each person who holds a legal or beneficial interest in the property to which such return relates, a statement identifying the same information described in section 6035(a)(1).

Section 6035(a)(3)(A) provides that each statement required to be furnished under section 6035 (a)(1) or (2) is to be furnished at such time as the Secretary may prescribe, but in no case at a time later than the earlier of (i) the date which is 30 days after the date on which the return under section 6018 was required to be filed (including extensions, if any) or (ii) the date which is 30 days after the date such return is filed.

On August 21, 2015, the Treasury Department and the IRS issued Notice 2015–57, 2015–36 IRB 294. Notice 2015–57 delays until February 29, 2016, the due date for any statements required by section 6035 that are due before that same date.

On February 11, 2016, the Treasury Department and the IRS issued Notice 2016–19, 2016–09 IRB. That notice provides that executors or other persons required to file or furnish a statement under section 6035(a)(1) or (a)(2) before March 31, 2016, need not do so until March 31, 2016.

## Explanation of Provisions

These temporary regulations reiterate that executors or other persons required to file or furnish a statement under section 6035(a)(1) or (a)(2) before March 31, 2016, need not do so until March 31, 2016. The text of these temporary regulations also serves as the text of the proposed regulations under § 1.6035–2 in the related notice of proposed rulemaking (REG–127923–15) in the Proposed Rules section of this issue of the **Federal Register**. These temporary regulations are issued within 18 months of the date of the enactment of the statutory provisions to which the temporary regulations relate and, as authorized by section 7805(b)(2), are effective/applicable to executors and other persons who file a return required by section 6018(a) or (b) after July 31, 2015.

## Statement of Availability of IRS Documents

IRS Revenue Procedures, Revenue Rulings notices, notices and other guidance cited in this preamble are published in the Internal Revenue Bulletin (or Cumulative Bulletin) and are available from the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402, or by visiting the IRS Web site at *http://www.irs.gov.*

## Special Analyses

Certain IRS regulations, including this one, are exempt from the requirements of Executive Order 12866, as supplemented and reaffirmed by Executive Order 13563. Therefore, a regulatory impact assessment is not required. In addition, section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations because they are excepted from the notice and comment requirements of section 553(b) and (c) of the Administrative Procedure Act under the interpretative rule and good cause exceptions provided by section 553(b)(3)(A) and (B) of that Act. The Act included an immediate effective date, thus making the first required statements due 30 days after enactment. It is necessary to provide more time to provide the statements required by section 6035(a) to allow the Treasury Department and the IRS sufficient time to issue both substantive and procedural guidance on how to comply with the section 6035(a) requirement and to provide executors and other affected persons the opportunity to review this guidance before preparing the required statements. These regulations reiterate the relief in Notice 2016–19 and, because of the immediate need to provide relief, notice and public comment pursuant to 5 U.S.C. 553(b) and (c) is impracticable, unnecessary, and contrary to the public interest. For the applicability of the Regulatory Flexibility Act (5 U.S.C. chapter 6), please refer to the Special Analyses section of the preamble to the cross-referenced notice of proposed rulemaking published in the Proposed Rules section in this issue of the **Federal Register**. Pursuant to section 7805(f) of the Internal Revenue Code (Code), these regulations have been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small business.

## Drafting Information

The principal author of these temporary regulations is Theresa Melchiorre, Office of the Associate Chief Counsel (Passthroughs and Special Industries). Other personnel from the Treasury Department and the IRS participated in their development.

## List of Subjects in 26 CFR Part 1

Income taxes, Reporting and recordkeeping requirements.

Exhibit C

## DEPARTMENT OF JUSTICE

**Drug Enforcement Administration**

**21 CFR Part 1300**

[Docket No. DEA–260F]

RIN 1117–AA94

**Definition of ''Positional Isomer'' as It Pertains to the Control of Schedule I Controlled Substances**

**AGENCY:** Drug Enforcement Administration (DEA), Department of Justice.

**ACTION:** Final Rule.

**SUMMARY:** On May 25, 2006, DEA published a Notice of Proposed Rulemaking which proposed the addition of a specific definition for the term ''positional isomer'' to allow for the systematic determination of which isomers of schedule I substances would be considered to be ''positional,'' and therefore, subject to schedule I control. This rulemaking finalizes that definition.

The Controlled Substances Act (CSA) and its implementing regulations specify which hallucinogenic substances are considered schedule I controlled substances. The CSA states that all salts, isomers, and salts of isomers of these substances are also schedule I controlled substances. In non-technical terms, an isomer of a substance is a different compound, but a compound which has the same number and kind of atoms. The terms ''optical isomer'' and ''geometric isomer'' are specific scientific terms and it is easy to determine whether one substance is an optical or geometric isomer of another. The term ''positional isomer,'' however, is subject to scientific interpretation.

The addition of a definition for the term ''positional isomer'' will assist legitimate research[ers] and industry in determining the control status of materials that are ''positional isomers'' of schedule I hallucinogens. While the DEA will remain the authority for ultimately determining the control status of a given material, providing a specific definition for ''positional isomer'' will ensure that consistent criteria are utilized in making these determinations.

This rule does not change existing laws, regulations, policies, processes, and procedures regarding the determination of control status for schedule I hallucinogenic substances. This rule merely makes available to the public the longstanding definition of ''positional isomer'' which DEA has used when making these scheduling determinations.

This rule is relevant only to specialized forensic or research chemists. Most of these individuals are existing DEA registrants who are authorized by the DEA to handle schedule I hallucinogenic substances.

**DATES:** Effective January 2, 2008.

**FOR FURTHER INFORMATION CONTACT:** Christine A. Sannerud, Ph.D., Chief, Drug and Chemical Evaluation Section, Office of Diversion Control, Drug Enforcement Administration, Washington, DC 20537 at (202) 307–7183.

**SUPPLEMENTARY INFORMATION:**

**Background**

On May 25, 2006, DEA published a Notice of Proposed Rulemaking (NPRM) [71 FR 30097] which proposed the addition of a specific definition for the term ''positional isomer.'' As DEA discussed in the NPRM, in many instances, the control of a substance under the CSA often includes the specific substance listed under the CSA, as well as the substance's salts, isomers, and/or salts of isomers. In most instances, the term isomer includes only optical isomers. In other instances, however, the term isomer includes positional and/or geometric isomers.

As DEA discussed in its NPRM, in non-technical terms, isomers are different compounds that have the same molecular formula (the same number and types of atoms). The terms ''optical isomer'' and ''geometric isomer'' are specifically defined and well understood scientific terms, and it is easy to determine whether one substance is an optical or geometric isomer of another. The term ''positional isomer,'' however, is not universally defined, and, therefore, is subject to scientific interpretation. In order to ensure that consistent criteria are utilized in determining whether one substance is considered a ''positional isomer'' of another, the DEA is establishing a specific definition for ''positional isomer.'' This definition will be added to 21 CFR 1300.01(b)(21).

**Existing CSA and CFR References to ''Positional Isomers''**

The CSA and its implementing regulations (21 CFR 1308.11(d)) specify which hallucinogenic substances are considered schedule I controlled substances. Under the CSA and its implementing regulations, there are only three references to the term ''positional isomer'':

(1) Pursuant to 21 U.S.C. 802(14), ''the term 'isomer' means the optical isomer, except as used in schedule I(c) and schedule II(a)(4). As used in schedule I(c), the term 'isomer' means any optical, positional, or geometric isomer. As used in schedule II(a)(4), the term 'isomer' means any optical or geometric isomer.''

(2) Under 21 CFR 1300.01(b)(21), ''The term 'isomer' means the optical isomer, except as used in §§ 1308.11(d) and 1308.12(b)(4) of this chapter. As used in § 1308.11(d) of this chapter, the term 'isomer' means the optical, positional, or geometric isomer. As used in § 1308.12(b)(4) of this chapter, the term 'isomer' means the optical or geometric isomer.''

(3) 21 CFR 1308.11(d) states, ''*Hallucinogenic substances.* Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation (for purposes of this paragraph only, the term 'isomer' includes the optical, positional and geometric isomers).''

**Why Definition Is Needed**

As DEA discussed in the NPRM, the CSA (21 U.S.C. 802(14) and 21 U.S.C. 812(c)(I)(c)) and its implementing regulations (21 CFR 1308.11(d)) specify which hallucinogenic substances are considered schedule I controlled substances. The CSA further states that all salts, isomers, and salts of isomers of these substances are also schedule I controlled substances.

Under the definition of ''isomer'' found in 21 CFR 1300.01(b)(21), ''The term 'isomer' means the optical isomer, except as used in §§ 1308.11(d) and 1308.12(b)(4) of this chapter. As used in § 1308.11(d) of this chapter, the term 'isomer' means the optical, positional, or geometric isomer. As used in § 1308.12(b)(4) of this chapter, the term 'isomer' means the optical or geometric isomer.''

Therefore, according to this definition as it specifically applies to hallucinogens, the term ''isomer'' includes all optical, positional, or geometric isomers. As such, all salts, isomers (including optical, positional, or geometric isomers), and salts of isomers (including optical, positional, or geometric isomers) of the hallucinogenic substances listed in 21 U.S.C. 812(c)(I)(c) and 21 CFR 1308.11(d) are considered schedule I controlled substances.

Because the determination as to whether a substance is considered a "positional isomer" can be subject to scientific interpretation, the DEA believes it is necessary to specifically define the term "positional isomer". This definition will only pertain to those substances that are "positional isomers" of schedule I controlled substances pursuant to 21 U.S.C. 812(c)(I)(c) and 21 CFR 1308.11(d).

As DEA noted in the NPRM, DEA is not establishing definitions for either optical or geometric isomers. The DEA believes that these terms are highly specific and are not subject to differing scientific interpretation.

## Comments

The definition of "positional isomer" will be used in the determination of the control status of substances as schedule I controlled substances pursuant to 21 CFR 1308.11(d). This definition is highly technical in nature and the DEA has sought to provide specific criteria for determination as to whether a substance is a "positional isomer" of schedule I hallucinogens. In writing the definition contained in this rulemaking, DEA consulted a wide variety of reference sources including, but not limited to, Chemical Abstracts, the IUPAC Compendium of Chemical Terminology, World Health Organization (WHO) documents, and various encyclopedias and chemistry textbooks.

The NPRM sought input from all interested parties regarding the proposed definition of "positional isomer." DEA received one comment in response to the proposed definition. That comment did not raise any specific objections to the definition, but expressed the opinion that instead of DEA adding this definition, this duty should be the responsibility of Congress and the definition added via legislation.

DEA disagrees. 21 U.S.C. 821 authorizes the Attorney General to "promulgate rules and regulations and to charge reasonable fees relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances." Expanding on this authority, 21 U.S.C. 871(b) further provides that the Attorney General "may promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his functions." The authority has been delegated by the Attorney General to the Administrator of DEA pursuant to 28 CFR 0.100, and redelegated to the Deputy Administrator pursuant to 28 CFR 0.104.

It is, therefore, well within the Deputy Administrator's purview to issue a notice of proposed rulemaking to define a term relating to the control of certain schedule I controlled substances. By inviting comment to the proposed definition, DEA ensured that potentially affected persons, such as researchers, were given the opportunity to review the definition and submit comments or changes. No other comments were received by DEA. Therefore, this rulemaking finalizes the definition exactly as it was proposed in the NPRM.

## Criteria That Will Apply to Positional Isomers

Pursuant to 21 U.S.C. 802(14), 21 U.S.C. 812(c)(I)(c), and 21 CFR 1308.11(d), positional isomers of schedule I hallucinogens are any and all substances which:

(1) Are not already controlled in a different schedule I category, or are listed in another schedule, or are specifically exempted from control by law; and

(2) Have the same molecular formula and core structure as a schedule I hallucinogen; and

(3) Have the same functional group(s) and/or substituent(s) as those found in the respective schedule I hallucinogen, attached at any position(s) on the core structure, but in such manner that no new chemical functionalities are created and no existing chemical functionalities are destroyed relative to the respective schedule I hallucinogen; except that

(4) Rearrangements of alkyl moieties within or between functional group(s) or substituent(s), or divisions or combinations of alkyl moieties, that do not create new chemical functionalities or destroy existing chemical functionalities, would be within the definition of positional isomer (and therefore be controlled).

As clarification, note that the "core structure" is the parent molecule that is the common basis for the class; for example, tryptamine, phenethylamine, or ergoline. The following are examples of rearrangements resulting in creation and/or destruction of chemical functionalities. These rearrangements result in compounds which are not positional isomers: ethoxy to *alpha*-hydroxyethyl, hydroxy and methyl to methoxy, or the repositioning of a phenolic or alcoholic hydroxy group to create a hydroxyamine. Examples of rearrangements resulting in compounds that would be positional isomers include, but are not limited to: *tert*-butyl to *sec*-butyl, methoxy and ethyl to isopropoxy, N,N-diethyl to N-methyl-N-propyl, or *alpha*-methylamino to N-methylamino.

## Impact of Rule Limited to Specialized Forensic or Research Chemists

As DEA discussed in the NPRM, the addition of a definition for the term "positional isomer" as it applies to 21 CFR 1308.11(d) will assist legitimate research[ers] and industry in determining the control status of substances that are isomers of schedule I hallucinogens. While the DEA will remain the authority on ultimately determining the control status of a given substance, providing a specific definition for "positional isomer" will greatly reduce any potential confusion or inconsistencies in making these determinations.

This definition will enable researchers and industry to determine definitively whether a substance is a "positional isomer" of a schedule I hallucinogen. As such, they will be able to know the control status of a particular substance when considering new research.

This rule is relevant only to specialized forensic or research chemists. Most of these individuals are existing DEA registrants who are authorized by the DEA to handle schedule I hallucinogenic substances.

## Specific Changes and Definition

As currently defined in 21 CFR 1300.01(b)(21), the term "isomer" means the optical isomer, except as used in § 1308.11(d) and § 1308.12(b)(4) of this chapter. As used in § 1308.11(d) of this chapter, the term "isomer" means any optical, positional, or geometric isomer. As used in § 1308.12(b)(4) of this chapter, the term "isomer" means any optical or geometric isomer.

Pursuant to this Final Rule, 21 CFR 1300.01(b)(21) is revised to include a specific definition for the term "positional isomer". The modification specifies that, as used in § 1308.11(d), the term "positional isomer" means any substance possessing the same molecular formula and core structure and having the same functional group(s) and/or substituent(s) as those found in the respective schedule I hallucinogen, attached at any position(s) on the core structure, but in such manner that no new chemical functionalities are created and no existing chemical functionalities are destroyed relative to the respective schedule I hallucinogen. Rearrangements of alkyl moieties within or between functional group(s) or substituent(s), or divisions or combinations of alkyl moieties that do not create new chemical functionalities or destroy existing chemical functionalities, would be within the

definition of positional isomer. For purposes of this definition, the "core structure" is the parent molecule that is the common basis for the class. Some examples would include tryptamine, phenethylamine, or ergoline. Examples of non-permissible rearrangements resulting in creation and/or destruction of chemical functionalities (that therefore would not be considered positional isomers) include, but are not limited to: ethoxy to *alpha*-hydroxyethyl, hydroxy and methyl to methoxy, or the repositioning of a phenolic or alcoholic hydroxy group to create a hydroxyamine. Examples of permissible rearrangements (that are within the definition of positional isomers) include: *tert*-butyl to *sec*-butyl, methoxy and ethyl to isopropoxy, N,N-diethyl to N-methyl-N-propyl, or *alpha*-methylamino to N-methylamino.

## Scientific/Technical Nature of Definition

As DEA discussed in its NPRM, DEA understands that the definition is highly technical and laden with scientific terms. However, the DEA believes that such a highly technical definition is necessary to ensure that consistent criteria are utilized in determining whether one substance is a "positional isomer" of another.

## Regulatory Certifications

### Regulatory Flexibility Act

The Deputy Administrator hereby certifies that this rulemaking has been drafted in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation, and by approving it certifies that this regulation will not have a significant economic impact on a substantial number of small entities. The inclusion of the definition of positional isomer set forth herein is unlikely to subject any new substances to CSA control. Also, this rule does not require the obtaining of new DEA registrations. Most persons affected by this rule are already DEA registrants (or would have to become registrants even absent this rule in order to handle schedule I hallucinogens). Further, this rule does not impose any additional regulatory burden on the regulated community. The change simply will ensure that consistent criteria are utilized in making scheduling determinations.

### Executive Order 12866

The Deputy Administrator further certifies that this rulemaking has been drafted in accordance with the principles in Executive Order 12866 § 1(b). It has been determined that this is a significant regulatory action.

Therefore, this action has been reviewed by the Office of Management and Budget.

### Executive Order 12988

This regulation meets the applicable standards set forth in §§ 3(a) and 3(b)(2) of Executive Order 12988 Civil Justice Reform.

### Executive Order 13132

This rulemaking does not preempt or modify any provision of state law; nor does it impose enforcement responsibilities on any state; nor does it diminish the power of any state to enforce its own laws. Accordingly, this rulemaking does not have federalism implications warranting the application of Executive Order 13132.

### Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $120,000,000 or more (adjusted for inflation) in any one year, and will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Congressional Review Act

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act). This rule will not result in an annual effect on the economy of $114,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

### List of Subjects in 21 CFR Part 1300

Controlled substances, Definitions, Drug Traffic Control.

■ For the reasons set out above, 21 CFR part 1300 is amended as follows:

## PART 1300—DEFINITIONS [AMENDED]

■ 1. The authority citation for Part 1300 continues to read as follows:

**Authority:** 21 U.S.C. 802, 871(b), 951, 958(f).

■ 2. Section 1300.01 is amended by revising paragraph (b)(21) to read as follows:

### § 1300.01   Definitions relating to controlled substances.

\*     \*     \*     \*     \*

(b) \* \* \*

(21) (i) *The term isomer* means the optical isomer, except as used in § 1308.11(d) and § 1308.12(b)(4) of this chapter. As used in § 1308.11(d) of this chapter, the term "isomer" means any optical, positional, or geometric isomer. As used in § 1308.12(b)(4) of this chapter, the term "isomer" means any optical or geometric isomer.

(ii) As used in § 1308.11(d) of this chapter, the term "positional isomer" means any substance possessing the same molecular formula and core structure and having the same functional group(s) and/or substituent(s) as those found in the respective schedule I hallucinogen, attached at any position(s) on the core structure, but in such manner that no new chemical functionalities are created and no existing chemical functionalities are destroyed relative to the respective schedule I hallucinogen. Rearrangements of alkyl moieties within or between functional group(s) or substituent(s), or divisions or combinations of alkyl moieties, that do not create new chemical functionalities or destroy existing chemical functionalities, are allowed i.e., result in compounds which are positional isomers. For purposes of this definition, the "core structure" is the parent molecule that is the common basis for the class; for example, tryptamine, phenethylamine, or ergoline. Examples of rearrangements resulting in creation and/or destruction of chemical functionalities (and therefore resulting in compounds which are not positional isomers) include, but are not limited to: ethoxy to *alpha*-hydroxyethyl, hydroxy and methyl to methoxy, or the repositioning of a phenolic or alcoholic hydroxy group to create a hydroxyamine. Examples of rearrangements resulting in compounds which would be positional isomers include: *tert*-butyl to *sec*-butyl, methoxy and ethyl to isopropoxy, N,N-diethyl to N-methyl-N-propyl, or *alpha*-methylamino to N-methylamino.

\*     \*     \*     \*     \*

Dated: November 21, 2007.

**Michele M. Leonhart,**
*Deputy Administrator,*
[FR Doc. E7–23413 Filed 11–30–07; 8:45 am]
**BILLING CODE 4410–09–P**