**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. PIERCE DIVISION**
**Case No. 16-14002-CR-ROSENBERG/LYNCH**

_____

**UNITED STATES OF AMERICA,**

     **-v-**

**JULIUS ANDREW REASON, III and**
**VENTERIA LEANET REASON,**

          **Defendants**

_____

**DEFENDANT VENTERIA REASON'S POST-HEARING MEMORANDUM OF LAW**
**ADDRESSING APPLICATION OF SENTENCING GUIDELINES 2D1.1,**
**APPLICATION NOTE SIX, TO ETHYLONE AND DIBUTYLONE**

Defendant Venteria Leanet Reason respectfully submits this post-hearing Memorandum of Law in support of a ruling rejecting MDMA as the substance to score dibutylone under the Sentencing Guidelines and rejecting MDEA as the substance to score ethylone. The Government has not sustained its burden of proving that MDEA and MDMA, which carry the draconian 1:500 marijuana equivalency ratio, are the "most closely related substance listed in the Guidelines" to ethylone and dibutylone.

The experts agreed that ethylone and dibutylone act (or in the case of dibutylone are expected to act) as **stimulants.** The Court should select a comparator that is a stimulant. The Sentencing Commission categorizes MDMA and MDEA as **hallucinogens**, a much higher scoring class of substances. *See* Exhibit 1, Drug Equivalency Table from 2016 Sentencing Guidelines Manual. MDMA and MDEA are also classified in Schedule I as "hallucinogenic substances." *See* 21 C.F.R. § 1308.11(d)(attached as Exhibit 2).

Based on ethylone and dibutylone being stimulants, in determining the "most closely related controlled substance listed in the guidelines," the Court should use the stimulants in Schedule I and II and the Guidelines ratios for stimulants as its guide.

> I.      <u>The Legal Landscape and the Focus on Similarly Categorized Substances</u>

Application note 6 of Sentencing Guidelines Section 2D1.1 provides the following instructions for Courts scoring the weight of a controlled substance not listed in the Guidelines:

> In the case of a controlled substance that is not specifically referenced in this guideline, determine the base offense level using the marihuana equivalency of the most closely related controlled substance referenced in this guideline. In determining the most closely related controlled substance, the court shall, to the extent practicable, consider the following:
>
> (A)    Whether the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.

(B)   Whether the controlled substance not referenced in this guideline has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance referenced in this guideline.

(C)   Whether a lesser or greater quantity of the controlled substance not referenced in this guideline is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in this guideline.

In the Sentencing Guidelines Drug Equivalency Table (Ex. 1), the Sentencing Commission sorts out the listed controlled substances by the following categories: opiates, stimulants, and hallucinogens. The hallucinogens are, as a class, scored more severely than the stimulants.[1] Similarly the Controlled Substance Schedules I and II at 21 C.F.R. § 1308.11(d) sort the Schedule I and II substances into opiates, opium derivatives, hallucinogens, depressants, stimulants, and cannabimimetic agents.

The Government is urging the Court to use as comparators for stimulants – ethylone and dibutylone -- substances the Sentencing Commission and regulators have categorized and, in the case of the Guidelines, penalized as hallucinogens. In applying Application Note 6, the Court should look to the categories established by the Sentencing Commission and regulators as a basis for scoring an unlisted substance. That is, where the "similar effect" being compared is "stimulant," the Court should look for a comparator among the substances the Sentencing Commission and regulators have classified as stimulants.

II.     **The Sentencing Commission Relied on Unique Qualities about MDMA and MDEA in Setting Their Offense Levels, Making Them Inappropriate Comparators**

---

[1] Based on the marijuana equivalencies provided in Application Note 8(D) to § 2D1.1 of the 2016 Sentencing Guidelines Manual, the median marijuana equivalency for the listed hallucinogens is 1:500; the median marijuana equivalency for the stimulants is 1:100.  *See* Data sets at Exhibit 3.

The Court should reject the proposed comparators based on Government Exhibit 11, the United States Sentencing Commission's Report to Congress on the Explanation of Recent Guidelines Amendments relating to MDMA Drug Offenses.  The Sentencing Commission relied on specific dangers and concerns in setting the 1:500 ratio for MDMA and MDEA.[2]  These unique considerations presumptively disqualify MDMA and MDEA as comparators for dibutylone and ethylone.

In the Report, the Commission states that in setting the temporary 1:500 ratio for MDMA, the Commission had chosen a higher penalty structure for MDMA than powder cocaine because: "(1) unlike MDMA, powder cocaine is not neurotoxic; (2) powder cocaine is not aggressively marketed to youth in the same manner as MDMA; and (3) powder cocaine is only a stimulant, but MDMA acts as both a stimulant and a hallucinogen." Govt. Ex. 11 p. 5.  The Commission described MDMA as a substance with "unique properties that made setting the appropriate penalty structure a challenge."  *Id*. p. 19.

The Government contends that ethylone and dibutylone should be scored based on their effect as stimulants, not hallucinogens, as was the case for MDMA. Moreover, MDMA as a neurotoxin was an important factor in the Commission's decision. The Report discussed research indicating that MDMA use has lasting negative effects on serotonin sites within the brain. *Id*. p. 8.  The Report cites a separate study finding that MDMA users had "a significantly reduced number of serotonin transporters throughout the brain and that the magnitude of the loss was associated with greater use of the drug."  *Id.* p. 9. In reaffirming MDMA's 1:500 ratio, the

---

[2] The report lists on page 2 five substances it was asked to evaluate amendments for.  These include MDMA and MDEA.  The Report discusses these substances as a group, categorized under the term "MDMA."

Commission included among its reasons "evidence supporting both short- and long-term health consequences of use including brain damage." *Id*. p. 19.

This Court should reject the "unique" substances MDMA and MDEA because the Sentencing Commission relied on very specific, signature characteristic of MDMA and MDEA in setting their marijuana equivalency ratios.

III.   **The Government Has Not Sustained its Burden of Establishing that MDMA is the Most Closely Related Controlled Substance to Dibutylone and MDEA is the Most Closely Related Controlled Substance to Ethylone**

    A.  **Dibutylone**

There are no previous cases assigning a marijuana ratio for dibutylone.

    1.  **Dibutylone is Not Substantially Similar Structurally to MDMA**

On chemical structure the government called as its expert chemist Daniel Willenbring and the defense called chemist Gregory Dudley.  Dr. Willenbring's testimony on dibutylone's structure reveals an analysis result-oriented toward MDMA. He did not testify that MDMA was the best match for dibutylone. On redirect, he was asked, "Why isn't dibutylone substantially similar to methcathinone?"  Tr. Vol. 1 p. 82.  He answered "I haven't made that evaluation.  I compared it to MDMA, and that is what I went forward with and that is what we discussed." *Id.* He then acknowledged that methcathinone and dibutylone have similarities.  *Id.* He testified: "Well, certainly dibutylone can be substantially similar to more than one thing. For the purpose of this, we compared it to MDMA and that is a consensus we reached in the unit, and we consult with the pharmacologists."[3]  Tr. Vol. 1 p. 84.

---

[3] Although this testimony was offered relating to dibutylone, the result oriented approach it demonstrates, if the DEA also applied it to ethylone, undercuts his opinion on ethylone as well.

4

Applying this result oriented approach, Dr. Willenbring disregarded three dissimilarities, two of which Dr. Dudley testified disqualified MDMA as a "substantially similar" substance. A good depiction of these differences is on page 8 of Dr. Dudley's slide deck.  Reason Defs.' Ex. 7, D.E. 211-1. MDMA and dibutylone are both phenethylamines. Tr. Vol. 1 p. 44.  But there are many thousands of substances in the phenethylamine class. *Id*. p. 68. They also both have an MD ring.  However, dibutylone, and not MDMA, has a ketone at the beta position, making it, but not MDMA, a member of the cathinone class. Dr. Dudley testified MDMA's lack of the beta ketone alone was disqualifying. Tr. Vol. 1 p. 205. Also disqualifying was dibutylone's dimethylamino in the square on page 8 of Dr. Dudley's slides. Dr. Dudley testified that this additional methyl group in dibutylone blocks it to donate a hydrogen bond, which is an important distinction. *See also* D.E. 178, Reason Defs' Ex. 6, Dr. Dudley's Report, p. 2-3. By way of demonstrating the difference a methyl group substituting for hydrogen in this position can make, the Reason Defendants offered Exhibit 1, a schematic of methamphetamine and dimethylamphetamine. These two substances differ only by the substitution of a methyl group for hydrogen at the same position in dimethylamphetamine. Tr. Vol. 1 p. 67. This difference turns methamphetamine (Guidelines ratio 1:20,000) into dimethylamphetamine (Guidelines ratio 1:40). These two important dissimilarities, especially when viewed in light of Dr. Willenbring's result oriented approach, should cause the Court to reject his opinion on structural "substantial similarity."

Dr. Dudley testified that in his opinion there are no Schedule I or II substances that are "substantially similar" structurally to dibutylone. Tr. Vol. 1 p. 208.  However, he testified that the cathinones identified on page 21 of his slide deck are the most closely related.  *Id*. p. 211. These include Schedule I and II substances khat (ratio 100:1) and methcathinone (ratio 1:380).

### 2.  MDMA Does Not Satisfy Prong B as to Dibutylone

There is inadequate evidence from which the Court can conclude that dibutylone and MDMA have a substantially similar effect. There is only one scientific study – an *in vitro* (ie., test tube) study --  on the effects of dibutylone. *See* Govt. Ex. 16. and Tr. Vol. 2 p. 91 (stating this is the only study).  This study indicated that dibutylone can be expected to have stimulant properties (Tr. Vol. 1, p. 155.). As Dr. Trecki testified, without animal (*in vivo*) studies, all he can say is that a stimulant effect is expected. *Id*. Dr. Trecki also testified that he has only **one** case report involving a single individual from which to draw conclusions about the effects of dibutylone. Tr. Vol. 1 p. 149-50. Dr. Trecki testified that he knew nothing about that individual's mental health history or his possible simultaneous use of other drugs. *Id.* p. 149. Dr. DiCaprio testified that MDMA and dibutylone are not substantially similar pharmacologically.  Tr. Vol. 2 p. 112. Based on the dearth of information, other than to say that MDMA has stimulant properties and dibutylone can be expected to have stimulant properties, there is inadequate proof that their effects are "substantially similar."

The government proffered stimulant effect as the Prong Two similarity between MDMA and dibutylone. But the evidence, and the scheduling and Guidelines classification of MDMA, establishes that the total effect of MDMA is different; it has an effect both as a stimulant and as an hallucinogen. *See* Gov't Ex. 11 p. 5 ("MDMA acts as both a stimulant and a hallucinogen."[4] On this, Dr. Trecki gave the following testimony:  Q: "You were asked about the release of serotonin in MDMA. Does that release of serotonin in MDMA prevent it from being a stimulant?" A: "No, it is an additional effect.  So, that is an additional, thought to be a hallucinogenic, additional properties of MDMA." Tr. Vol. 1 p. 166. *See also* Tr. Vo. 1 p. 42

---

[4] See Fn. 2 re Report's use of MDMA as representative of several similar drugs, including MDEA

(Willenbring direct)(stating that MDMA and MDEA have a hallucinogenic effect). Dr. Trecki testified further that the one *in vitro* study of dibutylone revealed that it has no effect on serotonin, the substance he testified was linked to MDMA's hallucinogenic properties. Tr. Vol. 1 p. 152. The government is seizing on a similar effect -- stimulation – but not accounting for the "unique" and defining hallucinogenic effect of MDMA and MDEA (by which I mean the effect that controls their Scheduling classification). Regulators and the Sentencing Commission have classified MDMA based on its hallucinogenic effect, not its effect as a stimulant. The Sentencing Commission expressed concern about MDEA and MDMA's signature hallucinogenic effect in setting the 1:500 sentencing ratio. This difference between dibutylone and MDMA makes it an unacceptable comparator in the area of effect.

### 3.   There is No Scientific Evidence on the Potency of Dibutylone.

There is only one scientific study on the effects of dibutylone. *See* Govt. Ex. 16. and Tr. Vol. 2 p. 91 (stating this is the only study).  As it is an *in vitro* study, it cannot be used to draw conclusions regarding potency. Tr. Vol. 1 p. 143 (Trecki: Potency cannot be determined from an *in vitro* study). For this reason, Dr. DiCaprio presented research on ethylone and methylone, as a surrogate for dibutylone. In his opinion, this research shows that MDMA is five times more potent than ethylone. Thames Ex. 4, ¶ 64. This is instructive, and shows MDMA to be a poor comparator as to potency.

In sum, MDMA is not substantially similar structurally to dibutylone and there is inadequate evidence to allow a determination as to substantial similarity of effect or potency. Dr. Dudley testified that the scheduled cathinones listed on page 21 of his slide deck are all closer matches than MDMA. Of these cathinones, two appear in Schedule I or II, khat (100:1) and methcathinone (1:380). These are both scheduled and controlled as stimulants, which is some

evidence of similarity of effect. Dr. Willenbring acknowledged that methcathinone is structurally similar to dibutylone.  However, applying the rule of lenity, we urge the Court to adopt, among the cathinones, Schedule One stimulant khat as the comparator for dibutylone.

> B.    **Ethylone:  The Court Should Reconsider Its Ruling in _U.S. v. Bully_, and Use the Stimulant Methcathinone as the Most Suitable Comparator for Ethylone**

The Court should not adhere to its ruling in _Bully_ approving MDEA as a comparator for ethylone. The Court was not informed in _Bully_ that MDEA is classified and scored as a hallucinogen, not a stimulant; it does not appear that the Court was aware that the Commission had scored MDMA and MDEA based on "unique" characteristics; and, most important, the government's chemist did not testify here, as he apparently did in _Bully_ that, "there was no drug in the Guidelines that was a better match for ethylone than MDEA." Order, _United States v. Bully_, dated September 12, 2016 at p. 6.

> 1.    **Ethylone's Chemical Structure is Most Closely Similar to Methcathinone**

The Government failed to establish that MDEA is the correct choice for ethylone under Prong A.  Dr. Willenbring did not testify that MDEA was the best or closest structural match to ethylone. This is a distinction between the evidence here and in _Bully_. AUSA Lineberger attempted to lead him into a more robust defense of his selection, asking him "[o]ut of all the substances in Schedule I and II, MDEA is the one you find that is substantially similar to ethylone?" Vol. 1, p. 41.  After an objection was sustained, she rephrased the question, asking, "What is your opinion."  Dr. Willenbring responded, "[T]hat Ethylone is substantially similar to MDEA and MDEA is referenced in the guidelines."  Tr. Vol. 1 p. 41.  Again, no most similar, no closest match.

Dr. Dudley, on the other hand, characterized methcathinone as the controlled substance "most closely" related to ethylone. Tr. Vol. 1 p. 212. He supported this conclusion, and rejected

MDEA as a better comparator, based on the undisputed fact that ethylone and methcathinone have the beta ketone, which makes them both cathinones, Tr. Vol. 1 p. 194, 197, 212. Dr. Willenbring acknowledged that MDEA is not a cathinone. Tr. Vol. 1 p. 58. The government did not call Dr. Willenbring in rebuttal to challenge Dr. Dudley's opinion that methcathinone holds a position of similarity superior to that of MDEA. Based on this, the Court should conclude on this record that methcathinone is a better match for ethylone in the area of chemical structure.

### 2. MDEA Does Not Satisfy Prong B Because of the Differences Between Ethylone's Stimulant Effect and the Mixed Stimulant/Hallucinogen Effect of MDEA

The government has proffered stimulant effect as the Prong Two similarity between MDEA and ethylone. Tr. Vol. 1 p. 114. The hallucinogen MDEA is not an acceptable comparator for all the reasons explained in Point 2 of the dibutylone discussion.

Methcathinone, which based on Dr. Dudley's uncontradicted testimony is the most closely similar substance in structure to ethylone, is listed as a stimulant in Schedule I. Based on the Government's position that ethylone should be scored as a stimulant, and methcathinone's classification as a stimulant, it is fair to conclude that ethylone and methcathinone share the similar effect of stimulation. This is instructive, and better than selecting a scheduled hallucinogen as a comparator.

### 3. The Government Failed to Establish that Ethylone and MDEA are Similar in Potency

Dr. Trecki admits in his report that drug discrimination studies showed ethylone to be less potent than MDEA. Govt. Ex. 8, para.1 of concluding section. A chart in his slide deck (Govt. Ex. 10) on pill equivalencies, which he cited as evidence of potency (Tr. Vol. 1. p 134), reports dosages in broad ranges (50-400 mg for ethylone); even Dr. Trecki downplayed the chart's usefulness, stating "a lot of this is based on small cases." Tr. Vol. 1. p 134. To the extent

it is helpful on potency, the top-of-range reported dosages for MDEA were 75 and 150 and the top of range dosage for ethylone was 400, indicating users would take between 2.6-5.3 times more ethylone than MDEA.  Dr. Dudley concurred regarding ethylone's lower potency vis-à-vis MDEA and MDMA. Dr. DiCaprio testified to research on the potency of methylone, which is similar to ethylone (Tr. Vol. 2. p. 9 and 105), and concluded that it has lower potency than MDMA. *Id*. p. 108.  *See also* Thames Exhibits 1 and 2. In his report, Dr. DiCaprio opined that the research supports a conclusion that MDMA is five times stronger than ethylone.  Thames Ex. 4, ¶ 64.  In sum, there is consensus that ethylone is less potent than MDEA and the related substance MDMA. This factor does not support MDEA as a comparator.

As the court emphasized in *United States v. Brey*, 627 Fed. Appx. 775 (11th Cir. 2015), its ruling affirming use of MDEA as a comparator for ethylone was not a holding that generally courts should apply the 1:500 ratio for ethylone. 627 Fed. Appx. fn. 5. The affirmance was "based on the specific record in this case." In *Brey*, the defense attorney stipulated to the government's position regarding the similarity of MDEA and ethylone as to both chemical structure and effect.  627 Fed. Appx. At 781. We have challenged the Government on both of these scores, and the parties agree that the two aren't the same as to potency.  At least one other court since *Brey* has adopted methcathinone as the best comparator for ethylone.  *See United States v. Holmes*, 2016 U.S. Dist. LEXIS 54044 (D. Hawaii 2016). *See also U.S. v. Malespin*, Case No. 15-20350, pages 27-30  (transcript attached as Exhibit 4)(post-*Brea* decision adopting 1:250 ratio for ethylone).  We ask this Court to adopt methcathinone as the comparator for ethylone, subject to a downward variance.

Dated: February 17, 2017                          Respectfully submitted,

                                                  s/ Julie Prag Vianale
                                                  Julie Prag Vianale (FBN 0184977)
                                                  Attorney for Venteria Reason
                                                  5550 Glades Road, Suite 500
                                                  Boca Raton, FL  33431
                                                  Tel: (561) 392-4750
                                                  jvianale@vianalelaw.com


## <u>CERTIFICATE OF SERVICE</u>

        Undersigned counsel hereby certifies that she filed the foregoing document on February 17, 2017 using the Court's CM-ECF system, which will cause a true and correct copy to be sent electronically to:

Carmen Lineberger
Assistant United States Attorney
101 South U.S. Highway 1
Suite 3100
Ft. Pierce FL  34950
carmen.lineberger@usdoj.gov



                                                  s/ Julie Prag Vianale
                                                  Julie Prag Vianale (FBN 1084977)
                                                  Vianale & Vianale LLP
                                                  5550 Glades Road, Suite 500
                                                  Boca Raton, FL  33431
                                                  Tel: (561) 392-4750

Exhibit 1

above amounts, is subject to the cap of 79.99 kilograms of marihuana set forth as the maximum combined equivalent weight for Schedule III, IV, and V substances. Without the cap, the combined equivalent weight would have been 88.48 (76 + 9.99 + 2.49) kilograms.

(D)   **Drug Equivalency Tables.—**

| Schedule I or II Opiates* | |
| --- | --- |
| 1 gm of Heroin = | 1 kg of marihuana |
| 1 gm of Alpha-Methylfentanyl = | 10 kg of marihuana |
| 1 gm of Dextromoramide = | 670 gm of marihuana |
| 1 gm of Dipipanone = | 250 gm of marihuana |
| 1 gm of 3-Methylfentanyl = | 10 kg of marihuana |
| 1 gm of 1-Methyl-4-phenyl-4-propionoxypiperidine/MPPP = | 700 gm of marihuana |
| 1 gm of 1-(2-Phenylethyl)-4-phenyl-4-acetyloxypiperidine/ PEPAP = | 700 gm of marihuana |
| 1 gm of Alphaprodine = | 100 gm of marihuana |
| 1 gm of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] Propanamide) = | 2.5 kg of marihuana |
| 1 gm of Hydromorphone/Dihydromorphinone = | 2.5 kg of marihuana |
| 1 gm of Levorphanol = | 2.5 kg of marihuana |
| 1 gm of Meperidine/Pethidine = | 50 gm of marihuana |
| 1 gm of Methadone = | 500 gm of marihuana |
| 1 gm of 6-Monoacetylmorphine = | 1 kg of marihuana |
| 1 gm of Morphine = | 500 gm of marihuana |
| 1 gm of Oxycodone (actual) = | 6700 gm of marihuana |
| 1 gm of Oxymorphone = | 5 kg of marihuana |
| 1 gm of Racemorphan = | 800 gm of marihuana |
| 1 gm of Codeine = | 80 gm of marihuana |
| 1 gm of Dextropropoxyphene/Propoxyphene-Bulk = | 50 gm of marihuana |
| 1 gm of Ethylmorphine = | 165 gm of marihuana |
| 1 gm of Hydrocodone (actual) = | 6700 gm of marihuana |
| 1 gm of Mixed Alkaloids of Opium/Papaveretum = | 250 gm of marihuana |
| 1 gm of Opium = | 50 gm of marihuana |
| 1 gm of Levo-alpha-acetylmethadol (LAAM) = | 3 kg of marihuana |

*Provided, that the minimum offense level from the Drug Quantity Table for any of these controlled substances individually, or in combination with another controlled substance, is level 12.

| Cocaine and Other Schedule I and II Stimulants (and their immediate precursors)* | |
| --- | --- |
| 1 gm of Cocaine = | 200 gm of marihuana |
| 1 gm of N-Ethylamphetamine = | 80 gm of marihuana |
| 1 gm of Fenethylline = | 40 gm of marihuana |
| 1 gm of Amphetamine = | 2 kg of marihuana |
| 1 gm of Amphetamine (Actual) = | 20 kg of marihuana |
| 1 gm of Methamphetamine = | 2 kg of marihuana |
| 1 gm of Methamphetamine (Actual) = | 20 kg of marihuana |
| 1 gm of "Ice" = | 20 kg of marihuana |
| 1 gm of Khat = | .01 gm of marihuana |
| 1 gm of 4-Methylaminorex ("Euphoria") = | 100 gm of marihuana |
| 1 gm of Methylphenidate (Ritalin) = | 100 gm of marihuana |
| 1 gm of Phenmetrazine = | 80 gm of marihuana |
| 1 gm Phenylacetone/P$_2$P (when possessed for the purpose of manufacturing methamphetamine) = | 416 gm of marihuana |
| 1 gm Phenylacetone/P$_2$P (in any other case) = | 75 gm of marihuana |
| 1 gm Cocaine Base ("Crack") = | 3,571 gm of marihuana |
| 1 gm of Aminorex = | 100 gm of marihuana |
| 1 gm of Methcathinone = | 380 gm of marihuana |
| 1 gm of N-N-Dimethylamphetamine = | 40 gm of marihuana |
| 1 gm of N-Benzylpiperazine = | 100 gm of marihuana |

*Provided, that the minimum offense level from the Drug Quantity Table for any of these controlled substances individually, or in combination with another controlled substance, is level 12.

| LSD, PCP, AND OTHER SCHEDULE I AND II HALLUCINOGENS (AND THEIR IMMEDIATE PRECURSORS)* | |
|---|---|
| 1 gm of Bufotenine = | 70 gm of marihuana |
| 1 gm of D-Lysergic Acid Diethylamide/Lysergide/LSD = | 100 kg of marihuana |
| 1 gm of Diethyltryptamine/DET = | 80 gm of marihuana |
| 1 gm of Dimethyltryptamine/DM = | 100 gm of marihuana |
| 1 gm of Mescaline = | 10 gm of marihuana |
| 1 gm of Mushrooms containing Psilocin and/or Psilocybin (Dry) = | 1 gm of marihuana |
| 1 gm of Mushrooms containing Psilocin and/or Psilocybin (Wet) = | 0.1 gm of marihuana |
| 1 gm of Peyote (Dry) = | 0.5 gm of marihuana |
| 1 gm of Peyote (Wet) = | 0.05 gm of marihuana |
| 1 gm of Phencyclidine/PCP = | 1 kg of marihuana |
| 1 gm of Phencyclidine (actual) /PCP (actual) = | 10 kg of marihuana |
| 1 gm of Psilocin = | 500 gm of marihuana |
| 1 gm of Psilocybin = | 500 gm of marihuana |
| 1 gm of Pyrrolidine Analog of Phencyclidine/PHP = | 1 kg of marihuana |
| 1 gm of Thiophene Analog of Phencyclidine/TCP = | 1 kg of marihuana |
| 1 gm of 4-Bromo-2,5-Dimethoxyamphetamine/DOB = | 2.5 kg of marihuana |
| 1 gm of 2,5-Dimethoxy-4-methylamphetamine/DOM = | 1.67 kg of marihuana |
| 1 gm of 3,4-Methylenedioxyamphetamine/MDA = | 500 gm of marihuana |
| 1 gm of 3,4-Methylenedioxymethamphetamine/MDMA = | 500 gm of marihuana |
| 1 gm of 3,4-Methylenedioxy-N-ethylamphetamine/MDEA = | 500 gm of marihuana |
| 1 gm of Paramethoxymethamphetamine/PMA = | 500 gm of marihuana |
| 1 gm of 1-Piperidinocyclohexanecarbonitrile/PCC = | 680 gm of marihuana |
| 1 gm of N-ethyl-1-phenylcyclohexylamine (PCE) = | 1 kg of marihuana |

*Provided, that the minimum offense level from the Drug Quantity Table for any of these controlled substances individually, or in combination with another controlled substance, is level 12.

| SCHEDULE I MARIHUANA | |
|---|---|
| 1 gm of Marihuana/Cannabis, granulated, powdered, etc. = | 1 gm of marihuana |
| 1 gm of Hashish Oil = | 50 gm of marihuana |
| 1 gm of Cannabis Resin or Hashish = | 5 gm of marihuana |
| 1 gm of Tetrahydrocannabinol, Organic = | 167 gm of marihuana |
| 1 gm of Tetrahydrocannabinol, Synthetic = | 167 gm of marihuana |

| FLUNITRAZEPAM ** | |
|---|---|
| 1 unit of Flunitrazepam = | 16 gm of marihuana |

**Provided, that the minimum offense level from the Drug Quantity Table for flunitrazepam individually, or in combination with any Schedule I or II depressants, Schedule III substances, Schedule IV substances, and Schedule V substances is level 8.

| SCHEDULE I OR II DEPRESSANTS (EXCEPT GAMMA-HYDROXYBUTYRIC ACID) | |
|---|---|
| 1 unit of a Schedule I or II Depressant (except gamma-hydroxybutyric acid) = | 1 gm of marihuana |

| GAMMA-HYDROXYBUTYRIC ACID | |
|---|---|
| 1 ml of gamma-hydroxybutyric acid = | 8.8 gm of marihuana |

**§2D1.1**

| SCHEDULE III SUBSTANCES (EXCEPT KETAMINE)*** | |
|---|---|
| 1 unit of a Schedule III Substance = | 1 gm of marihuana |

***Provided, that the combined equivalent weight of all Schedule III substances (except ketamine), Schedule IV substances (except flunitrazepam), and Schedule V substances shall not exceed 79.99 kilograms of marihuana.

| KETAMINE | |
|---|---|
| 1 unit of ketamine = | 1 gm of marihuana |

| SCHEDULE IV SUBSTANCES (EXCEPT FLUNITRAZEPAM)***** | |
|---|---|
| 1 unit of a Schedule IV Substance (except Flunitrazepam) = | 0.0625 gm of marihuana |

*****Provided, that the combined equivalent weight of all Schedule IV (except flunitrazepam) and V substances shall not exceed 9.99 kilograms of marihuana.

| SCHEDULE V SUBSTANCES****** | |
|---|---|
| 1 unit of a Schedule V Substance = | 0.00625 gm of marihuana |

******Provided, that the combined equivalent weight of Schedule V substances shall not exceed 2.49 kilograms of marihuana.

| LIST I CHEMICALS (RELATING TO THE MANUFACTURE OF AMPHETAMINE OR METHAMPHETAMINE)******* | |
|---|---|
| 1 gm of Ephedrine = | 10 kg of marihuana |
| 1 gm of Phenylpropanolamine = | 10 kg of marihuana |
| 1 gm of Pseudoephedrine = | 10 kg of marihuana |

*******Provided, that in a case involving ephedrine, pseudoephedrine, or phenylpropanolamine tablets, use the weight of the ephedrine, pseudoephedrine, or phenylpropanolamine contained in the tablets, not the weight of the entire tablets, in calculating the base offense level.

| DATE RAPE DRUGS (EXCEPT FLUNITRAZEPAM, GHB, OR KETAMINE) | |
|---|---|
| 1 ml of 1,4-butanediol = | 8.8 gm marihuana |
| 1 ml of gamma butyrolactone = | 8.8 gm marihuana |

To facilitate conversions to drug equivalencies, the following table is provided:

| MEASUREMENT CONVERSION TABLE |
|---|
| 1 oz = 28.35 gm |
| 1 lb = 453.6 gm |
| 1 lb = 0.4536 kg |
| 1 gal = 3.785 liters |
| 1 qt = 0.946 liters |
| 1 gm = 1 ml (liquid) |
| 1 liter = 1,000 ml |
| 1 kg = 1,000 gm |
| 1 gm = 1,000 mg |
| 1 grain = 64.8 mg. |

Exhibit 2



**U.S. DEPARTMENT OF JUSTICE ★ DRUG ENFORCEMENT ADMINISTRATION**

# DIVERSION CONTROL DIVISION

| Search |

HOME     REGISTRATION     REPORTING     RESOURCES     ABOUT US

RESOURCES > Title 21 Code of Federal Regulations > 1308 > 1308.11

## Title 21 Code of Federal Regulations

### PART 1308 — SCHEDULES OF CONTROLLED SUBSTANCES

**SCHEDULES**

**§1308.11 Schedule I.**

(a) Schedule I shall consist of the drugs and other substances, by whatever official name, common or usual name, chemical name, or brand name designated, listed in this section. Each drug or substance has been assigned the DEA Controlled Substances Code Number set forth opposite it.

(b) *Opiates.* Unless specifically excepted or unless listed in another schedule, any of the following opiates, including their isomers, esters, ethers, salts, and salts of isomers, esters and ethers, whenever the existence of such isomers, esters, ethers and salts is possible within the specific chemical designation (for purposes of paragraph (b)(34) only, the term isomer includes the optical and geometric isomers):

| | |
|---|---|
| (1) Acetyl-alpha-methylfentanyl (*N*-[1-(1-methyl-2-phenethyl)-4-piperidinyl]-*N*-phenylacetamide) | 9815 |
| (2) Acetylmethadol | 9601 |
| (3) AH-7921 (3,4-dichloro-*N*-[(1-dimethylamino) cyclohexylmethyl]benzamide | 9551 |
| (4) Allylprodine | 9602 |
| (5) Alphacetylmethadol (except levo-alphacetylmethadol also known as levo-alpha-acetylmethadol, levomethadyl acetate, or LAAM) | 9603 |
| (6) Alphameprodine | 9604 |
| (7) Alphamethadol | 9605 |
| (8) Alpha-methylfentanyl (N-[1-(alpha-methyl-beta-phenyl)ethyl-4-piperidyl] propionanilide; 1-(1-methyl-2-phenylethyl)-4-(N-propanilido) piperidine) | 9814 |
| (9) Alpha-methylthiofentanyl (*N*-[1-methyl-2-(2-thienyl)ethyl-4-piperidinyl]-*N*-phenylpropanamide) | 9832 |
| (10) Benzethidine | 9606 |
| (11) Betacetylmethadol | 9607 |
| (12) Beta-hydroxyfentanyl (N-[1-(2-hydroxy-2-phenethyl)-4-piperidinyl]-N-phenylpropanamide) | 9830 |
| (13) Beta-hydroxy-3-methylfentanyl (other name: N-[1-(2-hydroxy-2-phenethyl)-3-methyl-4-piperidinyl]-N-phenylpropanamide | 9831 |
| (14) Betameprodine | 9608 |
| (15) Betamethadol | 9609 |
| (16) Betaprodine | 9611 |
| (17) Clonitazene | 9612 |
| (18) Dextromoramide | 9613 |
| (19) Diampromide | 9615 |
| (20) Diethylthiambutene | 9616 |
| (21) Difenoxin | 9168 |
| (22) Dimenoxadol | 9617 |
| (23) Dimepheptanol | 9618 |
| (24) Dimethylthiambutene | 9619 |
| (25) Dioxaphetyl butyrate | 9621 |
| (26) Dipipanone | 9622 |
| (27) Ethylmethylthiambutene | 9623 |
| (28) Etonitazene | 9624 |
| (29) Etoxeridine | 9625 |
| (30) Furethidine | 9626 |
| (31) Hydroxypethidine | 9627 |
| (32) Ketobemidone | 9628 |
| (33) Levomoramide | 9629 |
| (34) Levophenacylmorphan | 9631 |
| (35) 3-Methylfentanyl (*N*-[3-methyl-1-(2-phenylethyl)-4-piperidyl]-*N*-phenylpropanamide) | 9813 |
| (36) 3-methylthiofentanyl (*N*-[(3-methyl-1-(2-thienyl)ethyl-4-piperidinyl]-*N*-phenylpropanamide) | 9833 |
| (37) Morpheridine | 9632 |
| (38) MPPP (1-methyl-4-phenyl-4-propionoxypiperidine) | 9661 |
| (39) Noracymethadol | 9633 |
| (40) Norlevorphanol | 9634 |
| (41) Normethadone | 9635 |
| (42) Norpipanone | 9636 |
| (43) Para-fluorofentanyl (*N*-(4-fluorophenyl)-*N*-[1-(2-phenethyl)-4-piperidinyl] propanamide | 9812 |

| (44) PEPAP (1-(-2-phenethyl)-4-phenyl-4-acetoxypiperidine | 9663 |
| (45) Phenadoxone | 9637 |
| (46) Phenampromide | 9638 |
| (47) Phenomorphan | 9647 |
| (48) Phenoperidine | 9641 |
| (49) Piritramide | 9642 |
| (50) Proheptazine | 9643 |
| (51) Properidine | 9644 |
| (52) Propiram | 9649 |
| (53) Racemoramide | 9645 |
| (54) Thiofentanyl (N-phenyl-N-[1-(2-thienyl)ethyl-4-piperidinyl]-propanamide | 9835 |
| (55) Tilidine | 9750 |
| (56) Trimeperidine | 9646 |

(c) *Opium derivatives.* Unless specifically excepted or unless listed in another schedule, any of the following opium derivatives, its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

| (1) Acetorphine | 9319 |
| (2) Acetyldihydrocodeine | 9051 |
| (3) Benzylmorphine | 9052 |
| (4) Codeine methylbromide | 9070 |
| (5) Codeine-N-Oxide | 9053 |
| (6) Cyprenorphine | 9054 |
| (7) Desomorphine | 9055 |
| (8) Dihydromorphine | 9145 |
| (9) Drotebanol | 9335 |
| (10) Etorphine (except hydrochloride salt) | 9056 |
| (11) Heroin | 9200 |
| (12) Hydromorphinol | 9301 |
| (13) Methyldesorphine | 9302 |
| (14) Methyldihydromorphine | 9304 |
| (15) Morphine methylbromide | 9305 |
| (16) Morphine methylsulfonate | 9306 |
| (17) Morphine-N-Oxide | 9307 |
| (18) Myrophine | 9308 |
| (19) Nicocodeine | 9309 |
| (20) Nicomorphine | 9312 |
| (21) Normorphine | 9313 |
| (22) Pholcodine | 9314 |
| (23) Thebacon | 9315 |

(d) *Hallucinogenic substances.* Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation (for purposes of this paragraph only, the term "isomer" includes the optical, position and geometric isomers):

| (1) Alpha-ethyltryptamine | 7249 |
| Some trade or other names: etryptamine; Monase; α-ethyl-1H-indole-3-ethanamine; 3-(2-aminobutyl) indole; α-ET; and AET. | |
| (2) 4-bromo-2,5-dimethoxy-amphetamine | 7391 |
| Some trade or other names: 4-bromo-2,5-dimethoxy-α-methylphenethylamine; 4-bromo-2,5-DMA | |
| (3) 4-Bromo-2,5-dimethoxyphenethylamine | 7392 |
| Some trade or other names: 2-(4-bromo-2,5-dimethoxyphenyl)-1-aminoethane; alpha-desmethyl DOB; 2C-B, Nexus. | |
| (4) 2,5-dimethoxyamphetamine | 7396 |
| Some trade or other names: 2,5-dimethoxy-α-methylphenethylamine; 2,5-DMA | |
| (5) 2,5-dimethoxy-4-ethylamphet-amine | 7399 |
| Some trade or other names: DOET | |
| (6) 2,5-dimethoxy-4-(n)-propylthiophenethylamine (other name: 2C-T-7) | 7348 |
| (7) 4-methoxyamphetamine | 7411 |
| Some trade or other names: 4-methoxy-α-methylphenethylamine; paramethoxyamphetamine, PMA | |
| (8) 5-methoxy-3,4-methylenedioxy-amphetamine | 7401 |
| (9) 4-methyl-2,5-dimethoxy-amphetamine | 7395 |
| Some trade and other names: 4-methyl-2,5-dimethoxy-α-methylphenethylamine; "DOM"; and "STP" | |
| (10) 3,4-methylenedioxy amphetamine | 7400 |
| (11) 3,4-methylenedioxymethamphetamine (MDMA) | 7405 |
| (12) 3,4-methylenedioxy-N-ethylamphetamine (also known as N-ethyl-alpha-methyl-3,4(methylenedioxy)phenethylamine, N-ethyl MDA, MDE, MDEA | 7404 |
| (13) N-hydroxy-3,4-methylenedioxyamphetamine (also known as N-hydroxy-alpha-methyl-3,4-methylenedioxy)phenethylamine, and N-hydroxy MDA | 7402 |
| (14) 3,4,5-trimethoxy amphetamine | 7390 |
| (15) 5-methoxy-N,N-dimethyltryptamine | 7431 |
| Some trade or other names: 5-methoxy-3-[2-(dimethylamino)ethyl]indole; 5-MeO-DMT | |
| (16) Alpha-methyltryptamine (other name: AMT) | 7432 |
| (17) Bufotenine | 7433 |
| Some trade and other names: 3-(β-Dimethylaminoethyl)-5-hydroxyindole; 3-(2-dimethylaminoethyl)-5-indolol; N, N-dimethylserotonin; 5-hydroxy-N,N-dimethyltryptamine; mappine | |
| (18) Diethyltryptamine | 7434 |
| Some trade and other names: N,N-Diethyltryptamine; DET | |
| (19) Dimethyltryptamine | 7435 |
| Some trade or other names: DMT | |
| (20) 5-methoxy-N,N-diisopropyltryptamine (other name: 5-MeO-DIPT) | 7439 |

| (21) Ibogaine | 7260 |
|---|---|
| Some trade and other names: 7-Ethyl-6,6β,7,8,9,10,12,13-octahydro-2-methoxy-6,9-methano-5H-pyrido [1', 2':1,2] azepino [5,4-b] indole; Tabernanthe iboga | |
| (22) Lysergic acid diethylamide | 7315 |
| (23) Marihuana | 7360 |
| (24) Mescaline | 7381 |
| (25) Parahexyl | 7374 |
| Some trade or other names: 3-Hexyl-1-hydroxy-7,8,9,10-tetrahydro-6,6,9-trimethyl-6H-dibenzo[b,d]pyran; Synhexyl. | |
| (26) Peyote | 7415 |
| Meaning all parts of the plant presently classified botanically as *Lophophora williamsii Lemaire,* whether growing or not, the seeds thereof, any extract from any part of such plant, and every compound, manufacture, salts, derivative, mixture, or preparation of such plant, its seeds or extracts | |
| (Interprets 21 USC 812(c), Schedule I(c) (12)) | |
| (27) N-ethyl-3-piperidyl benzilate | 7482 |
| (28) N-methyl-3-piperidyl benzilate | 7484 |
| (29) Psilocybin | 7437 |
| (30) Psilocyn | 7438 |
| (31) Tetrahydrocannabinols | 7370 |
| Meaning tetrahydrocannabinols naturally contained in a plant of the genus Cannabis (cannabis plant), as well as synthetic equivalents of the substances contained in the cannabis plant, or in the resinous extractives of such plant, and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant, such as the following: | |
| 1 cis or trans tetrahydrocannabinol, and their optical isomers | |
| 6 cis or trans tetrahydrocannabinol, and their optical isomers | |
| 3,4 cis or trans tetrahydrocannabinol, and its optical isomers | |
| (Since nomenclature of these substances is not internationally standardized, compounds of these structures, regardless of numerical designation of atomic positions covered.) | |
| (32) Ethylamine analog of phencyclidine | 7455 |
| Some trade or other names: N-ethyl-1-phenylcyclohexylamine, (1-phenylcyclohexyl)ethylamine, N-(1-phenylcyclohexyl)ethylamine, cyclohexamine, PCE | |
| (33) Pyrrolidine analog of phencyclidine | 7458 |
| Some trade or other names: 1-(1-phenylcyclohexyl)-pyrrolidine, PCPy, PHP | |
| (34) Thiophene analog of phencyclidine | 7470 |
| Some trade or other names: 1-[1-(2-thienyl)-cyclohexyl]-piperidine, 2-thienylanalog of phencyclidine, TPCP, TCP | |
| (35) 1-[1-(2-thienyl)cyclohexyl]pyrrolidine | 7473 |
| Some other names: TCPy | |
| (36) 4-methylmethcathinone (Mephedrone) | 1248 |
| (37) 3,4-methylenedioxypyrovalerone (MDPV) | 7535 |
| (38) 2-(2,5-Dimethoxy-4-ethylphenyl)ethanamine (2C-E) | 7509 |
| (39) 2-(2,5-Dimethoxy-4-methylphenyl)ethanamine (2C-D) | 7508 |
| (40) 2-(4-Chloro-2,5-dimethoxyphenyl)ethanamine (2C-C) | 7519 |
| (41) 2-(4-Iodo-2,5-dimethoxyphenyl)ethanamine (2C-I) | 7518 |
| (42) 2-[4-(Ethylthio)-2,5-dimethoxyphenyl]ethanamine (2C-T-2) | 7385 |
| (43) 2-[4-(Isopropylthio)-2,5-dimethoxyphenyl]ethanamine (2C-T-4) | 7532 |
| (44) 2-(2,5-Dimethoxyphenyl)ethanamine (2C-H) | 7517 |
| (45) 2-(2,5-Dimethoxy-4-nitro-phenyl)ethanamine (2C-N) | 7521 |
| (46) 2-(2,5-Dimethoxy-4-(n)-propylphenyl)ethanamine (2C-P) | 7524 |
| (47) 3,4-Methylenedioxy-N-methylcathinone (Methylone) | 7540 |
| (48) (1-pentyl-1*H*-indol-3-yl)(2,2,3,3-tetramethylcyclopropyl)methanone (UR-144) | 7144 |
| (49) [1-(5-fluoro-pentyl)-1*H*-indol-3-yl](2,2,3,3-tetramethylcyclopropyl)methanone (5-fluoro-UR-144, XLR11) | 7011 |
| (50) N-(1-adamantyl)-1-pentyl-1*H*-indazole-3-carboxamide (APINACA, AKB48) | 7048 |
| (51) quinolin-8-yl 1-pentyl-1*H*-indole-3-carboxylate (PB-22; QUPIC) | 7222 |
| (52) quinolin-8-yl 1-(5-fluoropentyl)-1*H*-indole-3-carboxylate (5-fluoro-PB-22; 5F-PB-22) | 7225 |
| (53) *N*-(1-amino-3-methyl-1-oxobutan-2-yl)-1-(4-fluorobenzyl)-1*H*-indazole-3-carboxamide (AB-FUBINACA) | 7012 |
| (54) *N*-(1-amino-3,3-dimethyl-1-oxobutan-2-yl)-1-pentyl-1*H*-indazole-3-carboxamide (ADB-PINACA) | 7035 |
| (55) 2-(4-iodo-2,5-dimethoxyphenyl)-*N*-(2-methoxybenzyl)ethanamine (25I-NBOMe, 2C-I-NBOMe) | 7538 |
| (56) 2-(4-chloro-2,5-dimethoxyphenyl)-*N*-(2-methoxybenzyl)ethanamine (25C-NBOMe, 2C-C-NBOMe) | 7537 |
| (57) 2-(4-bromo-2,5-dimethoxyphenyl)-*N*-(2-methoxybenzyl)ethanamine (25B-NBOMe, 2C-B-NBOMe) | 7536 |
| (58) Marihuana Extract | 7350 |
| Meaning an extract containing one or more cannabinoids that has been derived from any plant of the genus Cannabis, other than the separated resin (whether crude or purified) obtained from the plant. | |

(e) *Depressants.* Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a depressant effect on the central nervous system, including its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

| (1) gamma-hydroxybutyric acid (some other names include GHB; gamma-hydroxybutyrate; 4-hydroxybutyrate; 4-hydroxybutanoic acid; sodium oxybate; sodium oxybutyrate) | 2010 |
|---|---|
| (2) Mecloqualone | 2572 |
| (3) Methaqualone | 2565 |

(f) *Stimulants.* Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a stimulant effect on the central nervous system, including its salts, isomers, and salts of isomers:

| (1) Aminorex (Some other names: aminoxaphen; 2-amino-5-phenyl-2-oxazoline; or 4,5-dihydro-5-phenly-2-oxazolamine) | 1585 |
|---|---|
| (2) N-Benzylpiperazine (some other names: BZP, 1-benzylpiperazine) | 7493 |
| (3) Cathinone | 1235 |
| Some trade or other names: 2-amino-1-phenyl-1-propanone, alpha-aminopropiophenone, 2-aminopropiophenone, and norephedrone | |
| (4) Fenethylline | 1503 |
| (5) Methcathinone (Some other names: 2-(methylamino)-propiophenone; alpha-(methylamino)propiophenone; 2-(methylamino)-1-phenylpropan-1-one; alpha-*N*-methylaminopropiophenone; monomethylpropion; ephedrone;*N*-methylcathinone; methylcathinone; AL-464; AL-422; AL-463 and UR1432), its salts, optical isomers and salts of optical isomers | 1237 |
| (6) (±)*cis*-4-methylaminorex ((±)*cis*-4,5-dihydro-4-methyl-5-phenyl-2-oxazolamine) | 1590 |
| (7) N-ethylamphetamine | 1475 |

| (8) *N*,*N*-dimethylamphetamine (also known as *N*,*N*-alpha-trimethyl-benzeneethanamine; *N*,*N*-alpha-trimethylphenethylamine) | 1480 |
|---|---|

(g) *Cannabimimetic agents.* Unless specifically exempted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances, or which contains their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

| (1) 5-(1,1-dimethylheptyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (CP-47,497) | 7297 |
|---|---|
| (2) 5-(1,1-dimethyloctyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (cannabicyclohexanol or CP-47,497 C8-homolog) | 7298 |
| (3) 1-pentyl-3-(1-naphthoyl)indole (JWH-018 and AM678) | 7118 |
| (4) 1-butyl-3-(1-naphthoyl)indole (JWH-073) | 7173 |
| (5) 1-hexyl-3-(1-naphthoyl)indole (JWH-019) | 7019 |
| (6) 1-[2-(4-morpholinyl)ethyl]-3-(1-naphthoyl)indole (JWH- 200) | 7200 |
| (7) 1-pentyl-3-(2-methoxyphenylacetyl)indole (JWH-250) | 6250 |
| (8) 1-pentyl-3-[1-(4-methoxynaphthoyl)]indole (JWH-081) | 7081 |
| (9) 1-pentyl-3-(4-methyl-1-naphthoyl)indole (JWH-122) | 7122 |
| (10) 1-pentyl-3-(4-chloro-1-naphthoyl)indole (JWH-398) | 7398 |
| (11) 1-(5-fluoropentyl)-3-(1-naphthoyl)indole (AM2201) | 7201 |
| (12) 1-(5-fluoropentyl)-3-(2-iodobenzoyl)indole (AM694) | 7694 |
| (13) 1-pentyl-3-[(4-methoxy)-benzoyl]indole (SR-19 and RCS-4) | 7104 |
| (14) 1-cyclohexylethyl-3-(2-methoxyphenylacetyl)indole 7008 (SR-18 and RCS-8) | 7008 |
| (15) 1-pentyl-3-(2-chlorophenylacetyl)indole (JWH-203) | 7203 |

(h) *Temporary listing of substances subject to emergency scheduling.* Any material, compound, mixture or preparation which contains any quantity of the following substances:

(1) 4-methyl-*N*-ethylcathinone, its optical, positional, and geometric isomers, salts and salts of isomers—1249 (Other names: 4-MEC; 2-(ethylamino)-1-(4-methylphenyl)propan-1-one)

(2) 4-methyl-*alpha*-pyrrolidinopropiophenone, its optical, positional, and geometric isomers, salts and salts of isomers—7498 (Other names: 4-MePPP; MePPP; 4-methyl-α-pyrrolidinopropiophenone; 1-(4-methylphenyl)-2-(pyrrolidin-1-yl)-propan-1-one)

(3) *alpha*-pyrrolidinopentiophenone, its optical, positional, and geometric isomers, salts and salts of isomers—7545 (Other names: α-PVP; α-pyrrolidinovalerophenone; 1-phenyl-2-(pyrrolidin-1-yl)pentan-1-one)

(4) Butylone, its optical, positional, and geometric isomers, salts and salts of isomers—7541 (Other names: bk-MBDB; 1-(1,3-benzodioxol-5-yl)-2-(methylamino)butan-1-one)

(5) Pentedrone, its optical, positional, and geometric isomers, salts and salts of isomers—1246 (Other names: α-methylaminovalerophenone; 2-(methylamino)-1-phenylpentan-1-one)

(6) Pentylone, its optical, positional, and geometric isomers, salts and salts of isomers—7542 (Other names: bk-MBDP; 1-(1,3-benzodioxol-5-yl)-2-(methylamino)pentan-1-one)

(7) 4-fluoro-*N*-methylcathinone, its optical, positional, and geometric isomers, salts and salts of isomers—1238 (Other names: 4-FMC; flephedrone; 1-(4-fluorophenyl)-2-(methylamino)propan-1-one)

(8) 3-fluoro-*N*-methylcathinone, its optical, positional, and geometric isomers, salts and salts of isomers—1233 (Other names: 3-FMC; 1-(3-fluorophenyl)-2-(methylamino)propan-1-one)

(9) Naphyrone, its optical, positional, and geometric isomers, salts and salts of isomers—1258 (Other names: naphthylpyrovalerone; 1-(naphthalen-2-yl)-2-(pyrrolidin-1-yl)pentan-1-one)

(10) *alpha*-pyrrolidinobutiophenone, its optical, positional, and geometric isomers, salts and salts of isomers—7546 (Other names: α-PBP; 1-phenyl-2-(pyrrolidin-1-yl)butan-1-one)

(11) *N*-(1-amino-3-methyl-1-oxobutan-2-yl)-1-(cyclohexylmethyl)-1*H*-indazole-3-carboxamide, its optical, positional, and geometric isomers, salts, and salts of isomers—7031 (Other names: AB-CHMINACA)

(12) *N*-(1-amino-3-methyl-1-oxobutan-2-yl)-1-pentyl-1*H*-indazole-3-carboxamide, its optical, positional, and geometric isomers, salts, and salts of isomers—7023 (Other names: AB-PINACA)

(13) [1-(5-fluoropentyl)-1*H*-indazol-3-yl](naphthalen-1-yl)methanone, its optical, positional, and geometric isomers, salts, and salts of isomers—7024 (Other names: THJ-2201)

(14) *N*-(1-phenethylpiperidin-4-yl)-*N*-phenylacetamide, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: acetyl fentanyl)—(9821)

(15) *N*-(1-amino-3,3-dimethyl-1-oxobutan-2-yl)-1-(cyclohexylmethyl)-1*H*-indazole-3-carboxamide, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: MAB-CHMINACA; ADB-CHMINACA)—(7032)

(16) *N*-(1-phenethylpiperidin-4-yl)-*N*-phenylbutyramide, its isomers, esters, ethers, salts and salts of isomers, esters and ethers (Other names: Butyryl fentanyl)—(9822)

(17) *N*-[1-[2-hydroxy-2-(thiophen-2-yl)ethyl]piperidin-4-yl]-*N*-phenylpropionamide, its isomers, esters, ethers, salts and salts of isomers, esters and ethers (Other names: beta-hydroxythiofentanyl)—(9836)

(18) 3,4-Dichloro-*N*-[2-(dimethylamino)cyclohexyl]-*N*-methylbenzamide, its isomers, esters, ethers, salts and salts of isomers, esters and ethers (Other name: U-47700)—(9547)

(19) *N*-(1-phenethylpiperidin-4-yl)-*N*-phenylfuran-2-carboxamide, its isomers, esters, ethers, salts and salts of isomers, esters and ethers (Other name: Furanyl fentanyl)—(9834)

(20)-(22) [Reserved]

(23) methyl 2-(1-(5-fluoropentyl)-1*H*-indazole-3-carboxamido)-3,3-dimethylbutanoate, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: 5F-ADB; 5F-MDMB-PINACA)—(7034)

(24) methyl 2-(1-(5-fluoropentyl)-1*H*-indazole-3-carboxamido)-3-methylbutanoate, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: 5F-AMB)—(7033)

(25) *N*-(adamantan-1-yl)-1-(5-fluoropentyl)-1*H*-indazole-3-carboxamide, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: 5F-APINACA, 5F-AKB48)—(7049)

(26) *N*-(1-amino-3,3-dimethyl-1-oxobutan-2-yl)-1-(4-fluorobenzyl)-1*H*-indazole-3-carboxamide, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: ADB-FUBINACA)—(7010)

(27) methyl 2-(1-(cyclohexylmethyl)-1*H*-indole-3-carboxamido)-3,3-dimethylbutanoate, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: MDMB-CHMICA, MMB-CHMINACA)—(7042)

(28) methyl 2-(1-(4-fluorobenzyl)-1*H*-indazole-3-carboxamido)-3,3-dimethylbutanoate, its optical, positional, and geometric isomers, salts and salts of isomers (Other names: MDMB-FUBINACA)—(7020)

[39 FR 22141, June 20, 1974]

Editorial Note: For Federal Register citations affecting §1308.11, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at www.fdsys.gov.

**NOTICE: This is an unofficial version. An official version of this publication may be obtained directly from the *Government Printing Office* (GPO).**





HOME     CONTACT US     A-Z SUBJECT INDEX     PRIVACY NOTICE     WEBSITE ASSISTANCE

**REGISTRATION**
Applications
Tools
Resources
CMEA Required Training & Self-Certification
Quota Applications

**ABOUT US**
Program Description
Customer Service Plan
DEA Forms & Applications
Mailing Addresses
Meetings & Events
What's New

**REPORTING**
ARCOS
BCM Online
Chemical Import/Export Declarations
CSOS (Controlled Substances Ordering System)
Drug Theft/Loss
Import/Export
Registrant Record of Controlled Substances Destroyed
Quotas
Reports Required by 21 CFR
Submit a Tip to DEA
Year-End Reports

**RESOURCES**
Cases Against Doctors
Chemical Control Program
CMEA (Combat Meth Epidemic Act)
Controlled Substance Schedules
DATA Waived Physicians
Drug Disposal Information
Drug and Chemical Information
E-commerce Initiatives
Federal Agencies & Related Links
Federal Register Notices

National Take-Back Initiative
NFLIS
Publications & Manuals
Questions & Answers
Significant Guidance Documents
Synthetic Drugs
Title 21 Code of Federal Regulations
Title 21 USC Codified CSA



U.S. DEPARTMENT OF JUSTICE  •  DRUG ENFORCEMENT ADMINISTRATION
Diversion Control Division  •  8701 Morrissette Drive  •  Springfield, VA 22152  •  1-800-882-9539

**DEA.GOV  |  JUSTICE.GOV  |  USA.GOV  |  REGULATIONS.GOV**

DOJ Legal Policies and Disclaimers     |     DOJ Privacy Policy     |     Section 508 Accessibility




RESOURCES > Title 21 Code of Federal Regulations > Part 1308 > 1308.12

## Title 21 Code of Federal Regulations

### PART 1308 — SCHEDULES OF CONTROLLED SUBSTANCES

**EXCLUDED NONNARCOTIC SUBSTANCES**

**SCHEDULES**

**§1308.12 Schedule II.**

(a) Schedule II shall consist of the drugs and other substances, by whatever official name, common or usual name, chemical name, or brand name designated, listed in this section. Each drug or substance has been assigned the Controlled Substances Code Number set forth opposite it.

(b) Substances, vegetable origin or chemical synthesis. Unless specifically excepted or unless listed in another schedule, any of the following substances whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

(1) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate excluding apomorphine, thebaine-derived butorphanol, dextrorphan, nalbuphine, nalmefene, naloxegol, naloxone, and naltrexone, and their respective salts, but including the following:

| | |
|---|---|
| (i) Codeine | 9050 |
| (ii) Dihydroetorphine | 9334 |
| (iii) Ethylmorphine | 9190 |
| (iv) Etorphine hydrochloride | 9059 |
| (v) Granulated opium | 9640 |
| (vi) Hydrocodone | 9193 |
| (vii) Hydromorphone | 9150 |
| (viii) Metopon | 9260 |
| (ix) Morphine | 9300 |
| (x) Opium extracts | 9610 |
| (xi) Opium fluid | 9620 |
| (xii) Oripavine | 9330 |
| (xiii) Oxycodone | 9143 |
| (xiv) Oxymorphone | 9652 |
| (xv) Powdered opium | 9639 |
| (xvi) Raw opium | 9600 |
| (xvii) Thebaine | 9333 |
| (xviii) Tincture of opium | 9630 |

(2) Any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in paragraph (b) (1) of this section, except that these substances shall not include the isoquinoline alkaloids of opium.

(3) Opium poppy and poppy straw.

(4) Coca leaves (9040) and any salt, compound, derivative or preparation of coca leaves (including cocaine (9041) and ecgonine (9180) and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include:

(i) Decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine; or

(ii) [$^{123}$I]ioflupane.

(5) Concentrate of poppy straw (the crude extract of poppy straw in either liquid, solid or powder form which contains the phenanthrene alkaloids of the opium poppy), 9670.

(c) Opiates. Unless specifically excepted or unless in another schedule any of the following opiates, including its isomers, esters, ethers, salts and salts of isomers, esters and ethers whenever the existence of such isomers, esters, ethers, and salts is possible within the specific chemical designation, dextrorphan and levopropoxyphene excepted:

| | |
|---|---|
| (1) Alfentanil | 9737 |
| (2) Alphaprodine | 9010 |
| (3) Anileridine | 9020 |

| (4) Bezitramide | 9800 |
| (5) Bulk dextropropoxyphene (non-dosage forms) | 9273 |
| (6) Carfentanil | 9743 |
| (7) Dihydrocodeine | 9120 |
| (8) Diphenoxylate | 9170 |
| (9) Fentanyl | 9801 |
| (10) Isomethadone | 9226 |
| (11) Levo-alphacetylmethadol [Some other names: levo-alpha-acetylmethadol, levomethadyl acetate, LAAM] | 9648 |
| (12) Levomethorphan | 9210 |
| (13) Levorphanol | 9220 |
| (14) Metazocine | 9240 |
| (15) Methadone | 9250 |
| (16) Methadone-Intermediate, 4-cyano-2-dimethylamino-4,4-diphenyl butane | 9254 |
| (17) Moramide-Intermediate, 2-methyl-3-morpholino-1, 1-diphenylpropane-carboxylic acid | 9802 |
| (18) Pethidine (meperidine) | 9230 |
| (19) Pethidine-Intermediate-A, 4-cyano-1-methyl-4-phenylpiperidine | 9232 |
| (20) Pethidine-Intermediate-B, ethyl-4-phenylpiperidine-4-carboxylate | 9233 |
| (21) Pethidine-Intermediate-C, 1-methyl-4-phenylpiperidine-4-carboxylic acid | 9234 |
| (22) Phenazocine | 9715 |
| (23) Piminodine | 9730 |
| (24) Racemethorphan | 9732 |
| (25) Racemorphan | 9733 |
| (26) Remifentanil | 9739 |
| (27) Sufentanil | 9740 |
| (28) Tapentadol | 9780 |
| (29) Thiafentanil | 9729 |

(d) Stimulants. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a stimulant effect on the central nervous system:

| (1) Amphetamine, its salts, optical isomers, and salts of its optical isomers | 1100 |
| (2) Methamphetamine, its salts, isomers, and salts of its isomers | 1105 |
| (3) Phenmetrazine and its salts | 1631 |
| (4) Methylphenidate | 1724 |
| (5) Lisdexamfetamine, its salts, isomers, and salts of its isomers | 1205 |

(e) Depressants. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a depressant effect on the central nervous system, including its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

| (1) Amobarbital | 2125 |
| (2) Glutethimide | 2550 |
| (3) Pentobarbital | 2270 |
| (4) Phencyclidine | 7471 |
| (5) Secobarbital | 2315 |

(f) Hallucinogenic substances.

| (1) Nabilone | 7379 |
| [Another name for nabilone: (+/-)-trans-3-(1,1-dimethylheptyl)-6,6a,7,8,10,10a-hexahydro-1-hydroxy-6, 6-dimethyl-9H-dibenzo[b,d]pyran-9-one] | |

(g) Immediate precursors. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances:

(1) Immediate precursor to amphetamine and methamphetamine:

| (i) Phenylacetone | 8501 |
| Some trade or other names: phenyl-2-propanone; P2P; benzyl methyl ketone; methyl benzyl ketone; | |

(2) Immediate precursors to phencyclidine (PCP):

| (i) 1-phenylcyclohexylamine | 7460 |
| (ii) 1-piperidinocyclohexanecarbonitrile (PCC) | 8603 |

(3) Immediate precursor to fentanyl:

| (i) 4-anilino-N-phenethyl-4-piperidine (ANPP) | 8333 |
| (ii) [Reserved] | |

[39 FR 22142, June 20, 1974]

**Editorial Note:** For Federal Register citations affecting §1308.12, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at www.fdsys.gov.

*NOTICE: This is an unofficial version. An official version of this publication may be obtained directly from the Government Printing Office (GPO).*

Exhibit 3

Cocaine and Other Schedule I and II Stimulants
(order of decreasing ratio)

MEDIAN VALUE IS HIGHLIGHTED

| | | |
|---|---|---|
| 1 | 1 gm of Amphetamine (Actual) = | 20 kg of marihuana= 20,000 gm |
| 2 | 1 gm of "Ice" = | 20 kg of marihuana=20,000 gm |
| 3 | 1 gm of Methamphetamine (Actual) = | 20 kg of marihuana=20,000 gm |
| 4 | 1 gm Cocaine Base ("Crack") = | 3,571 gm of marihuana |
| 5 | 1 gm of Amphetamine = | 2 kg of marihuana= 2000 gm |
| 6 | 1 gm of Methamphetamine = | 2 kg of marihuana=2000 gm |
| 7 | 1 gm Phenylacetone/P2P (when possessed for the purpose of manufacturing methamphetamine) = | 416 gm of marihuana |
| 8 | 1 gm of Methcathinone = | 380 gm of marihuana |
| 9 | 1 gm of Cocaine = | 200 gm of marihuana |
| 10 | 1 gm of 4-Methylaminorex ("Euphoria") = | 100 gm of marihuana |
| 11 | 1 gm of Methylphenidate (Ritalin) = | 100 gm of marihuana |
| 12 | 1 gm of Aminorex = | 100 gm of marihuana |
| 13 | 1 gm of N-Benzylpiperazine = | 100 gm of marihuana |
| 14 | 1 gm of N-Ethylamphetamine = | 80 gm of marihuana |
| 15 | 1 gm of Phenmetrazine = | 80 gm of marihuana |
| 16 | 1 gm Phenylacetone/P2P (in any other case) = | 75 gm of marihuana |
| 17 | 1 gm of Fenethylline = | 40 gm of marihuana |
| 18 | 1 gm of N-N-Dimethylamphetamine = | 40 gm of marihuana |
| 19 | 1 gm of Khat = | .01 gm of marihuana |

LSD, PCP, and Other Schedule I and II Hallucinogens
(order of descending ratio)

MEDIAN VALUE HIGHLIGHTED

| | | |
|---|---|---|
| 1 | 1 gm of D-Lysergic Acid Diethylamide/Lysergide/LSD = | 100 kg of marihuana = 100,000 gm |
| 2 | 1 gm of Phencyclidine (actual) /PCP (actual) = | 10 kg of marihuana=10,000 gm |
| 3 | 1 gm of 4-Bromo-2,5-Dimethoxyamphetamine/DOB = | 2.5 kg of marihuana=2,500 gm |
| 4 | 1 gm of 2,5-Dimethoxy-4-methylamphetamine/DOM = | 1.67 kg of marihuana=1,670 gm |
| 5 | 1 gm of Pyrrolidine Analog of Phencyclidine/PHP = | 1 kg of marihuana=1,000 gm |
| 6 | 1 gm of Thiophene Analog of Phencyclidine/TCP = | 1 kg of marihuana=1,000 gm |
| 7 | 1 gm of Phencyclidine/PCP = | 1 kg of marihuana=1,000 gm |
| 8 | 1 gm of N-ethyl-1-phenylcyclohexylamine (PCE) = | 1 kg of marihuana=1,000 gm |
| 9 | 1 gm of 1-Piperidinocyclohexanecarbonitrile/PCC = | 680 gm of marihuana |
| 10 | 1 gm of Psilocybin = | 500 gm of marihuana |
| 11 | 1 gm of 3,4-Methylenedioxyamphetamine/MDA = | 500 gm of marihuana |
| 12 | 1 gm of 3,4-Methylenedioxymethamphetamine/MDMA = | 500 gm of marihuana |

| | | |
|---|---|---|
| 13 | 1 gm of 3,4-Methylenedioxy-N-ethylamphetamine/MDEA = | 500 gm of marihuana |
| 14 | 1 gm of Paramethoxymethamphetamine/PMA = | 500 gm of marihuana |
| 15 | 1 gm of Psilocin = | 500 gm of marihuana |
| 16 | 1 gm of Dimethyltryptamine/DM = | 100 gm of marihuana |
| 17 | 1 gm of Diethyltryptamine/DET = | 80 gm of marihuana |
| 18 | 1 gm of Bufotenine = | 70 gm of marihuana |
| 19 | 1 gm of Mescaline = | 10 gm of marihuana |
| 20 | 1 gm of Mushrooms containing Psilocin and/or Psilocybin (Dry) = | 1 gm of marihuana |
| 21 | 1 gm of Mushrooms containing Psilocin and/or Psilocybin (Wet) = | 0.1 gm of marihuana |
| 22 | 1 gm of Peyote (Dry) = | 0.5 gm of marihuana |
| 23 | 1 gm of Peyote (Wet) = | 0.05 gm of marihuana |

Exhibit 4

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                        CASE NO. 15-20350-CR
 3

 4     UNITED STATES OF AMERICA,        Miami, Florida

 5              Plaintiff,              October 27, 2015

 6        vs.                          12:31 p.m. to 1:52 p.m.

 7     MARIO ALBERTO MALESPIN,         Courtroom 12-2

 8              Defendant.             (Pages 1 to 58)

 9    _____

                              SENTENCING
10           BEFORE THE HONORABLE CECILIA M. ALTONAGA,
                    UNITED STATES DISTRICT JUDGE
11

12     APPEARANCES:

       FOR THE GOVERNMENT:      JONATHAN K. OSBORNE, ESQ.
13                              MICHAEL THAKUR, ESQ.
                                Assistant United States Attorney
14                              99 Northeast Fourth Street
                                Miami, Florida 33132
15                              (305) 961-9135
                                jonathan.osborne@usdoj.gov
16
       FOR THE DEFENDANT:       ALFREDO R. ZAMORA, ESQ.
17                              The Feiler Law Firm
                                7685 Southwest 104th Street, Suite 200
18                              Miami, Florida 33156
                                (305) 545-8380
19                              zamoralaw4you@gmail.com

20                              JOAQUIN G. PEREZ, ESQ.
                                6780 Coral Way
21                              Miami, Florida 33155
                                (305) 261-4000
22                              jplaw@bellsouth.net

23     Also Present:           David Acosta, Homeland Security
                               Investigations
24
                               Nicole Pender, USPO
25
```

```
1    APPEARANCES CONTINUED:

2    REPORTED BY:            STEPHANIE A. McCARN, RPR
                             Official Court Reporter
3                            400 North Miami Avenue
                             Twelfth Floor
4                            Miami, Florida 33128
                             (305) 523-5518
5                            Stephanie_McCarn@flsd.uscourts.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2                        WITNESSES

3
   WITNESSES FOR THE GOVERNMENT:                    Page
4                                                    --

5


6
   WITNESSES FOR THE DEFENDANT:                     Page
7  Gregory Dudley
      Cross-Examination by Mr. Osborne              5
8     Redirect Examination by Mr. Zamora            12

9

10 EXHIBITS MARKED & ADMITTED IN EVIDENCE   MARKED  ADMITTED

11 Defendant's Exhibit No.                    --      --

12 Government's Exhibit No. 1                   6       6

13

14

15

16

17                    MISCELLANEOUS

18                                                   Page
   Proceedings......................................  4
19 Argument by Mr. Osborne..........................  17
   Argument by Mr. Zamora...........................  18
20 The Court's ruling...............................  46
   Court Reporter's Certificate.....................  49
21

22

23

24

25
```

```
 1            (The following proceedings were held at 12:31 p.m.)

 2                 THE COURT:  Good afternoon, please be seated.

 3                 Counsel, please state your appearances.

 4                 MR. OSBORNE:  Your Honor, good afternoon.  Jonathan

 5       Osborne along with Michael Thakur on behalf of the United

 6       States, with David Acosta from Homeland Security

 7       Investigations.

 8                 THE COURT:  Good afternoon.

 9                 MR. THAKUR:  Good afternoon, Your Honor.

10                 MR. PEREZ:  Good afternoon, Joaquin Perez on behalf of

11       Mario Malespin, who is present in court, along with cocounsel

12       who will introduce himself.

13                 MR. ZAMORA:  Good afternoon, Your Honor, Alfredo

14       Zamora on behalf of the defendant Mario Malespin.

15                 THE COURT:  Good afternoon.

16                 And from Probation?

17                 THE PROBATION OFFICER:  Good afternoon, Your Honor,

18       Nicole Pender from United States Probation.

19                 THE COURT:  Thank you.

20                 We continue with the sentencing hearing.

21                 MR. OSBORNE:  Yes, Your Honor.

22                 THE COURT:  I can't hear you.

23                 MR. OSBORNE:  I believe that when we concluded, I

24       had --

25                 THE COURT:  I can't hear you.
```

1              MR. OSBORNE:  I believe that when we concluded, I had

2       just finished my direct of Mr. Dudley.

3              THE COURT:  Mr. Dudley, yes.

4              MR. OSBORNE:  Yes, Your Honor, may I be seated so I

5       can see Dr. Dudley on the screen?

6              THE COURT:  Certainly.

7              MR. OSBORNE:  And, Your Honor, from a timing

8       perspective, I have a calendar call before Judge Moreno at 2:00

9       and so it would just be helpful to know, should I ask someone

10      to cover that for me?

11             THE COURT:  No, we stop at 1:45.

12             MR. OSBORNE:  Yes, Your Honor.

13         (Time 12:33 p.m.)

14                            GREGORY DUDLEY,

15          a witness for the Defendant, previously sworn,

16      testified as follows:

17                         CROSS-EXAMINATION

18      BY MR. OSBORNE:

19      Q.  Good afternoon, Dr. Dudley.

20      A.  Good afternoon.  Can you hear me okay?

21      Q.  Yes, sir.  Sir, I am going to ask you questions about

22      topics that you testified to on direct examination, the first

23      of that being the chemical structure of ethylone, the

24      controlled substance in this case.

25          Sir, you are familiar with the chemical structure of

 1   ethylone; is that right?

 2   A.   Yes, that is correct.

 3   Q.   And you agree that ethylone is not listed in the United

 4   States sentencing guidelines; is that right?

 5   A.   Yes, I agree.

 6   Q.   And you are familiar with a substance called MDEA?

 7   A.   Yes.

 8   Q.   And you agree that that substance is listed in the United

 9   States sentencing guidelines?

10   A.   Yes.

11   Q.   Sir, I am now going to direct your attention to what's been

12   previously marked for identification as Government's Exhibit 1.

13       (Government's Exhibit No. 1 was marked for identification.)

14           MR. OSBORNE:  Your Honor, if I may approach, I have a

15   copy of the exhibits for the Court.

16           THE COURT:  Do I have them already or no?

17           MR. OSBORNE:  I don't think so.

18           THE COURT:  Okay.

19   BY MR. OSBORNE:

20   Q.   And, sir, do you have Government's Exhibit 1 in front of

21   you?

22   A.   I do, structural evaluation of ethylone.

23   Q.   Yes, sir.  Would you please turn to Page 3 of that exhibit?

24   The pages are all numbered at the bottom-right corner.

25   A.   Yes.

 1    Q.  And you would agree that the diagram at the top of this

 2    slide titled ethylone is an accurate depiction of the chemical

 3    structure of the drug commonly referred to as ethylone, right?

 4    A.  Yes.

 5    Q.  And you would agree that the diagram at the bottom of the

 6    slide titled MDEA is an accurate depiction of the chemical

 7    structure of MDEA, right?

 8    A.  Yes.

 9    Q.  And would you make any changes to the diagrams to more

10    accurately depict the chemical structure of these substances?

11    A.  You could fill in the implied atoms and bonds, but under

12    the conventions of organic chemistry, these are complete and

13    accurate representations of structures.

14    Q.  Thank you, sir.  Sir, I will now turn your attention to

15    Page 4 of Government's Exhibit 1.  And this slide identifies

16    the similarity --

17    A.  Yes.

18    Q.  Are you there, I'm sorry?

19    A.  Yes.  Yes.

20    Q.  Okay.  And this slide identifies the similarities and

21    differences between MDEA and ethylone; is that correct?

22    A.  Yes.

23    Q.  And would you agree that's the only difference?

24    A.  Yes, it does.

25    Q.  I'm sorry.  You can finish your answer.

1    A.   Oh, no -- yes, yes, it does.

2    Q.   Okay.  Thank you.  You would agree that the only difference

3    between these two substances is depicted in the fifth row,

4    third column, identified in red; is that correct?

5    A.   The difference -- the atomic difference is depicted in red

6    on the -- on the third row.  The hydrogens that are removed

7    from MDEA weren't explicitly drawn in, in the structure on the

8    left, so the addition of the oxygen atom goes -- at the same

9    time there are two hydrogen atoms and two bonds that have been

10   removed from the molecular structure, from the atoms and the

11   conductivity, yes.

12   Q.   But otherwise they are the same, right?

13   A.   Otherwise, the atomic composition is the same.  There is a

14   number of -- there are structural features that aren't well

15   represented by the line drawings, such as the bond lengths and

16   electron distribution that is impacted by the ketone.  But to

17   the extent that these line drawing notations convey chemical

18   structure, the difference is represented by the red carbonyl.

19   Q.   And so both MDEA and ethylone share the structural feature

20   phenethylamine; is that right?

21   A.   Yes.

22   Q.   And they both share 3,4-methylenedioxy; is that right as

23   well?

24   A.   The 3,4-methylenedioxy is present in both compounds -- both

25   substances.

October 27, 2015

USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1  Q.  And they both share the alpha position -- alkylation; is

2  that right?

3  A.  In both cases there is a methyl group that is at the alpha

4  position with respect to the nitrogen of phenethylamine.

5  Q.  And both of these substances, MDEA and ethylone, have a

6  nitrogen substitution; is that right?  Sir?

7  A.  Yes.

8          THE COURT:  I'm sorry, we are just having him confirm

9  what Dr. Wong said.  I am not sure what the purpose of this is

10 other than going through her slides.

11         MR. OSBORNE:  Your Honor, it is to determine whether

12 or not he has any disagreement that the chemical structures are

13 the same.

14         THE COURT:  You can ask him that.

15 BY MR. OSBORNE:

16 Q.  Sir, is it correct that you have no disagreement with

17 Dr. Wong -- Ms. Wong's testimony that the chemical structures

18 of MDEA and ethylone are similar?

19 A.  I disagree with some of her opinions and how she

20 characterizes the subjective aspects, but in terms of the

21 matters of fact, the structures, the chemical structures of

22 ethylone and MDEA, I do not disagree with those facts.

23 Q.  All right.  So I will direct your attention to the issue of

24 pharmacology in this case.  You testified on direct examination

25 that you are familiar with the field of pharmacology; is that

October 27, 2015                                    10

USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1   right?

2   A.   Yes.

3   Q.   And you heard Dr. Priolaeu testify that both ethylone and

4   MDEA can be expected to have stimulant effects; is that right?

5   A.   I heard her testimony, yes.

6   Q.   And you would agree that MDEA can be expected to have

7   stimulant effects, right?

8   A.   One could formulate that hypothesis based on the data, yes.

9   Q.   And the data to which you are referring would include *in*

10  *vitro* studies and SAR analysis?

11  A.   SAR analysis, the structure activity relationship is the

12  assumption that -- or the presumption that substances with

13  similar structures will have similar pharmacological effects.

14  And so to the extent that the SAR relationships hold in these

15  cases, one could look at data for methylone to formulate

16  hypotheses as to the expected pharmacological activities of

17  ethylone.

18       So, yes, based on the available in vitro data for ethylone

19  and the extrapolations to data for methylone, yes.

20  Q.   I think you are answering yes, but you are answering a

21  different question than the one that I asked.  I will be more

22  clear.

23  A.   I'm sorry.

24  Q.   My question is based on the available data, is it

25  reasonable to conclude that MDEA would have stimulant effects?

1  A.  It's reasonable to formulate that hypothesis.  In terms of

2  the scientific method, the conclusion would be drawn after the

3  experiments are performed.  One can draw conclusions about the

4  data, about the specific experiments that were performed

5  regarding how ethylone interacts with receptors and human

6  cells.  And then based on those data, one could reasonably

7  formulate the hypothesis that ethylone would be expected to

8  have pharmacological effects in human users.

9  Q.  Specifically, the pharmacological effects of a stimulant or

10  a psychostimulant, right?

11  A.  Yes.

12  Q.  And you are aware of reports that ethylone has been

13  implicated in human deaths; is that right?

14  A.  I am aware of such reports.  I haven't reviewed any of the

15  such -- any of those reports.

16  Q.  And you are aware that under the sentencing guidelines, the

17  Court is trying to determine what is the most closely related

18  controlled substance to ethylone that's referenced in the

19  United States Sentencing Guidelines, right?

20  A.  That is my understanding.

21  Q.  And you would agree with United States in this case that

22  MDEA is the substance in the guidelines that is most closely

23  related to ethylone; is that right?

24  A.  I would agree that looking to MDEA as the most closely

25  related substance in the guidelines is probably correct.  That

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

```
 1    requires certain assumptions about the pharmacological effects,
 2    but that is a reasonable place to look, and it's probably
 3    correct.
 4          MR. OSBORNE:  Nothing further, Your Honor.  Thank you.
 5          THE COURT:  Redirect?
 6          MR. ZAMORA:  Yes, Your Honor.  May I also remain
 7    seated while I conduct redirect?
 8          THE COURT:  You may, but please use a microphone.
 9          MR. ZAMORA:  Are you able to hear me?
10          THE COURT:  Just move it closer to yourself.
11          MR. ZAMORA:  Is that any better now?
12                         REDIRECT EXAMINATION
13    BY MR. ZAMORA:
14    Q.  Mr. Dudley, in your direct examination, we talked about
15    another drug that's in the sentencing guidelines:
16    Methcathinone.  Just a moment ago on cross-examination, you
17    were asked about the differences -- excuse me, the similarities
18    between ethylone and MDEA.  Can you please also describe the
19    similarities between ethylone and methcathinone in structure --
20    in chemical structure?
21    A.  I am still on my computer looking at Slide 4, the
22    comparison structural features of MDEA and ethylone.  The --
23    and I can walk through the same table but using methcathinone
24    in place of MDEA, if that's what you're -- if that's what you
25    are asking.
```

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1    Q.   Yes, please do.

2            MR. OSBORNE:   Your Honor, I would object as to outside

3    the scope of cross.

4            THE COURT:   Overruled.

5            THE WITNESS:   Okay.   The first line refers to the

6    structural feature of phenethylamine, methcathinone and

7    ethylone both have that phenethylamine core.   The second line

8    refers to the structural feature 3,4-methylenedioxy.

9    Methcathinone does not have that structural feature; ethylone

10   does.

11           The third line refers to alpha position alkylation.

12   Methcathinone and ethylone both have that alpha position

13   alkylation.

14           The fourth line nitrogen substituents, methcathinone

15   and ethylone both have that nitrogen substituent.   In the case

16   of methcathinone, it is the methyl group.   In the case of

17   ethylone, it is an ethyl group.

18           And then the fifth line, the beta-keto both

19   methcathinone and ethylone have the beta keto.

20   Q.   Does MDEA have a beta keto?

21   A.   No.

22   Q.   So as it relates to Factor A, the substance that is most

23   substantially similar in chemical structure, not addressing

24   anything else, just specifically that question, what is your

25   opinion as to what -- what drug within the guidelines is

1   substantially similar in chemical structure to ethylone?

2   A.  Again, the "substantially similar" standard is one that I

3   wouldn't apply to any of the substances in the guidelines.  But

4   in terms of chemical structure, the structure most closely

5   relate to ethylone that is listed in the guidelines is that of

6   methcathinone, in my opinion, because they are both cathinones.

7   Q.  Okay.  Moving on to pharmacology.  You testified on direct

8   and now again on cross-examination that you are forming a

9   hypothesis of what the effect -- the pharmacological effect on

10  the system is, correct?

11  A.  Yes.

12  Q.  And you base that hypothesis -- well, first of all; what is

13  your hypothesis, that way the Court is clear?

14  A.  My hypothesis regarding the pharmacological effect of

15  ethylone in humans is that the effects would likely be similar

16  to methylone but less potent.  Methylone, in turn, is likely to

17  be similar to MDMA and/or cocaine but, again, not a perfect

18  comparison.

19  Q.  Okay.

20  A.  So ethylone is likely to have

21  psychostimulant-pharmacological effects that are comparable to

22  other substances like methylone, MDMA, cocaine, but less potent

23  than ethylone.

24  Q.  Okay.  So I understand that you are extrapolating to get to

25  your answer here, but specifically let's talk about the drugs

1    that are on the guideline, and that is, you just mentioned,

2    MDEA and cocaine, correct?

3    A.   Yes.

4    Q.   Okay.  So is it your opinion that ethylone, in fact, is

5    a -- will have a stimulant effect on the central nervous

6    system?

7    A.   That is the hypothesis that I would formulate, yes.

8    Q.   Are you able to differentiate whether that effect on the

9    central nervous system is more akin to MDEA or cocaine based on

10   your hypothesis?

11   A.   I would look first to MDEA.

12   Q.   Okay.  Have you conducted any experiments or are you aware

13   of any experiments that support this hypothesis?

14   A.   There are *in vitro* data from studies in human cells for

15   ethylone and more data to form a clearer picture on methylone,

16   and it is based on those data that I would formulate my

17   hypothesis regarding the effects in humans.

18           MR. ZAMORA:  I have no further questions, Your Honor.

19           THE COURT:  Recross?

20           MR. OSBORNE:  Nothing further from the government,

21   Your Honor.

22           THE COURT:  Dr. Dudley, thank you very much.

23           THE WITNESS:  Okay.  Thank you.

24           MR. OSBORNE:  Your Honor, my understanding is that the

25   only other witness would be for the defense's cross-examination

 1   of our pharmacologist.

 2          THE COURT:  Correct.

 3          MR. ZAMORA:  Your Honor, I think that when we ended, I

 4   ended on a note that was appropriate for me.  You said I would

 5   have that opportunity if I wanted at this time.

 6          THE COURT:  Certainly.

 7          MR. ZAMORA:  I don't need -- I don't need the

 8   opportunity to continue my cross-examination.

 9          THE COURT:  I thought that's why we had her here

10   participating.  No?

11          MR. ZAMORA:  No objection.

12          THE COURT:  Didn't you communicate that to

13   Mr. Osborne, that's why we have been having her linked up?

14          MR. ZAMORA:  Judge, I communicated to Mr. Osborne

15   whether he would have her available at this hearing.  He told

16   me that she couldn't be because she is testifying in Iowa, and

17   we have never spoken again about the matter.

18          MR. OSBORNE:  The last we spoke was outside the

19   courtroom, and we were told that we should have her available

20   because if the defense needed an opportunity to further the

21   cross-examination, they were entitled to that.  And

22   accordingly, we asked Dr. Prioleau to make herself available

23   now that she is in D.C. via video conference.

24          THE COURT:  Dr. Prioleau, thank you very much.  And

25   you have a good day, ma'am.

1        THE WITNESS:  Thank you.

2        THE COURT:  Okay.  So we can turn off those

3    connections, or do you gentlemen need the witnesses to still be

4    available?

5        MR. OSBORNE:  No, Your Honor.

6        MR. ZAMORA:  We do not, Your Honor.

7        THE COURT:  Okay.

8        MR. OSBORNE:  Your Honor, there is a three-prong

9    analysis in this case, and that analysis comes from 2D1.1,

10   Application Note 6.  And in it, the Court is asked to identify

11   the most closely related controlled substance referenced in the

12   guideline and to use the marijuana equivalency ratio for that

13   substance and apply it to this case.

14       Here, Your Honor has heard testimony from the

15   government's experts as well as the defense expert.  And

16   without rehashing the testimony now, that testimony establishes

17   that as to Prong A of the analysis, MDEA is the substance

18   listed in the guidelines that is substantially similar in

19   chemical structure to ethylone.

20       Prong B of that analysis, Your Honor has heard

21   testimony actually from both experts, the government's and the

22   defense's expert that ethylone is the appropriate substance to

23   compare to MDEA when trying to make this determination.  And,

24   Your Honor, the defense expert also agrees with the United

25   States that the most closely related substance listed in the

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1    guidelines to ethylone is MDEA.

2          And for those reasons, as well as reasons stated in

3    our papers and also in the *Bray* decision from the Eleventh

4    Circuit, the United States maintains that a 1 to 500 ratio is

5    appropriate in this case.

6          THE COURT:  I will hear from defense.

7          MR. ZAMORA:  Yes, Your Honor.

8          Your Honor, I am going the start with the *Bray*

9    decision.  Judge, that decision in no way touches on whether or

10   not the 1 to 500 ratio is appropriate, but rather addresses

11   Judge King's ruling as to whether or not he had to consider --

12   whether, excuse me, the government met their burden when they

13   failed to introduce any evidence related to potency.

14         And in the *Bray* opinion it talked about statutory

15   interpretation and how these three factors in Note 6, A, B and

16   C, are disjunctive and not conjunctive, and the Court should

17   not -- or, excuse me, government should not fail to meet their

18   burden just because there is no scientific studies or evidence

19   available to them to offer to the Court to satisfy Prong C.

20         But in that case in front of Judge King, it's very

21   distinguishable.  First of all, there wasn't a defense expert

22   how there is here today, so Judge King didn't have the benefit

23   of hearing another expert and their opinion on these matters.

24   Beyond that, the defense in those cases stipulated --

25         THE COURT:  Can you slow down?

1          MR. ZAMORA:  I'm sorry.  Stipulated to Factor A and

2   Factor B, which we are not stipulating to Factor A or Factor B.

3   And, in fact, we have offered evidence to the opposite as it

4   relates to Factor A.  We have also offered evidence as to

5   potency.  The government today and in our previous hearings has

6   not offered any evidence as it relates to potency.  So Your

7   Honor has heard that there is an expert that contradicts the

8   government's expert and says that as it relates to Factor A

9   that this Court should find that the substance within the

10  guidelines that is most substantially similar in chemical

11  structure to ethylone is not MDEA but, in fact, is

12  methcathinone which is punished at a ratio of 350 to 1.

13          As we move on to Factor B -- and before I go on to

14  Factor B, I just want to highlight that during the expert for

15  the government's -- Ms. Wong's testimony, the government -- the

16  expert for the government.  There was a lot of points in there

17  in which she could not articulate how she would compare

18  methcathinone to ethylone, and in fact did not even acknowledge

19  and said that ethylone is not a cathinone, despite this being

20  well-accepted in the scientific community that, in fact,

21  ethylone is a cathinone, she said that it is not.  So I ask you

22  to consider that as we give her testimony weight.

23          Moving on to Factor BH, the pharmalogical [*sic*]

24  effects on the central nervous system, both of our experts have

25  testified this is a hypothesis, that this is their guess that

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1    what they think would happen.  And our expert offers, as he

2    extrapolates what he believes the psychological -- excuse me --

3    the pharmalogical [*sic*] effects on the central nervous system

4    would be, he takes it a step further and talks about potency.

5    And he is able to do that because he says, if we agree that

6    methylone has the same pharmalogical [*sic*] effects as MDEA and

7    then we agree that ethylone has the same pharmacological

8    effects at methylone, then the government -- we would say that

9    as it relates to Factor B, the government is correct that the

10   most substantially similar substance within the guidelines only

11   to Factor B would be MDEA.

12          But he can also take it a step further as he gets

13   into, now, using that same exact theory that the government

14   wants to rely on when they say that the defense expert agrees

15   with them.  He gives you a hypothesis on potency, and he is

16   able to do that through a variety of studies.  And I know that

17   Your Honor remembers those studies.

18          And he used an example of rubbing alcohol, butane and

19   propane, and he says to you that the addition of this oxygen

20   atom in rubbing alcohol is the difference between the gasoline

21   that goes in your car or the treatment that you put on a wound

22   when you get cut.  And that is a huge difference, and that is

23   something that is important when considering pharmalogical

24   [*sic*] effects and potency.

25          He uses *in vivo* studies, he uses user studies that all

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1    come back and they all say in his final opinion is that the

2    potency of ethylone is substantially less than methylone and

3    that methylone is substantially less potent than MDEA;

4    therefore, ethylone is less potent than MDEA.

5          For these reasons, Judge, the state has failed --

6    excuse me, government has failed to meet their burden as it

7    relates to Factor A and Factor C of the guidelines, and

8    therefore they fail to meet their burden in their objection

9    here today, and Your Honor should in fact keep the ratio as

10    suggested by the Office of Probation of 1 to 250 or even less.

11         THE COURT:  Well, you are suggesting I adopt

12    Probation's ratio, except Dr. Dudley, doesn't, right?

13         MR. ZAMORA:  Dr. Dudley, I'm sorry?

14         THE COURT:  Does not.

15         MR. ZAMORA:  He thinks he should be less.

16         THE COURT:  Low.

17         MR. ZAMORA:  He does think it should be less, Judge,

18    he does, based on a variety of different reasons.  And I

19    just -- another good point in *Bray*, Judge, that the Court did

20    not find that the 1 to 500 ratio as a matter of law -- was

21    correct as a matter of fact, but whether it was supported by

22    the facts presented there.  And once again, they didn't --

23    Judge King didn't have the benefit of an expert.  You do have

24    the benefit of the defense expert.

25         And this is also distinguishable from what Judge

1    Gayles heard as well.  And I know that Judge Gayles ruled that

2    the 1 to 500 ratio was the appropriate ratio in that case, also

3    very distinguishable, no expert opinion was offered by the

4    defense.  And in that case as well, the defense stipulated to

5    chemical structure which we do not.  We offer the Court an

6    alternative.

7           THE COURT:  And this alternative has been adopted by

8    one other court, correct?

9           MR. ZAMORA:  Correct, Judge.  In fact, in Tampa two

10   other courts have agreed and they have -- I believe, the case

11   is *Caldwell.*  And I can cite it for you if you give me a

12   moment, I can flip through my transcripts.  In that situation,

13   the Court gave a 1 to 200 ratio.  Now, all things aside, in the

14   *Caldwell* case, the government did not have their experts there,

15   and I know the Judge in that case was very upset that they

16   didn't have their experts.  And he ruled based on what he had,

17   which was the defense experts.

18          Judge Covington and Judge Scrivener -- Scriven, I

19   apologize.

20          THE COURT:  Thank you.

21          Mr. Osborne?

22          MR. OSBORNE:  Your Honor, starting at the end with the

23   *Caldwell* decision, as defense counsel points out, there the

24   Court didn't have the benefit of a government expert and took

25   into account an argument that the Court should consider

 1    methylone and then extrapolate as defense has argued.  But

 2    there is nothing in the guidelines that permits a court to

 3    consider a substance that's not listed in the guidelines in

 4    determining what ratio to apply.

 5              So here, Dr. Dudley's testimony as to -- starting with

 6    methylone and then comparing it MDMA and then reaching a

 7    conclusion about ethylone is actually not permitted by the

 8    application note, which requires the court to consider the

 9    substance in question with the most closely related or

10    substantially similar substance that's listed in the

11    guidelines.  And methylone is simply not listed in the

12    guidelines.

13              THE COURT:  All right.

14              MR. ZAMORA:  Judge, may I just briefly respond to

15    that?

16              THE COURT:  Yes.

17              MR. ZAMORA:  It is a little disinguous to say that.

18    And the reason that I say that is because there is scientific

19    data that relies -- that has compared methylone to MDEA.  And

20    this Court's responsibility today and what the government is

21    asking this Court to do is to overrule what has been presented

22    by the Office of Probation and to consider the scientific data

23    in formulating what ratio is appropriate.

24              As we do that, we can only look at what we have.  And

25    the case -- in *Bray*, the Court said, I can't look at potency

1    because I don't have anything as it relates to potency.  Here

2    we have an expert that says, yes, we do.  And the way we do is

3    we take these experiments that relate these two subjects and

4    then we -- these two components or these two drugs, and then we

5    take these two -- that also compare these two drugs, and now we

6    have an answer, now we have a reasonable hypothesis as to what

7    the potency is.  And that is something that has been offered to

8    this Court and that the Court, I believe, should consider as it

9    is making a decision as to what substance is most substantially

10   similar and whether or not the state -- the government has met

11   its burden.

12          THE COURT:  Right, but how do you respond to

13   Mr. Osborne's statement that the substance being compared is

14   not listed in the guidelines and I am limited to that?

15          MR. ZAMORA:  As it relates to potency, Your Honor?

16   Because as it relates to Factor A, we have offered the Court an

17   alternative that is within the guidelines and that is

18   methcathinone at a ratio of 1 to 350.

19          As it relates to Factor B, we loosely agree that MDEA

20   is what is within the guidelines that is most similar.  And you

21   heard our expert Dr. Dudley talk about that.  He doesn't think

22   it is substantially similar, but he would not say it was more

23   akin to methcathinone.

24          Now, as we move on to potency, the government offers

25   nothing to Your Honor at all.  What we offer is that there is

1    reliable scientific studies comparing methylone to MDEA, and

2    there are also reliable scientific studies comparing ethylone

3    to methylone.  To ignore these studies would be to ignore the

4    only studies that exist as it relates to the potency, and that

5    is that logically if MDEA is more potent than methylone, and

6    methylone is more potent than ethylone, then ethylone has to be

7    less potent than MDEA.

8           So you can consider the studies because in each of

9    these studies we are talking about a comparison to a substance

10   that is in fact on the guidelines list and that is MDEA.  We

11   are always bringing it back to that substance for Your Honor to

12   consider.

13          Now, what they are asking you to do is to ignore data

14   that would -- the only data that exists at this point in time

15   that would allow Your Honor to evaluate the potency of this

16   substance.  And that is something that is very important as to

17   the ratio that is attributed.

18          And an example of that is the difference between

19   methamphetamine and methcathinone.  Methamphetamine has a ratio

20   of 1 to 20,000.  Methcathinone, which is the equivalent of MDEA

21   and ethylone, has a ratio of 1 to 350.  So as we are talking

22   about the difference in these chemical structures, the

23   difference in the effects on the user and the potency, that's

24   something that has been taken into consideration by Congress as

25   they are creating these ratios, and that is something that I

1    would ask Your Honor to consider.

2         I have seen nothing within the guidelines or within

3    the statute that says that Your Honor cannot consider these

4    studies because they do give you a correlation to the substance

5    that is within the guidelines.

6         THE COURT:  Thank you.

7         Mr. Osborne, what do you say to that?

8         MR. OSBORNE:  Your Honor, the rule very clearly says

9    that in the case of a controlled substance that is not

10   specifically referenced in the guideline, determine the base

11   offense level using the marijuana equivalency of the most

12   closely related controlled substance referenced in the

13   guideline.  And here it is actually undisputed from the

14   government's experts and the defense experts that MDEA is the

15   most closely related substance in the guideline for ethylone.

16        As it relates to the potency issue, it is actually a

17   narrow argument.  It is that methylone is not an appropriate

18   drug on which to rely in determining potency because methylone

19   is not listed in the guidelines.  And in his analysis of this

20   issue, I'll point out that Judge Gayles took note of the second

21   sentence of Application Note 6 which states that in determining

22   the most closely related controlled substance, the court shall

23   to the extent practicable consider the following, and where it

24   is undisputed from the experts that there is limited potency

25   data as it relates to ethylone, it is simply not practicable to

1    make a decision that turns on potency, particularly where, as

2    here, the record is clear that neither expert disputes the

3    chemical structures of ethylone and MDEA and, in fact, the

4    defense's expert agrees with the United States on Prong B.

5            THE COURT:  We will take a brief recess.

6            COURT SECURITY OFFICER:  All rise.

7        (A recess was taken from 1:05 p.m. to 1:18 p.m.)

8            THE COURT:  Please be seated.  I'm sorry.  I didn't

9    look up to see that you are all still standing.

10           We certainly have a very complete record here, as

11   complete as it can be given the state of the science compared

12   to the other decisions that the parties have cited, the Judge

13   Gayles decision, the Judge King decision and the Middle

14   District of Florida cases that have been referenced.

15           The presentence investigation report provided us all

16   with a ratio that I believe the defense agrees with 250 to 1,

17   and the government does not.  The government is seeking to have

18   me apply a ratio of 500 to 1, producing a much higher sentence

19   therefore for the defendant.  Notwithstanding, I might note,

20   that the government has also asked for a sentence reduction

21   with its motion, and notwithstanding that the overriding goal

22   under 3553 is to sentence the defendant in a manner sufficient

23   but not greater than necessary to achieve the objectives of

24   sentencing.  So I find some of the messages I am getting from

25   the government to be somewhat mixed.

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1          The analysis that controls is cited by the government

2     in its objection to the presentence report.  And it is quoted

3     from Application Note 6 of the commentary, the §2D1.1 of the

4     advisory guidelines.  And I am dealing here with a controlled

5     substance that is not referenced in the guidelines.  And I am

6     to determine the base offense level using the marijuana

7     equivalency of the most closely related controlled substance

8     referenced in the guidelines.

9          And to do that I consider three things, the three

10    factors that the parties have addressed.  Three factors that I

11    think Dr. Dudley best addresses in his testimony and in his

12    expert report and that I am not as satisfied the government

13    satisfies through its witnesses.  They were both certainly very

14    capable and they've conducted their analyses as requested, but

15    I think Dr. Dudley brings a background and experience and a

16    perspective that is far more certainly academic, far more

17    sophisticated and far more complete in aiding the Court in

18    answering the questions that the commentary asks me to

19    consider.

20         And so going to the first, whether the controlled

21    substance not referenced in the guideline has a chemical

22    structure that is substantially similar to a controlled

23    substance referenced in the guidelines.  Dr. Dudley explains in

24    his testimony and in his report that ethylone and MDMA are

25    not -- MDEA, I'm sorry, are not substantially similar in

1   chemical structure because a significant change in oxidation

2   takes place.

3          Ethylone is a cathinone, and MDEA is an amphetamine.

4   And so cathinones and amphetamines differ because of the

5   presence or absence of the ketone functional group associated

6   with a difference in oxidation.  And he goes on to explain how

7   changes in functional groups and oxidation states are

8   significant.  And I will add that methcathinone, of course, is

9   listed in the guidelines.

10          As to B, pharmacological effect, effect on the user,

11  there is very little in the science, and the government offers

12  very little.  But there is certainly some information that we

13  have to date through animal studies.  And Dr. Dudley, as to

14  Section B, notes that the pharmacological effects of methylone,

15  ethylone and butylone can be characterized as being MDMA-like

16  or mixed-cocaine-MDMA-like.  And it is reasonable to identify

17  MDMA or MDEA and not cocaine as the most closely related

18  controlled substance in the guidelines based on chemical

19  structure and the data available on pharmacology.

20          But it would not be appropriate to assert the

21  subjective effects of methylone, ethylone and butylone on the

22  central nervous system are substantially similar to MDMA or

23  MDEA.  And he has explained the inverted DATSERT ratios and how

24  that affects his conclusion as to B.  And I am in agreement

25  with his analysis.

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

```
 1              C of the commentary asks me to consider the potency of

 2      the drug.  And on this, I believe the government doesn't offer

 3      any information that I can rely on, whereas Dr. Dudley does.

 4              Therefore, based upon the testimony and evidence

 5      presented here at sentencing, I don't find the government has

 6      persuaded that I should apply a ratio of 1 to 500.  I am in

 7      agreement with Probation, and the ratio that is applied in the

 8      presentence investigation report, a ratio that is even higher

 9      than that which Dr. Dudley suggests as reasonable.

10              Let us continue.

11              MR. PEREZ:  I think at this point the -- I think the

12      Court will -- will simply make a finding that the findings by

13      the Probation as it pertains to the total offense level is

14      correct.

15              THE COURT:  Yes.  I don't think there are any other

16      objections except to this aspect.

17              MR. PEREZ:  And I think the guideline is 84 months,

18      and I think the high end if, I'm not mistaken is --

19              THE COURT:  105.

20              MR. PEREZ:  105.  And I also believe it's a 5B1.1

21      motion that was filed.

22              THE COURT:  Asking for a 10 percent reduction, I

23      believe?

24              MR. OSBORNE:  Yes, Your Honor.

25              THE COURT:  All right.
```

```
 1              MR. OSBORNE:  Would you like me to explain that now?

 2              THE COURT:  Yes.

 3              MR. OSBORNE:  Mr. Malespin met with the agents on

 4    several occasions and attempted to provide assistance as to

 5    other individuals that are involved in drug trafficking.  None

 6    of the information that he provided about other individuals has

 7    led significantly to any arrests or to any other prosecutions.

 8    However, he did turn over approximately 4 kilograms of ethylone

 9    to the agents, and based on that assistance, which removed a

10    substantial amount of drugs from the street at a pretty high

11    street-level value, the United States is moving for a 10

12    percent reduction of the Court's finding as to the appropriate

13    sentence for Mr. Malespin.

14              THE COURT:  And what sentence are you suggesting,

15    then?

16              MR. OSBORNE:  Well, Your Honor, noting our objection

17    to the finding of the 1 to 250 ratio.

18              THE COURT:  Yes.

19              MR. OSBORNE:  Our plea agreement binds us, and I think

20    under the 3553(a) factors, an appropriate sentence would be at

21    the low-end of the guideline range.

22              THE COURT:  So what sentence are you requesting?

23              MR. OSBORNE:  Well, noting the objection, Your Honor,

24    under the Court's finding, it would be 84 months.

25              THE COURT:  84 months is the low end of the
```

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

```
 1    guidelines.  What are you suggesting given his cooperation?

 2              MR. OSBORNE:  I'm sorry.

 3              THE COURT:  That's all right.  I just want it clear.

 4              MR. OSBORNE:  A reduction of -- I don't want to get

 5    the math wrong.

 6              THE COURT:  10 percent from the 84, you are starting

 7    from the bottom?

 8              MR. OSBORNE:  Yes, Your Honor.  Yes.

 9              THE COURT:  Okay.  Thank you.

10              I will hear from defense counsel.

11              MR. PEREZ:  Your Honor, if I may, I think I know from

12    experience that the Court is not bound by either the

13    government's recommendation, my recommendation representing the

14    defendant and so on --

15              THE COURT:  You learned that all too recently,

16    Mr. Perez.

17              MR. PEREZ:  That's right.  So I do want to put in

18    context the extent of the cooperation, because I think that it

19    is significant that Mr. Malespin was arrested in possession of

20    1 kilogram of ethylone.  Soon after he was arrested and he

21    retained my services, we agreed to meet with the agent, the

22    good agent who is here.  And to that end, we had a number of

23    meetings.

24              The first meeting took place on June 23rd of this

25    year.  At that meeting he said the following:  the one kilo
```

1    that I was arrested with belonged to -- I'm not going to

2    mention the full name, but I just want to say belonged to Henry

3    C.  Okay, that's that.  And Henry C. works with other people,

4    including somebody named Guillermo R.  And these are the people

5    who are the major players in this.

6         And the reason why Henry C. is so important is I don't

7    know anything about computers.  I don't have any contacts in

8    China.  So therefore the person that makes all of this possible

9    is Mr. Henry C.  And this is just by way of background.  But,

10   obviously, Henry C. is the investor.  He is the one that orders

11   the merchandise from China.  His function was to find a house

12   where the merchandise would be sent and then to retrieve the

13   drugs, and then he will split the profits with Henry C.

14        Lo and behold, soon after I became involved in the

15   case and at that the meeting, we found out that Henry C. and

16   Guillermo were making threats because they wanted to get

17   additional drugs back, four kilos specifically.  And at that

18   point the defendant did what he was supposed to do.  And,

19   obviously, you can say that his motivation is to get a sentence

20   reduction, which is the reason why he did it.

21        But nevertheless he met with the agent.  And on the --

22   I think it was on the 23rd of June, he says, These drugs that

23   were seized from me belonged to Henry, and these drugs belonged

24   to me are -- this is how it works.  This is how he put the deal

25   together.  This is how he orders from China.  This is how he

 1    finances the transactions.  And then my job is to collect the

 2    drugs and eventually to split the profits with Henry C.

 3         Now, three days later we had an additional meeting.

 4    And I know this gets to be a little bit -- but at that time we

 5    met with the defendant's wife, who is present in court.  The

 6    defendant's wife said, These people are calling me, they are

 7    threatening me, and they are demanding the return of the 4

 8    kilos.  What should I do?  Should we record the conversations?

 9         At that meeting, the law enforcement community decided

10    not to take any action in order to record this major target.

11    Now, the reason why they did that is because this major target

12    was working, apparently was double-dipping and was also working

13    for the law enforcement community.  And because of that, at

14    that point, the decision was made not to do anything against

15    two major targets in the case.

16         What's significant about all of this is that

17    eventually the government realized that what my client was

18    saying was the truth, that this major target was a major player

19    and then he became a target as well.  Now, this major target

20    has not been arrested, but based upon information that I have

21    received, it is a question of time before he gets arrested.

22         So what the defendant did is not just provide 4 kilos

23    to the government.  He went beyond that.  He actually said the

24    drugs, the 4 kilos belonged to Henry, and they belonged to

25    Guillermo, and these are the people -- and these are the people

 1    who are the ones that makes this crime possible, because I

 2    don't know how to use a laptop, I don't even know how to order

 3    the stuff from China.  I have received -- and then we had

 4    another meeting on August 18th regarding that.

 5            The point that I'm trying to make is that this is not

 6    the way that the government is kind of presenting it, like he

 7    gave 4 kilos and therefore that's it.  No, he did more than

 8    that.  And the information that he had was subsequently

 9    corroborated by other information that, in fact, this guy is a

10    major player.

11            Now, when you analyze the factors under 5k, you know

12    that he is testifying against somebody who is more significant

13    than he is, the information is comprehensive, the information

14    was used by the law enforcement community because now they have

15    a major investigation against this person who is a major player

16    with a lot of money.  And in addition to that, he placed

17    himself and his family at risk by doing that.  And, finally,

18    his cooperation was timely because he started doing it very

19    soon after he was arrested.

20            So -- and I was -- I am glad some of the -- this is

21    not a situation where there were 4 kilos that were turned over.

22    This is a situation where the information was rather

23    significant and that he placed himself at risk by providing

24    this information.  Now, if there is an area in which there are

25    no guidelines, it has to do with cooperation, as the Court is

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1   well aware, we don't have a way to measure that.

2          There are many people by basically agreeing to

3   testify, they get 25 percent if the person pleads guilty.  If

4   they testify, they get 33 percent.  If they do something

5   proactive they get 40 percent.  And frankly it is very

6   difficult at times to predict what a person is likely to do.

7          In this case, like I told the prosecutors, an attorney

8   like me places himself on the line because what he did was

9   right, turn over the 40 [*sic*] kilos.  But at the same time, it

10  had an impact because those 40 -- the 4 kilos belonged to

11  somebody who was a significant player, and now the government

12  is in possession of this information.

13         It's so difficult to quantify what a person has done,

14  but if you use the guidelines as a basis, the 5K1 language, I

15  suppose you can say that the information was, A, truthful and

16  complete.  The information was significant because the

17  individuals were somewhat major players.  The nature and extent

18  of his assistance was obviously as well significant, because

19  now they have a target, and they have a target that is

20  apparently being pursued, you know, by other agencies or the

21  same agency as this, and also it was timely.

22         So for that reason what I will ask the Court to do is

23  to exceed the recommendation to 25 percent at this point,

24  because I think 25 to 33 percent is consistent with what other

25  people get.

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1        THE COURT:  That's more consistent where there are

2    codefendants, where there are others who have pending cases.  I

3    don't -- we have nobody here he is cooperating against.  He has

4    provided some names, but nobody has been apprehended, right?

5        MR. PEREZ:  Well, my suggestion is the following:  The

6    reason why he was not apprehended at the time was for tactical

7    reasons.  The defendant -- I think that this person eventually

8    is going to be apprehended.  At this point what I would ask the

9    Court --

10        THE COURT:  I'm familiar with the ranges.  I'm

11    familiar with, you know, 50 percent is extraordinary, and it is

12    where you testify at several trials against several

13    codefendants, many cases are brought.  33 percent, you have two

14    or three codefendants, you are the first to plead, you sit down

15    with the government, you testify at a trial.

16        We don't have that here, and you are asking me to come

17    up to 25 percent.

18        MR. PEREZ:  Well --

19        THE COURT:  Which is not customary where there is no

20    case that's brought as a result of the cooperation.

21        MR. PEREZ:  I am a hundred percent sure that a case

22    will be brought.

23        THE COURT:  But that's when the government then comes

24    back and says, all right, Mr. Malespin now provided some

25    testimony or he is actively cooperating, reduce it some more.

1   That's what I normally see.  I see more than one motion.  This

2   is not the end.

3          MR. PEREZ:  Well, in that case in light of what the

4   Court is saying and with that caveat, what I would ask, then,

5   the Court to do now is to read between the lines is to exceed

6   the 10 percent recommendation which is only, I believe, is only

7   eight months.

8          THE COURT:  8.4 months.

9          MR. PEREZ:  What?

10         THE COURT:  8.4 months.

11         MR. PEREZ:  Why don't we, I guess, the Court can

12  exercise the same discretion and exceed it by, I guess, 10 to

13  12 months, and then in the event that the person gets arrested

14  and the government wishes to use him -- the problem is that the

15  reality is when you have some of these big players, when they

16  get arrested, they are going to flip, and then the defendant is

17  never going to have a chance to really take any advantage of

18  the situation.  That, unfortunately, is what the reality is.  I

19  see it from the point of view that those big defendants are the

20  ones who typically don't go to trial.  The ones that go to

21  trial are the marginal cases where, you know, it can go either

22  way.

23         I don't think they are going to need him as a witness

24  in the future.  So I will just ask the Court to, at this point,

25  exceed the government's recommendation at least by -- by a bit.

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1          THE COURT:  All right.  Thank you.

2          Mr. Osborne?

3          MR. OSBORNE:  Your Honor, just from a factual

4    standpoint, I just wanted to point out for the Court that

5    Mr. Malespin was arrested in April.  He notified the United

6    States of these drugs that were in his possession months later,

7    and they actually were at his mother's house in his possession.

8    So there was no --

9          THE COURT:  They were in safekeeping.  They are very

10   well cared for by mom, right?

11         MR. OSBORNE:  So, Your Honor, the argument that these

12   drugs belonged to someone else is not enough on which to build

13   a case against another person.

14         MR. PEREZ:  Now, that's completely incorrect.  From

15   the beginning, he indicated that they -- to whom they belong.

16   The fact that he agreed to turn them over -- in fact, let's

17   look at it another way.  He didn't -- the -- most people have

18   an obligation as citizens to do something like turn over

19   information and stuff like that.  But the reality in the world

20   in which we live, his decision to turn over the drugs when, in

21   fact, the government didn't know about it, has -- it has a

22   value.  And that's what -- that's what the reason why I am

23   asking to exceed the recommendation.

24         THE COURT:  Thank you.

25         Mr. Zamora?

1    MR. ZAMORA:  Your Honor, I know it is not customary to

2    hear from both counsel.  I know Mr. Perez -- I am not going to

3    repeat anything he says and waste your time.

4        THE COURT:  Could you please use the microphone?

5        MR. ZAMORA:  I'm sorry.  I am so tall that I have to

6    sit down.  I don't want to sit down.  I will walk to the podium

7    real quick.

8        As I was saying, I am not going to repeat what

9    Mr. Perez said, but I do just want to articulate some points

10   that I think are very important for the Court to consider, and

11   I respect that the Court has laid out what is customary as to

12   the percentages given when certain things are done.

13       In this situation, the people that were referenced,

14   the people who are categorized as the big fish that Mario tried

15   to deliver to the government and the government wasn't

16   interested.  And at the time we didn't know why they weren't

17   interested, because naturally in these investigations they are

18   working their way up to flip either on codefendants that are

19   lateral or go up to get the big fish.  We were a little taken

20   back; however, what could he do.  The only thing he could do

21   was turn over the only drugs he had in his possession.

22       As a result of turning over those 4 kilos of ethylone

23   that he had in his possession, he is putting his family in

24   significant danger.  So when we talk about him testifying

25   against other people, that is one thing to consider what he

1    puts himself into, but now he has put -- his wife directly has

2    been threatened.  These text messages have been turned over to

3    the government.  Snapshots of these text messages are in the

4    government's possession which corroborates what Mr. Malespin

5    has said.

6           And now we find out months later, the reason why they

7    didn't want to accept that information, the reason why we don't

8    have two codefendants sitting here or three codefendants

9    sitting here and we don't have a much larger variance that is

10   being requested is because they had found out that these

11   individuals were working for law enforcement, that these

12   individuals were double-dipping.  They were working for law

13   enforcement on one end, and they were continuing to work with

14   Mr. Malespin on another end.

15          Now that that information has come to the light

16   throughout some investigation, and I don't know exactly how

17   this happened, everything that Mr. Malespin has tried to give

18   the government they are saying that's correct.  They would have

19   found out -- the government would have found out much sooner

20   that these targets, Henry and Guillermo were double-dipping had

21   they followed the information that was being provided by Mr.

22   Malespin.

23          And what is being contemplated that we'll see motions

24   on the back end, Mr. Perez hits right on the head is that that

25   would be great, if they take it to trial, Mr. Malespin would

1    cooperate, he would help, he would get there and maybe he would

2    end up with a Rule 35.  But if he doesn't, if there's -- if

3    these individuals don't take it to trial, if they flip, if they

4    plead, then Mr. Malespin won't be in that position.  And the

5    information that Mr. Malespin provided which is a direct result

6    of the government finding out two of their own -- that they

7    thought were working -- of their own that they thought were

8    working in the line of law enforcement, were in fact not.  They

9    were deceiving law enforcement.  And that information only came

10   to light or largely came to light and was corroborated by what

11   Mr. Malespin did, and that is very valuable.  And so to hope

12   and pray that we see it on the back end --

13          THE COURT:  Well, the government only values it at 10

14   percent.

15          MR. ZAMORA:  They value it at 10 percent, but I ask

16   this Court to value it at much higher.  The fact that --

17          THE COURT:  Why would I value it at a higher level

18   than the government is?  It's the government's own

19   investigation.  They know more about this case than I do.  They

20   know more about what they intend to do or not do with the

21   information Mr. Malespin has provided.

22          MR. ZAMORA:  So if you want to take the 4 kilo -- they

23   are not standing up and disagreeing with what's being proffered

24   to this Court.  And if they are, they are free to stand up and

25   say that what Mr. Malespin had provided to this Court and the

1    information -- not to this Court, excuse me, but to their

2    office and what it has led and what it will lead to in the near

3    future is going to be significant.

4         Beyond that, he took 4 kilos of ethylone off the

5    street.  If they truly believe --

6         THE COURT:  Off of mom's hands.

7         MR. ZAMORA:  It was actually in a shed in the back of

8    the house.

9         THE COURT:  Oh, backyard, shed.

10        MR. ZAMORA:  Nevertheless, what happens to these 4

11   kilos of ethylone if they just sit there?  They either

12   eventually make it on their way to the street.  If the drug is

13   truly --

14        THE COURT:  Is there a shelf life for ethylone?  Or

15   does it expire, its potency?  You don't know, huh?

16        MR. OSBORNE:  We are not aware that it expires, Your

17   Honor.

18        THE COURT:  We should send it up to Dr. Dudley and

19   have him run more experiments to see what the shelf life is or

20   is there an expiration date on ethylone.

21        MR. ZAMORA:  I don't know.  But if the drugs are truly

22   so significant and horrible that they deserve a 1 to 500 ratio,

23   then the fact --

24        THE COURT:  Well, the government didn't get that.

25        MR. ZAMORA:  I know they didn't get that, but the fact

1   is that it makes way now to my argument and that is that if

2   they are so bad that they deserve the comparison to a kilo of

3   MDEA, then what did he just do?  He took 4 kilos off of these

4   drugs off the street.  He made sure that users didn't get their

5   hands on them.  And I am sure there is other drugs on the

6   street, but personally he did that.  And he tried to offer you

7   additional people that the government wasn't interested in only

8   because they were already working with law enforcement, they

9   later found out.

10          So I am asking this Court to consider --

11          THE COURT:  I have.

12          MR. ZAMORA:  -- more than 10 percent, and that Mr.

13   Malespin deserves more than that.

14          THE COURT:  Thank you.

15          Mr. Osborne?

16          MR. OSBORNE:  I have nothing further, Your Honor.

17          THE COURT:  Why 10 percent?  Why isn't the information

18   that Mr. Malespin gave of greater value?

19          MR. OSBORNE:  Your Honor, the information that he

20   provided as to these other individuals hasn't furthered the

21   investigation to law enforcement at all.

22          THE COURT:  Why?

23          MR. OSBORNE:  To some extent, they already had

24   information about these other individuals that's unconnected to

25   our case.  There is no evidence that these -- the two men that

1    he is talking about today were connected to the 2 kilograms

2    that were seized from him in April of this year, and that's

3    what this case is about.

4            In connection with that case, he came in and said, I

5    can tell you about all of these other people that are

6    committing crimes in South Florida, but the information that he

7    provided to us or to the agency rather, has not led to any

8    arrests, it hasn't led to any prosecutions.

9            It's possible that down the road if these individuals

10   are arrested that Mr. Malespin would have an opportunity to

11   provide further testimony, at which point the government would

12   do what's fair, which is to make a recommendation to this Court

13   for an additional reduction.

14           THE COURT:  Thank you.

15           MR. PEREZ:  Let me just answer this, because this is

16   really upsetting.  When we met with the wife, the wife had

17   recordings and he had text messages from these people.  I mean,

18   how can Mr. Osborne in good faith say that they didn't have any

19   corroboration when we have the phone numbers belonging to these

20   people, we have the text messages and so on.  I mean to suggest

21   that the -- the reality is that the reason why they were not

22   charged is because they were working for the government, and

23   that's the reason why they were not charged.  But to suggest

24   that they didn't have the information is not accurate.

25           MR. OSBORNE:  And I didn't say that Mr. Malespin was

October 27, 2015
USA v. Mario Alberto Malespin - Case No. 15-20350-CR

1    lying to us or that there was no corroboration.  I said that it

2    didn't significantly advance an investigation or lead to

3    arrests or prosecution.

4            THE COURT:  That often happens, and it may happen in

5    the future.

6            Mr. Malespin, is there anything you would like to say

7    before I announce your sentence?

8            THE DEFENDANT:  Yes, Your Honor.  I would just like to

9    apologize for any trouble that I may've caused, and I just

10   wanted to say I am sorry.  That's all, Your Honor.

11           THE COURT:  Thank you.

12           Let me address the advisory guidelines.  To be clear,

13   Mr. Malespin's Offense Level is 28, his Criminal History

14   Category is a 4.

15           I carefully reviewed the presentence investigation

16   report.  I have been looking at the factors in 18 U.S.C. §3553,

17   mindful of the need to provide a sentence sufficient but not

18   greater than necessary to achieve the objectives of sentencing,

19   consistent with the seriousness of the offense committed, the

20   defendant's history and characteristics, the need to provide

21   deterrence not only to Mr. Malespin but to others, and mindful

22   that there should not be unwarranted sentencing disparity.  It

23   is appropriate to sentence Mr. Malespin within the advisory

24   guideline range.

25           I would have sentenced Mr. Malespin to the low end of

1   the guideline range, but the government has indicated that it

2   requests a 10 percent sentence reduction for the cooperation he

3   has provided to date.  I do not agree with the defense that the

4   cooperation to date is of such a degree that it should warrant

5   a 25 percent reduction, but I will reduce Mr. Malespin's

6   low-end sentence to a sentence of 72 months; that's a 15

7   percent reduction.

8           Therefore, Mr. Malespin, it is the judgment of the

9   Court that you are committed to the Bureau of Prisons to be

10  imprisoned for 72 months as to Count 2.  I find that you are

11  not able to pay a fine, therefore no fine is imposed.

12          Upon release from imprisonment, you will be on

13  supervised release for three years.  Within 72 hours of

14  release, you must report in person to the probation office in

15  the district to which you are released.

16          While on supervised release you will not commit any

17  crimes, you are prohibited from possessing a firearm or other

18  dangerous device.  You will not possess a controlled substance.

19  You will cooperate in the collection of DNA.  You will comply

20  with standard conditions of supervised release, including the

21  following special conditions:  You are to seek and activity

22  maintain full-time, legitimate employment.  You are to comply

23  with the permissible search and no-new-debt restriction

24  conditions outlined in Part G of the presentence report.

25          You must pay the United States a special assessment of

```
 1    $100.  If there is to be any forfeiture, the government is to

 2    supply a proposed order within three days.

 3            Now that the sentence has been imposed, does the

 4    defendant or his attorneys object to the Court's findings or

 5    the manner in which the sentence was announced?

 6            MR. PEREZ:  No, we do not.

 7            THE COURT:  Mr. Malespin, you have the right to appeal

 8    the sentence.  Any notice of appeal must be filed within 14

 9    days after entry of the judgment.  If you are unable to pay the

10    cost of an appeal, you may apply for leave to appeal in forma

11    pauperis.

12            I'll recommend placement as near to South Florida as

13    possible and that he be considered for the 500-hour drug

14    program.

15            Does the government seek dismissal of the remaining

16    counts?

17            MR. OSBORNE:  Yes, Your Honor.

18            THE COURT:  Those counts are dismissed.

19            Is there anything additional?

20            MR. OSBORNE:  Your Honor, I would just object on

21    behalf of the United States to the finding of the 1 to 250

22    ratio in the case.

23            MR. ZAMORA:  Nothing further, Your Honor.

24            THE COURT:  Good luck to you, Mr. Malespin, and to

25    your family.
```

1          THE DEFENDANT:  Thank you very much, Your Honor.

2          THE COURT:  Thank you.  You all have a good day.

3          THE DEFENDANT:  You too, thank you.

4          THE COURT:  Mr. Osborne, did you want this back?

5          MR. OSBORNE:  No, Your Honor, thank you.

6      (The proceedings adjourned at 1:52 p.m.)

7

8                    C E R T I F I C A T E

9      I hereby certify that the foregoing is an

10   accurate transcription of the proceedings in the

11   above-entitled matter.

12

13

14   _11/06/15_            STEPHANIE A. McCARN, RPR
        DATE               Official United States Court Reporter
15                         400 North Miami Avenue, Twelfth Floor
                           Miami, Florida 33128
16                         (305) 523-5518

17

18

19

20

21

22

23

24

25