UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  16-14002-CR-ROSENBERG/LYNCH

UNITED STATES OF AMERICA,

v.

JULIUS ANDREW REASON III,

NATASHIA THAMES and

VENTERIA LEANET REASON,

     Defendants.

_____/

## GOVERNMENT'S POST HEARING MEMORANDUM REGARDING THE MARIJUANA EQUIVALENCY

**COMES NOW**, the United States of America, by and through the undersigned counsel, hereby files its Post Hearing Sentencing Memorandum Regarding the Marijuana Equivalency and states as follows:

The three Defendants, Julius Andrew Reason III, Natashia Thames and Venteria Leanet Reason, all have objected to their respective offense level computation in the presentence investigation report (PSR), claiming that the ratio used to calculate their respective Base Offense Level is incorrect.  Specifically, all three Defendants dispute the PSR and the Government's position that the most closely related controlled substance in the U.S.S.G to Dibutylone is MDMA, a schedule I controlled substance, because Dibutylone is substantially similar to MDMA, in both chemical structure and stimulant effect on the central nervous system ; Julius and Venteria Reason also dispute the PSR and the Government's position that the most closely related controlled

1

substance in the U.S.S.G to Ethylone is MDEA,  a schedule I controlled substance, because Ethylone is substantially similar to MDEA, in both chemical structure and stimulant effect on the central nervous system, dispite this Court's prior ruling in **United States v. Kevin Raphael Bully**,

On January 31, and February 1, 2017, the Court conducted a sentencing hearing to determine the most closely related controlled substances to Ethylone and Dibutylone in the U.S.S.G., during which the parties presented witnesses.  The evidence presented by the Government was more credible and should be given more weight than that presented by the Defendants.  The Government has proven these contested facts by a preponderance of the evidence, and has satisfied this burden with both "reliable and specific evidence." **United States v. Gupta**, 572 F.3d 878, 887 (11th Cir.2009).

## **INTRODUCTION**

As part of its consideration of factors affecting what sentence to impose, the court is required to calculate the applicable guideline range provided for by the United States Sentencing Guidelines. 18 U.S.C. § 3553(a)(4)(A).  Under the Sentencing Guidelines, the Base Offense Level applicable to a drug charge depends upon the type and amount of drug involved, as set forth in § 2D1.1 of the Sentencing Guidelines.  U.S.S.G. § 2D1.1 assigns Base Offense Levels to a number of controlled substances, but neither Ethylone or Dibutylone is mentioned in § 2D1.1.

When a controlled substance is not referenced in the guidelines, Application Note 6 to § 2D1.1 sets forth a procedure for determining the Base Offense Level, directing the court to "determine the base offense level using the marihuana equivalency of the most closely related controlled substance referenced in this guideline." U.S.S.G. § 2D1.1 cmt. n. 6 ("Application Note

6"). Drug Equivalency Tables are included in Application Note 8(D) to § 2D1.1. Those tables list a variety of drugs, providing with respect to each listed drug a corresponding amount of marihuana.

Application Note 6 outlines three factors that "the court shall, to the extent practicable, consider" in determining "the most closely related controlled substance":

(A)    Whether the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.

(B)    Whether the controlled substance not referenced in this guideline has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance referenced in this guideline.

(C)    Whether a lesser or greater quantity of the controlled substance not referenced in this guideline is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in this guideline.

The Government's position, accepted by the Probation Office in the PSR, and **proven by a preponderance of the evidence**, is that the Court should rule that, considering the three factors listed in Application Note 6, the controlled substance listed in the Drug Equivalency Tables that is most closely related to Ethylone is MDEA, in structure and effect, 1 gram of which is listed as equivalent to 500 grams of marijuana (the same ratio provided for MDMA); and that the controlled substance listed in the Drug Equivalency Tables that is most closely related to Dibutylone is MDMA, in structure and effect, and 1 gram of which is listed as equivalent to 500 grams of marijuana. *See* U.S.S.G. § 2D1.1 cmt. n. 8(D).

## THE EXPERT TESTIMONY

The United States presented two expert witnesses, Dr. Daniel Willenbring and Dr. Jordan Trecki, during the sentencing hearing regarding the Drug Equivalency Tables and the substantially similar substances, most closely related to Ethylone and Dibutylone.

**Dr. Daniel Willenbring- U.S.S.G. § 2D1.1, app. n.6(A)- Chemical Structure:**

**Experience**

Dr. Daniel Willenbring, is a drug science specialist, in the Drug and Chemical Evaluation Section of the Diversion Control Division, at the Drug Enforcement Administration (DEA). He holds a Bachelor's Degree in chemistry and computer science, with a double major from the University of St. Thomas in Minnesota and a Ph.D. in Organic Chemistry from the University of California at Davis.  (Exhibit 1) He has testified and been accepted as an expert in chemistry in numerous federal courts across the country in pretrial hearings, motions to dismiss, **Daubert** hearings, trials and sentencings, involving comparisons of substances to substances listed in the Sentencing Guidelines.  He provided the Court with a list of relevant sentencings, in which he testified concerning sentencing comparisons. (Exhibit 2) He has never been found not to be qualified in the field of chemistry.  Dr. Willenbring was qualified, proffered, accepted, without objection, and did testify as an expert in chemistry.  (DE 216: 19, 24-23)

After discussing what his day to day employment entails, Dr. Willenbring described the process used when making comparisons of substances not specifically set forth in the Sentencing Guidelines.  He described how he and his colleagues first make their own independent evaluations, and then meet as a group discuss it and come to a consensus before moving forward with the particular comparison. (Id.: 22-23)   Although it may be assigned to a particular chemist, they all have to provide an opinion on the substance.  (Id.: 78)   Dr. Willenbring testified, in response to the Court's questions, that if there is any disagreement with his opinion and unless there is a unanimous consensus as to the conclusions of substantial similarity, he wouldn't be in court about this substantial similarity of chemical structures and presenting a Rule 16 expert report (Id.:77-78)

4

Dr. Willenbring stated in reviewing substances, they compare all the things that are the same and all the things that are different.  They look at every feature of a substance during their evaluation.  (Id.: 79) While working as a DEA chemist, he was involved in the chemical accuracy review of the emergency control action for the scheduling of both Ethylone and Dibutylone.  Both substances are Schedule I, have high use, no accepted medical use by a physician or doctor, and neither are specifically set forth in the Sentencing Guidelines. (Id.: 27)   Additionally, Dr. Willenbring has testified previously about Ethylone.  He prepared Rule 16 summaries regarding his opinions and basis for both Ethylone and Dibutylone (Exhibits 3 and 5).

**ETHYLONE**

As it concerned **Application Note 6 Prong (A)**, Dr. Willenbring described the chemical structure make-up of Ethylone, which he testified is a controlled substance not referenced in the sentencing guideline, and opined that, after conducting a review of the United States Sentencing Guidelines, its chemical structure is substantially similar to 3,4-methylenedioxy-N-ethylamphetamine (MDEA), a controlled substance that is referenced in the sentencing guideline. Dr. Willenbring testified to a number of the similarities, which are substantial, of the chemical structures of Ethylone and MDEA.  Dr. Willenbring identified the phenethylamine core and common basis for both **Ethylone** and MDEA. He next walked the Court through the remaining structural features, explaining the substitutions and their positions on the phenethylamine core that both **Ethylone** and MDEA have in common, and that are the same: the 3, 4- methylenedioxy substitution (methylenedioxy ring), the alpha position alkylation, and the nitrogen substitution. (Exhibit 4:2-4) (DE 216: 33-37)

Dr. Willenbring next testified that the sole difference in the chemical structures is minor and insignificant between Ethylone and MDEA, is a single oxygen atom called a beta ketone that

is associated with Ethylone but not MDEA.   Due to the beta ketone, Ethylone becomes a beta keto derivative of MDEA, a change to the Schedule I amphetamine, MDEA.  Dr. Willenbring testified while it is a change in structure, thereby making it not the same, it is **not a significant difference**, in the context of the entire ideation and is not enough to make Ethylone not substantially similar. (Id.38, 40, 42, 60)   Dr. Willenbring testified that his opinion, within a reasonable degree of scientific certainty is that, under United States Sentencing Commission Guidelines Manual § 2D1.1, Application Note 6(A), Ethylone is substantially similar in chemical structure to 3,4-methylenedioxy-N-ethylamphetamine (MDEA).

**DIBUTYLONE**

Dr. Willenbring testified that closely after Ethylone became controlled in China, who also controls substances much like the United States, he saw the emergence of Dibutylone in the United States.  (Id.: 43) As it concerned **Application Note 6 Prong (A)**, Dr. Willenbring described the chemical structure make-up of Dibutylone, which he testified is a controlled substance not referenced in the sentencing guideline, and opined that, after conducting a review of the United States Sentencing Guidelines its chemical structure is substantially similar to .    3,4-methylenedioxy-N-methylamphetamine (MDMA), a controlled substance that is referenced in the sentencing guideline

As he did for Ethylone, Dr. Willenbring testified to the number of similarities found in the chemical structures of Dibutylone and MDMA: the phenethylamine core structure, the 3, 4-methylenedioxy substitution (methylenedioxy ring), the alpha position alkylation, and the nitrogen substitution.  Exhibit 4:6-8) (Id.:44)   He testified to several minor differences between Dibutylone and MDMA: the single oxygen atom called a beta ketone that is found in Dibutylone but not MDMA, one of the carbon groups on the nitrogen atom, and an additional carbon unit on the alpha

position.  He testified that he believed the differences were minor, were changes consistent with their class of substances, and the type of modifications usually made to attempt to evade chemical control.  (Id.: 46-47)   Dr. Willenbring also testified that, while Dibutylone can be structurally similar to other substances, it is not **just** the chemical structure that makes the substance substantially similar and that they also work in conjunction with pharmacologists. (Id. 84)   Dr. Willenbring testified that his opinion, within a reasonable degree of scientific certainty is that, under United States Sentencing Commission Guidelines Manual § 2D1.1, Application Note 6(A), Dibutylone is substantially similar in chemical structure to 3,4-methylenedioxy-N-methylamphetamine (MDMA)

**Dr. Jordan Trecki- U.S.S.G. § 2D1.1, app. n.6(B)- Effect on the CNS Experience**

Dr. Jordan Trecki, who, since August 2012, has been a Pharmacologist with the Drug and Chemical Evaluation Section of the Diversion Control Division, at the Drug Enforcement Administration (DEA).   He is a graduate of Duquesne University in Pennsylvania, and has a Master's degree from Georgetown University. He holds a Ph.D. in Pharmacology from Temple University School of Medicine. He returned to the Department of Neuroscience Georgetown University for a "post doc" in traumatic injury and Parkinson's Disease.  He worked as a toxicologist with the EPA, prior to his current  position with DEA.

His impressive credentials, including Research Funding Awarded, Peer-Reviewed Publications, Abstracts, Posters & Invited Talks at Scientific Symposia, Accomplishments and Honors Membership in Professional Societies And Committees more fully detailed in his resume (Exhibit 6) Dr. Trecki supplemented that he has a new publication on the effects of synthetic cannabinoids, involved in an outbreak in New York City, that was not yet added to his resume. (DE 216: 89-90)

7

As a pharmacologist, Dr. Trecki testified that his role is to research and report on various assigned substances, whether licit or illicit.   This could be a drug from a pharmaceutical company that may have passed clinical trials and now needing a certain schedule under the CSA or, it could include drugs illicit in nature, like the drugs in this case, bath salts, cannabinoids, various substances that need to be analyzed.  He is a member of a section comprised of pharmacologists, who, like the DEA chemists, work in conjunction looking at various substances, and work to come to a consensus and present it to the supervisors.  (DE 216 :89)

Dr. Trecki detailed what it took for him to obtain his Ph.D. in Pharmacology.  He testified that the degree began with two years of specialized courses, "courses with the name pharmacology in them," principles of pharmacology, neuro pharmacology, drug abuse, various courses, lab rotations, techniques, handling, behavioral experiments, in vitro work.   That coursework was followed by multiple years of his research project, going through dissertations and different exams from the different professors on the committee, and once the research was complete, he defended his thesis in front of the committee and that followed with graduation. (Id.: 91)

Dr. Trecki stated a Ph.D. in pharmacology was not the same as a Ph.D. in chemistry, and that one does not become a pharmacologist merely by proctoring or administering pharmacology exams, by reading the articles, reports or works of other pharmacologists, or by testifying in court a few times.  He described how his "post doc" also involved pharmacology, in terms of the studies they conducted, doing behavioral studies, looking at the effects of Parkinson's and syndrome; using laboratory animals, histology, brain sections and using the tools that pharmacologists use in the discipline.  As opposed to looking at the chemical structure of the drugs, Dr. Trecki stated he did the behavioral work, which is what defines what a pharmacologist does. (Id.: 92)

8

Since working as a Pharmacologist with DEA, Dr. Trecki estimated he has been asked to specifically look at a few hundred substances, and is currently tracking between 200 and 300 synthetic cannabinoids on the illicit market; those that are controlled and possible controlled substance analogues, 20 to 30 of the bath salt/cathinone substances, as well as approximately 150 synthetic versions of fentanyl on the market.  He works in a laboratory and has done both in vitro studies and in vivo studies.  He estimated that he has provided Rule 16 summaries for and testified in court proceedings for approximately 40 to 50 substances, and has given presentations on the comparisons of illegal drug substances in court testimony settings as well as various outside audiences, including field officers, medical examiners, and poison centers. (Id.:94)

Dr. Trecki has testified as an expert in Pharmacology, in federal courts around the country, in **Daubert** hearings, trials, and sentencing hearings, and has never been found to be not qualified. (Id.: 95; Exhibit 7)   Some of these hearings included Ethylone.

For this case, he provided Rule 16 summaries for his opinions regarding Ethylone and Dibutylone. (Exhibits 8-9)   He, like Dr. Willenbring, prepared an exhibit for the Court to assist him in explaining his opinions (exhibit 10)   Dr. Trecki's testimony was clear and concise, using all available data, and to the extent practicable, evaluated the effects and potency of both Ethylone and Dibutylone.  Dr. Trecki testified that he has been studying this class of substance his entire career at DEA and noted the purpose of their abuse is two-fold. One is to mimic other drugs of abuse, like methamphetamine, cocaine, MDMA, and the other is to avoid detection in drug tests. (DE 216: 103-104)   Dr. Trecki also detailed the wealth of knowledge that he has accumulated in addition to pharmacology studies and uses to form his opinions on the effects of the drugs; reports, field agents, medical examiners, coroners, physicians, and users of these substances, both in court

settings, testimony.  He has looked at the tracking of the way the drugs come into the country, the shipping, manufacturing and marketing. (Id. :104, 106)        Dr. Trecki also detailed in his slide presentation (Exhibit 10:3-5) the concerns and factors that the Sentencing Commission took into account when it made its ratio recommendation to Congress regarding MDMA and the similarity of the rise Ethylone and Dibutylone. (Id.: 107-111)

Like Dr. Willenbring, Dr. Trecki noted that with Phenethylamines, such as MDMA and MDEA, Dibutylone and Ethylone, the intent of the manufacturers when designing these synthetic drugs of the substances was to make modifications, but retain the pharmacological properties; and to skirt prosecution, to avoid making the same or identical molecule listed as the illicit substance or illegal drug, but keep the same effects to give the user the desired effects that the last drug had. Ethylone compares to MDEA, and Dibutylone compares to MDMA, having substantial pharmacological properties, similar properties, specifically stimulant effects on the Central Nervous System. (Id. 114)  Dr. Trecki noted that MDMA has been around for quite a few decades, and has been replaced by additional drugs, like this case, with the effects of the drugs continuing to be the same- users having serious adverse effects, including overdose or death, purchasing what they call on the streets "Molly", substances coming in the mail from China, not really knowing what they are getting because as substances get controlled in China, new substances take their place, but are being used for the same purpose. (Id. 115-122) (Exhibit 10: 7-9)

**ETHYLONE**

Dr. Trecki testified, based on studies he has reviewed and his own Structural Activity Relationship Analysis, as it concerns **Application Note 6 Prong (B)**, Ethylone, which is not referenced in the Sentencing Guidelines, has a pharmacological effect (stimulant effect) on the central nervous system that is substantially similar to the pharmacological effect (stimulant effect)

10

on the central nervous system of MDEA, which is a controlled substance referenced in the Sentencing Guidelines.  (Exhibits 8, 10:10) (Dr. Trecki testified that both in vitro and in vivo studies, Ethylone and MDEA, which he calls its non-beta-ketone analog, have a stimulant effect on the central nervous system. (Exhibit 8)  Ethylone, like MDEA, has been shown inhibit dopamine transporters, inhibits serotonin transporters, and norepinephrine.  (DE 216: 122-124)

Additionally, data from recent drug discrimination studies (in vivo studies), since he testified in **United States v. Bully**, 15-CR-80068- RLR, demonstrate that Ethylone, like MDEA, **fully substitute**s for the discriminative stimulus effects produced by methamphetamine in rats. According to Dr. Trecki, due to the fact that human testing with the toxic substance is ill-advised, the drug discrimination study in animals is one of the most selective animal models used to predict stimulant-like subjective effects in humans.  In the drug discrimination paradigm, if a new drug or substance has discriminative stimulus effects in animals similar to a known drug of abuse, this new drug or substance highly likely to produce pharmacological and subjective effects in humans, similar to the known drug of abuse and would be similarly abused by humans.  Looking at the animal studies of Ethylone, this meant that the animals could not differentiate between the Ethylone or methamphetamine when administered. Additionally, MDEA has been shown to substitute for MDMA, and MDMA substitute for methamphetamine.  (DE 216: 124).  Dr. Trecki opined that using available data from in vitro and in vivo experiments, accompanied by published and peer reviewed case reports, the most closely related substance to Ethylone **is** MDEA.

As further evidence of Ethylone's effect on human's, Dr. Trecki testified regarding the numerous case reports and scientific studies, including the Lee study set forth in the Journal of Analytical Toxicology, which have also demonstrated the dangerous level of the adverse effects

11

of Ethylone on humans, acute Ethylone intoxication and related fatalities. (Id. 125- 129; Exhibit 10:11-12; Exhibits 11, 12, 13)

Dr. Trecki testified that his opinion, within a reasonable degree of scientific certainty is that, under United States Sentencing Commission (USSC) Guidelines Manual § 2D1.1, **Application Note 6: (B)** the stimulant effects of Ethylone on the central nervous system are substantially similar to 3,4- methylenedioxy-N-ethylamphetamine (MDEA), a Controlled Substances Act (CSA) schedule I substance.

**Regarding U.S.S.G. § 2D1.1, app. n.6 (C),** while Ethylone has been shown to be less potent in the drug discrimination assay than MDEA, drug discrimination tests demonstrate that Ethylone and MDEA both have subjective effects that are substantially similar to the effects of methamphetamine. As a result, Dr. Trecki's opinion is that that the effects of Ethylone are substantially similar to MDEA. (Exhibit 8)

### DIBUTYLONE

Dr. Trecki testified that based on studies he has reviewed and his own Structural Activity Relationship Analysis, as it concerns **Application Note 6 Prong (B),** Dibutylone, which is not referenced in the Sentencing Guidelines, is expected to have a stimulant effect on the central nervous system that is substantially similar to the stimulant effect on the central nervous system of 3,4-methylenedioxy-methylamphetamine (MDMA), which is a controlled substance referenced in the Sentencing Guidelines. (Id. :130)  (Exhibit 9- Rule 16 Summary)

Dr. Trecki testified his opinion is couched in that fashion, as he previously did for Ethylone in **US. v. Bully**, because in vivo studies have not yet been completed, and that DEA is in the process of contracting out studies for dibutlyone, along with many others.  He testified that in vitro studies have shown Dibutylone and MDMA both inhibit dopamine transporter, resulting in

an abundance of dopamine within the central nervous system, consistent with the drug having a stimulant effect on the central nervous system. (Exhibit 16)   Dr. Trecki testified that he bases the aforementioned opinion on everything that is known collectively, the case report, in vitro and historical information on the drug, such as structure, modifications made to it, history of where the drugs came from and what the ones before it did, and similar modifications. (Id.:156)   He did not feel that the additional hallucinogenic properties of MDMA affected the stimulation observed with MDMA, and still felt that Dibutylone was substantially similar due to it being a stimulant. (Id. :167).

Dr. Trecki discussed bulletins that came out in the Fall of 2016 related to the adverse effects specific to Florida, where an individual under the influence of Dibutylone committed an attack. Recent law enforcement reports have detailed the adverse effects of Dibutylone on humans, and like MDMA the adverse effects include stimulant effects, and hallucinations.  He showed the court that Dibutylone is coming from China on the right and can produce amounts similar to what a kilo of Ethylone or Methylone or MDMA can produce in terms of quantity.   He detailed how the controlled status of drugs in China correlated to their decrease of use in the U.S. and the rise of similar substances.  Ethylone began to decrease as Dibutylone has been increasing.

Dr. Trecki acknowledged that regarding the third item of Application Note 6,  Prong (C), potency cannot be determined from an in vitro study alone.   However, he testified that Dibutylone is following the same pattern as Ethylone and MDMA, if one looks at the history of the drugs, where it came from, the structure of it, structure activity relationships, what the modifications were, in vitro, and the case report involving the attack by an individual that had used Dibutylone, which included that the person experienced stimulant effects, tremors, euphoria, dysphoria as reported by the first responders and police.  (Id.:151).

Dr. Trecki testified that he relied on in vitro studies, the case report, and the history of these drugs to come up with his opinion, which was, within a reasonable degree of scientific certainty is that, under United States Sentencing Commission (USSC) Guidelines Manual § 2D1.1, Application Note 6: (B) the stimulant effects of Dibutylone on the central nervous system are expected to be substantially similar to 3,4-methylenedioxy-N-methylamphetamine (MDMA), a Controlled Substances Act (CSA) schedule I substance.

**DEFENDANT'S TESTIMONY**

The Defendants collectively presented two expert witnesses, Dr. Gregory Dudley and Anthony DeCaprio, to testify at sentencing.  The Government submits that each of their testimonies should be given little if any weight by the Court, and greatly discounted due to their lack of experience in these very specialized fields, deficiencies in their specialized knowledge, credibility issues brought out on cross examination and bias, motivated by personal monetary gain.

**Dr. Gregory Dudley:**

**Lack of credentials, lack of experience, bias, and deception**

The Government objected to Dr. Gregory Dudley testifying as an expert in Pharmacology. The Court overruled the objection and graciously permitted Dr. Dudley to testify both as an Expert in Chemistry and Pharmacology.

Dr. Dudley, who received his Ph.D. in Organic Chemistry from the Massachusetts Institute of Technology, discussed his very limited experience in areas that barely "morph" into the subject qualifying him as a Pharmacologist.  For instance, Dudley was on the faculty at  Florida A&M in the area of pharmacy and pharmaceutical sciences, and served on the Ph.D. advisory committees, because students asked him to serve on their Ph.D. committees, and examined and participated  in the examination of the students.  (DE 216: 175)   He now teaches at West Virginia University,

where the chemistry and biochemistry department are separate departments, and are in separate colleges within the University.  In addition, Pharmacology is a separate college at the university. Dr. Dudley vaguely claimed to have written three papers that dealing with the synthesis and pharmacological analysis of substances for which there was a hypothesis that these substances would produce or not produce a particular pharmacological effect on pharmacological effect. (Id.:177)  Over the Government's strenuous objection, and previously filed as a motion in limine, the Court ruled it was considering him to be an expert in pharmacology and chemistry.

Unlike Dr. Trecki, Dr. Dudley does not hold a PhD. in Pharmacology, never passed any exams in pharmacology for his PhD., did not do a doctoral dissertation in pharmacology, MIT had no pharmacology department when he got his PhD., duties he performed on a regular basis in those chemistry departments were not those of a pharmacologist, he worked in chemical synthesis. In the School of Pharmacy and Pharmaceutical Sciences at FAMU, he gave tests. Prior to being called as an expert in these sort of cases, he hadn't engaged in any study of these particular substances, synthetic cannabinoids, or synthetic cathinones, as they compare to substances in the Sentencing Guidelines.  He had never conducted any types of experiments with regard to the substances, and had not written any reports prior to being asked to consult on cases like this.  Nor had he ever testified before the Sentencing Commission nor was he ever asked his opinions. (DE 217: 30-33) He has never done in vitro studies, in vivo studies, never performed drug discrimination studies, never spoken to users or law enforcement officers about Ethylone or Dibutylone. (Id.: 63-65)  He doesn't believe that the effects on a human being or animal is more important than an in vitro study (Id.:. 65)

Regarding his resume, Dr. Dudley made a number of what can be characterized as misleading statements concerning prior testimony as an expert in Pharmacology, which should

cause this Court to pause in accepting his opinions as an expert on **any** topic. Dr. Dudley makes statements in his resume, touting his testimony in the area of pharmacology, for attorneys to review in hiring decisions, and for the Courts to review in making their decisions whether to accept him as an expert in Pharmacology, despite the fact that the Courts have specifically ruled he is not qualified.

In a number of cases, where the court specifically ruled he was not being qualified as an expert in pharmacology, Dr. Dudley. Nowhere is that material fact mentioned. For instance, for **US v Saher Abdallah**, Dr. Dudley stated in his resume, "Qualified as an expert in chemistry; testified on molecular structure and pharmacology. Provided expert testimony and opinion on the preparation, molecular pharmacology, and pharmacological effects of so-called "synthetic marijuana" containing the controlled substance XLR-11 as compared to marijuana and THC. (DE 178: 20) Under oath, he acknowledged that the Court specifically stated that Dr. Dudley **was not** a pharmacologist, and ruled the Government's objection to the defense witness rendering pharmacological opinions sustained (DE 217: 34-35) (Exhibit 20:2) None-the-less, Dr. Dudley disobeyed the Court's ruling and spoke on matters of pharmacology.

For the case of **US. v. Wagner Cruz**, which was **U.S. v. Chauca et al**., (FLMD) 8:14-cr-409, Dr. Dudley stated he was "Qualified as an expert in chemistry; testified on chemistry and pharmacology Provided expert testimony and opinion on the chemical structure, pharmacological effects, and potency of the controlled substance, methylenedioxyethcathinone (MDEC, Ethylone). (DE 178: 22) In that case, the record confirmed, that the Court again ruled Dr. Dudley was not a pharmacologist, sustaining the Government's objection to his expertise as a pharmacologist (DE 217: 37, 43, Exhibit 18: 82) None-the-less, Dr. Dudley disobeyed the Court's ruling and spoke on matters of pharmacology.

In **The Smoke Shop, LLC** case, Dr. Dudley's resume claims he was "Proffered and qualified as an expert in chemistry and pharmacology Provided expert testimony and opinion on the chemical structure and pharmacological effects of UR-144 and XLR-11, alleged to be Controlled Substance Analogues of JWH-018" (DE 178: 23)  In that case, Dr. Dudley was never offered or accepted by the Court as an expert in pharmacology, he, admittedly, merely testified to his subjective opinion. (Exhibit 19: 70, 52-161)

Dr. Dudley testifies the way he does, and makes the misrepresentation he does in his resume so that he will be hired and continued to be hired as an expert in these types of cases, involving synthetic controlled substances.  His place of employment is at a West Virginia State University that gives him a salary, expecting a 40 hour work week, from which he is not required to deduct his time spent on his expert preparation, travel and testimony time.  He only testifies for the defense.  He charges between $250 up to $500 an hour for his preparation, travel, and court time. (Id.:68)  His travel is reimbursed by the client.  He recycles his reports and slide presentation, charging the clients and the Courts by the hour, for his reports, for his time over the phone, for his time in court, regardless if he testifies or not, and regardless if he is accepted as an expert of not. He conveniently doesn't remember how much he has made on his expert testimony. (DE 217:49-54)

**ETHYLONE**

Dr. Dudley's report regarding Ethylone states "In my opinion, it is reasonable to identify MDMA or MDEA — not cocaine — as the most closely related controlled substance in the guidelines based on the chemical structure and the available pharmacology data.  (Defense Exhibit 6/ DE 178: 59)  Dr. Dudley then testified on direct that he disagreed with Dr. Willenbring's opinion and he considers the ketone functional group to be an important structural feature and do not

consider substances that differ in the absence of a ketone to be substantially similar in chemical structure. (DE 216: 199-200) Dr. Dudley did his best to disagree with Dr. Willenbring, and exaggerated the minimal difference, describing his slide, the first line as similar and then thenext couple of lines as the same and then the last line as different. (Id. 203-204)

Dr. Trecki, however testified that the addition of the beta ketone does not decrease the stimulation, its pharmacological properties are retained.  (DE 216: 167)  **The guidelines do not require a comparison of physical properties.** If he followed his argument to its logical conclusion, he would not have ignored the ether functional group, which he identified as an alkyl, and the methylenedioxy ring that is common to both MDEA and Ethylone but lacking in Methylone. This is one structural difference, the methylenedioxy ring, that distinguishes Ethylone from Methylone, which he considers to be substantially similar.  The methylenedioxy oxygen atoms also can take part in chemical reactions and hydrogen bonding.

Interestingly, for chemical structure, Dr. Dudley chose to compare a group of selected substances to each other, some of which were either not in the guidelines at all, or contained in Schedules IV and V, as opposed to Schedule I, where Ethylone and Dibutylone are found.  In addition, he selected differences to these irrelevant substances, while comparing them to one another.

Regarding the effect of Ethylone, Dr. Dudley chose to cite in the vitro studies comparing Methylone to MDMA as opposed to comparing Ethylone to MDEA or MDMA.  (DE 217:58)  He also highlighted the differences in the neurotransmitters, that have no effect on its stimulant properties.  Dr. Dudley misquoted Dr. Trecki's comparisons of Ethylone to MDEA, and had to be corrected on the record.  (DE 217: 62).  Dr. Dudley's opinion regarding effect did not contradict Dr. Trecki.   In a round about way, trying to reinforce his opinions about Methylone, he

acknowledged that the studies categorize Ethylone as a stimulant with mixed cocaine/MDMA type properties and that the drug discrimination study shows that Ethylone is active as a stimulant in vivo laboratory animals. (DE 217:22) He confirmed that Ethylone is a stimulant, not a categorized as a depressant or as an a hallucinogen.(DE 217: 29) in contradiction to his testimony before the Court, Dr. Dudley also confirmed that in the **U.S. v. Palfalvi** Ethylone case, he testified that he agreed with Doctors Prilow and Willenbring that the substance listed in the guidelines that was most closely related to ethylone was MDEA.

DIBUTYLONE

Dr. Dudley testified that no substances in the sentencing guidelines are substantially similar to Dibutylone.  (Id. :208)  He then proceeded to conveniently choose other substances he believed were "comparable"   and then "most closely related" in his own convoluted interpretation of how the sentencing guidelines are to be read.   Notably, the cathinone group chosen by Dr. Dudley, for both substance are all are missing the methylenedioxy ring, as is the amphetamine group, with the exception of MDMA and MDEA, for Ethylone.

Dr. Trecki, in rebuttal stated that Dr. Dudley misinterpreted the data contained in his tables regarding the results of the various in vitro studies and opined that it was most likely due to his inexperience in the field. (DE 217: 138-139)

**Dr. Anthony DeCaprio:**

**Bias, lacks credibility**

Dr. DeCaprio was called by the Defendants to testify concerning Dibutylone and submitted a 16 page, 47 paragraph report that focused on many areas of his testimony, including the following: his inability to define the term substantially similar (¶¶ 7-12); that it is impossible to predict pharmacological effects and relative potencies of drugs in humans with a high degree of

confidence based on in vitro or animal data alone (¶14); that the use of in vitro data alone is unreliable (¶15); and that factors "B" and "C" of the marijuana equivalency determination for sentencing purposes as currently written do not represent an objective, reliable, and scientifically based approach to predicting the relative potency and pharmacological effect of an untested compound in comparison to a listed substance (¶17).

Dr. DeCaprio testified that it is not possible to predict the pharmacological effects of drugs on humans using in vitro and in vivo studies, advocated human studies, and acknowledged there have not been any human studies on Dibutylone. (DE 217 : 85-87) Despite his opinions on the unreliability of in vitro studies, Dr. DeCaprio then proceeded to give an opinion using substances not in the sentencing guidelines, as comparators to Dibutylone. Dr. DeCaprio, who was charging the federal government $325 an hour for his work on the case, even admitted that his report was used in a prior case with Ethylone and alpha-PVP, and that he had just updated it, adding Dibutylone. Dr. DeCaprio, however, failed to include the most recent Janowsky study, regarding Dibutylone in his update. (Id. :91)

Choosing to arbitrarily focus his testimony on Methylone, another substance not listed in the sentencing guidelines, as opposed to the substances involved in this case, Dr. DeCaprio proceeded to opine on the very areas that he stated were "impossible" to do (¶14), and he relied on data that his report claimed to be unreliable (¶15), and opined that MDMA was five times the potency of Methylone, butylone, Ethylone and Dibutylone, despite there being a study showing that MDMA was twice as potent as Methylone. (Id. :105, 100)

Dr. DeCaprio used a chart averaging very different pharmacological effects, despite testifying that in vitro study was not enough to answer the question of substantial similarity. (Id. 115) Dr. De Caprio opines on potency of substances he cannot testify are substantially similar.

20

(Id. :116)  Dr. DeCaprio largely based his analysis and testimony on a "tabulation of in vitro data on Methylone versus MDMA" chart taking a convoluted "average" of neurotransmitter release and inhibition of re-uptake, based solely on studies **he selected**, in direct opposition to his previous statements in ¶14 and ¶15, where he discredited the use of the very in vitro data he utilized.

Dr. DeCaprio did acknowledge that MDMA is pharmacologically similar to Dibutylone. (Id.: 111) He acknowledge that dopamine is the pleasure hormone, has a stimulatory effect, and is responsible for addiction because of the euphoric response (Id.: 89)  Dr. DeCaprio acknowledged that Ethylone had stimulant properties, but was unwilling to do so for Dibutylone, despite the Janowsky study.

Dr. DeCaprio agreed that the Cozzi team in their 1999 article stated that Methylone was similar in potency to methamphetamine and MDMA, resembling them in behavioral profiles.  He acknowledged that in doing so, Cozzi also referenced three other studies. (Id: 119-120) Regarding his tables, Dr. DeCaprio acknowledged his averages included several VMAT (SER) inhibition scores, previously determined by studies not to be important for behavioral effects.  (Id:222-224)

Dr. DeCaprio also acknowledged that studies show that cocaine, methamphetamine and MDMA fully substitute for each other in in vivo studies, and he acknowledged reviewing the Janowsky study, Dibutylone was compared to both cocaine and methamphetamine.

Dr. Trecki believed the manner in which Dr. DeCaprio attempted to blend together the various neurotransmitter in vitro assays, was improper, inappropriate "to average all of the different tests and laboratories to make a number that suits your opinion" and resulted in an unreliable calculation.(Id.:136-138)

Dr. DeCaprio's opinion is a scientific house of cards. It is an extrapolation of an extrapolation of an extrapolation based on data that he testified is impossible to use to predict the

21

pharmacological effects and relative potencies of drugs in humans with a high degree of confidence (¶14). He relied on a convoluted average based solely on a variety of in vitro studies that he selected to attempt to provide information as to whether a greater or lesser amount of Methylone, which he tried to compare to Ethylone and/or Dibutylone, would be needed to produce a substantially similar stimulant effect in the central nervous system as does MDMA. His logic, however, involves multiple comparisons to substances that aren't involved in this case, or in the U.S.S.G. drug equivalency table. Dr. DeCaprio's testimony was inconsistent, unreliable and unsupported by science. The Court should give little weight to his conclusions regarding pharmacological effects and potency of Ethylone or Dibutylone.

## ARGUMENT

In **United States v. Booker**, 543 U.S. 220, 125 S. Ct. 738 (2005), the Court held that the federal Sentencing Guidelines violated **Apprendi** and **Blakely** insofar as they were mandatory and to the extent that they allowed the upper limits of the sentence to depend on facts not established by the guilty plea or proven to a jury beyond a reasonable doubt. Rather than striking down the entire guidelines system, the Court made the guidelines advisory; in doing so, the Court severed and excised § 3553(b)(1), which had required district courts to impose a sentence within the guidelines range, and § 3742(e), which had set forth the scope and standard of review. In place of § 3742(e), the Court inferred from the statutory scheme that the appropriate standard of review is "reasonableness," regardless of whether the sentence falls within or outside the advisory guideline range. The "reasonableness" standard is tantamount to a deferential abuse of discretion standard. In performing this review, "reasonableness" must be measured against the factors outlined by Congress in 18 U.S.C. § 3553(a). **Booker**, 543 U.S. at 261. The factors set forth in 3553(a) factors include:

(1)the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence; (4) the need to protect the public; (5) the need to provide the defendant with educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) the pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

18 U.S.C. § 3553(a).

**ETHYLONE**

At the outset, the United States recognizes that, regarding Ethylone, this conversion issue has been previously litigated in other cases in both the Southern and the Middle District of Florida. The United States requests that the Court not stray from its previous ruling in this area, **United States v. Bully** ,and argues that the testimony in this case, as well as the prior litigation in both the Southern and the Middle District of Florida, should also prove useful to the Court.

The Government's witnesses are more experience in the fields of Chemistry and Pharmacology. They do this type of evaluation everyday, regardless of their opinions, their salary is not effected. They have nothing to gain from their testimony. It is their job to get it right. The greater credibility and weight should be given to the experts presented by the Government. The Court should view the substances in their totality, not one isolated facet in the comparison. The testimony established that the structure, effect and potency of Ethylone is substantially similar to MDEA. The Court should also take into account the history and purpose these drugs were created, for their similarity to the outlawed drugs MDEA and MDMA

23

In **United States v. Brey**, 627 Fed.Appx. 775, 778 (11th Cir. 2015), the government argued that Ethylone was substantially similar to MDEA, because the first two factors under Application Note 6, chemical structure and effect on the user, favored the government, while the third factor, potency, was an "unknown" that should be considered "neutral," so "the scales tip in favor of the Government." Id.   The district court agreed with the Government.  Brey appealed arguing that the district court clearly erred in determining that MDEA was the most closely related substance to Ethylone under Application Note 6 to § 2D1.1 because the government did not put forth any evidence establishing Ethylone's potency. The Eleventh Circuit found that the government produced reliable and specific evidence of the first two factors, chemical structure and effect on the user, which Brey did not challenge. The Eleventh Circuit found that Brey's argument that the lack of evidence of potency was fatal to the government's position—and the district court's ultimate conclusion—was not supported by the commentary to § 2D1.1. Application Note 6 which does not impose an absolute duty on the government to produce evidence about all three factors; rather, it requires only that the district court consider the three factors "to the extent practicable." U.S.S.G. § 2D1.1 cmt. n. 6 (emphasis added). Brey, 627 Fed.Appx at 780.

In **United States v. Pangourelias**, case no. 8:14-cr-303-T-23EAJ, which also involved Ethylone, Judge Merryday ruled that Ethylone was substantially similar to MDEA stating that the 500 to 1 ratio is not optional and that the guidelines do not yield discretion in that regard to the courts. Judge Merryday stated on the record, "I'm not invited here to promulgate a new ratio under simply a statement that maybe the Guidelines should have used some other substance or the like given the substance that they used that the ratio is wrong or some better ratio is available." *Id.*, Page 117. "I recognize under the present regime I am authorized to grant -- to impose a different

sentence than the one required by the ratio, but that is not a question of guideline interpretation nor is it a question of the applicability of the guideline[;] it [is] a question of the reasonableness of the resulting sentence." *Id.*, Page 118.

The Ethylone to marijuana equivalency issue was also litigated in the Middle District of Florida before Judge Honeywell in **United States v. Chauca**, et al, 8:14-cr-409-T-36TBM. On May 5, 2015, Dr. Dudley, Dr. Willenbring, and Dr. Prioleau each testified in that matter. The court likewise overruled the defense objection finding that Ethylone was substantially similar to MDEA, and applied the respective ratio. Id. at Doc.169 (Hearing Minutes).

In **U.S. v. Palfalvi**, Case No. 2:14-CR-79-FtM-38DNF, Dr. Daniel Willenbring, Dr. Cassandra Prioleau, a Pharmacologist who also works for DEA and Dr. Gregory Dudley testified, the Court ruled that Ethylone is most closely related to MDEA.

In **United States v. Kuhn**, 8:14-cr-485-T-26TGW, which also involved the presentation of expert testimony, Judge Lazzara applied the 1:500 ratio in a contested Ethylone case (Transcript at Doc.83).[1]

The Defendant's may try to argue that this Court should effectively create new guideline based on another substance, not set forth in the Sentencing Guidelines.

In **United States v. Marte**, 586 F. App'x. 574 (11th Cir. 2014), where the defendant appealed his sentence, the Eleventh Circuit held that "the district court did not clearly err in finding that methylone was most closely related to MDMA for purposes of determining Marte's base offense level" .  The Court further stated, "the commentary to section 2D1.1 does not impose a

___

[1] According to DEA, the Courts have also applied the 500 to 1 ratio for Ethylone in **U.S. v. Hernandez** (FLSD) 1:15-cr-20755; **U.S. v. Kelly** (NVD) 2:15-cr-41;  and **U.S. v. Warner** (FLMD) 6:16-cr-16.

CASE 2:16-cr-14002-RLR   Document 226   Entered on FLSD Docket 02/17/2017   Page 26 of 28

duty on the government to produce evidence about every feature of a controlled substance; instead, it instructs the district court to consider the features 'to the extent practicable.' U.S.S.G. § 2D1.1 cmt. n. 6.

The guidelines do not allow the court to modify the equivalency conversion based on drug potency. See **United States v. Ono**, 918 F.2d 1462, 1466-67 (9th Cir. 1990). The government believes that the correct approach is to calculate the marijuana equivalency ratio following the procedures set forth in the guidelines. Then, the Court may consider under the 3553(a) factors, whether that sentence is reasonable.

**DIBUTYLONE**

The Government's witnesses are more experience in the fields of Chemistry and Pharmacology.  They do this type of evaluation everyday, regardless of their opinions, their salary is not effected.  They have nothing to gain from their testimony. It is their job to get it right. The greater credibility and weight should be given to the experts presented by the Government.  The Court should view the substances in their totality, not one isolated facet in the comparison.  The testimony established that the structure, and effect and potency of Dibutylone is substantially similar to MDMA.  The Court should also take into account the history and purpose these drugs were created, for their similarity to the outlawed drugs MDEA and MDMA

In the instant case, the most closely related listed drug to Ethylone is MDEA, and the most closely related listed drug to Dibutylone is MDMA. The marihuana equivalency for these substances is 1:500. U.S.S.G. § 2D1.1, comment. n.6, 8(D). The PSR correctly sets forth the applicable offense levels.

Despite any contrary rulings, the defendant's objection in this regard should be overruled.

## Conclusion

Wherefore, the government respectfully requests that the Court find that the substance most closely related and substantially similar to Ethylone is MDEA, and that the the substance most closely related and substantially similar to Dibutylone HCI is MDMA and apply the ratio of 1:500 to both substances

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY


By: s/ Carmen M. Lineberger
Carmen M. Lineberger
Court ID 5501180
Assistant United States Attorney
Carmen.Lineberger@usdoj.gov
United States Attorney's Office
101 South US Highway 1, Suite 3100
Fort Pierce, FL   34950
Telephone:  772-466-0899
Facsimile:  772-466-1020
Attorney for United States of America

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2017, I electronically filed the foregoing *Government's Post Hearing Sentencing Memorandum Regarding the Marijuana Equivalency* with the Clerk of the Court using CM/ECF.

*s/ Carmen M. Lineberger*

Carmen M. Lineberger A5501180
Assistant United States Attorney